1  BORNSTEIN & BORNSTEIN
   Jonathan Herschel Bornstein (SBN 163392)
2  Kathryn Quetel (SBN 167100)
   2590 Geary Boulevard
3  San Francisco, CA 94115
   Telephone: (415) 409-7611
4  Fax: (415) 409-9345

5  SCHIFFRIN & BARROWAY, LLP
   Eric L. Zagar
6  280 King of Prussia Road
   Radnor, PA 19087
7  Telephone: (610) 667-7706
   Fax: (610) 667-7056

8
   Attorneys for Plaintiff
9

10              UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF CALIFORNIA
11

12  ROBERT KORHELY, Derivatively on        )   No. C 05-4642
    Behalf of Nominal Defendant             )
13  MERCURY INTERACTIVE                      )
    CORPORATION,                             )                         PJH
14                                           )
                      Plaintiff,             )
15                                           )
         v.                                  )   VERIFIED DERIVATIVE COMPLAINT
16                                           )
    BRAD BOSTON, IGAL KOHAVI,                )
17  AMNON LANDAN, CLYDE OSTLER,              )
    YAIR SHAMIR, SUSAN SKAER,                )
18  DOUGLAS SMITH, GIORA YARON, and          )
    ANTHONY ZINGALE,                         )
19                                           )
                      Defendants,            )
20                                           )
                      and                    )   JURY TRIAL DEMANDED
21                                           )
    MERCURY INTERACTIVE                      )
22  CORPORATION,                             )
                                             )
23                    Nominal Defendant.     )
    _____)
24

25

26

27

28

                              - 0 -
                    VERIFIED DERIVATIVE COMPLAINT

1    Plaintiff, as and for his Derivative Complaint (the "Complaint"), by her attorneys, alleges

2    upon personal knowledge as to herself and her own acts and upon information and belief as to all

3    other matters, as follows:

4                                          **NATURE OF THE ACTION**

5        1.    This is a shareholder's derivative action brought pursuant to Rule 23.1 of the

6    Federal Rules of Civil Procedure for the benefit of nominal defendant Mercury Interactive

7    Corporation ("Mercury" or the "Company") against the members of its Board of Directors (the

8    "Board") and certain executive officers seeking to remedy defendants' breaches of fiduciary

9    duties and unjust enrichment, and asserting claims under the Sarbanes-Oxley Act of 2002

10   ("Sarbanes-Oxley").

11                                        **JURISDICTION AND VENUE**

12       2.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and

13   1332(a)(2) in that the action states a federal question and plaintiffs and defendants are citizens of

14   different states and the matter in controversy exceeds $75,000, exclusive of interest and costs.

15   This action is not a collusive one to confer jurisdiction on a court of the United States which it

16   would not otherwise have.

17       3.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) and (c).  The

18   Company has its principal place of business in this District and the defendants and other

19   witnesses reside or transact business in this District.

20                                               **PARTIES**

21       4.    Plaintiff Robert Korhely, a citizen of the State of Arizona, is, and was at all

22   relevant times, a shareholder of Mercury.

23       5.    Nominal defendant Mercury is a Delaware corporation with its principal

24   executive offices located at 379 North Whisman Road, Mountain View, California 94043.

25   According to its public filings, Mercury is a provider of software and services for the business

26   technology optimization market.

27

28

1    6.    Defendant Amnon Landan ("Landan") served as Chairman of the Board and as
2    Chief Executive Officer of the Company from February 1997 until his resignation in November
3    2005.

4    7.    Defendant Douglas Smith ("Smith") served as Executive Vice President and
5    Chief Financial Officer of the Company from September 2000 until his resignation in November
6    2005.

7    8.    Defendant Susan Skaer ("Skaer") served as General Counsel of the Company
8    from 2003 until her resignation in November 2005.

9    9.    Defendant Anthony Zingale ("Zingale") has served as a director of Mercury since
10   July 2002. Zingale served as President and Chief Operating Officer of the Company from
11   December 2004 to November 2005 and currently serves as Chief Executive Officer of the
12   Company. Zingale served as a member of the Compensation Committee of the Board (the
13   "Compensation Committee") from July 2002 to December 2004.

14   10.   Defendant Giora Yaron ("Yaron") has served as a director of Mercury since
15   February 1996 and currently serves as Chairman of the Board. Yaron has served as a member of
16   the Compensation Committee at all times relevant hereto.

17   11.   Defendant Yair Shamir ("Shamir") has served as a director of Mercury since
18   August 1994. Shamir has served as a member of the Compensation Committee and as a member
19   of the Audit Committee of the Board (the "Audit Committee") at all times relevant hereto.

20   12.   Defendant Igal Kohavi ("Kohavi") has served as a director of Mercury since
21   January 1994. Kohavi has served as a member of the Audit Committee at all times relevant
22   hereto and served as a member of the Compensation Committee until July 2002.

23   13.   Defendant Brad Boston ("Boston") has served as a director of Mercury since May
24   2004.

25   14.   Defendant Clyde Ostler ("Ostler") has served as a director of Mercury and as a
26   member of the Audit Committee since May 2002.

27   15.   Collectively, the defendants identified in paragraphs 6-14 will be referred to
28   herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

16.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

17.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

18.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

> a.     exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;
>
> b.     exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;
>
> c.     exercise good faith to ensure that the Company's financial statements were prepared in accordance with Generally Accepted Accounting Principles ("GAAP"); and
>
> d.     refrain from unduly benefitting themselves at the expense of the Company.

19.    The Individual Defendants, particularly the officers and the members of the Audit Committee, were responsible for maintaining and establishing adequate internal accounting controls for the Company and to ensure that the Company's financial statements were based on accurate financial information. According to GAAP, to accomplish the objectives of accurately recording, processing, summarizing, and reporting financial data, a corporation must establish an internal accounting control structure. Among other things, the Individual Defendants were required to:

> (1)    make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and
>
> (2)    devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –
>
> > (a)    transactions are executed in accordance with management's general of specific authorization;
> >
> > (b)    transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles.

20.    Moreover, according to Appendix D to Statement on Auditing Standards No. 55 ("SAS 55"), management should consider, among other things, such objectives as: (i) making certain that "[t]ransactions are recorded as necessary ... to permit preparation of financial statements in conformity with generally accepted accounting principles ... [and] to maintain accountability for assets;" and (ii) make certain that "[t]he recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences."

21.    According to SAS 55.13:

> Establishing and maintaining an internal control structure is an important management responsibility. To provide reasonable assurance that an entity's objectives will be achieved, the internal control structure should be under ongoing supervision by management to determine that it is operating as intended and that it is modified as appropriate for changes in conditions.

22.    Mercury's Audit Committee Charter provides that the Audit Committee shall, among other things:

a. "review with management, the internal auditors and the independent auditors, in separate meetings if the Audit Committee deems it appropriate:

- the annual audited financial statements, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations", prior to the filing of the Company's Form 10-K;

- the quarterly financial statements, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations", prior to the filing of the Company's Form 10-Q;

- any analyses or other written communications prepared by management, the internal auditors and/or the independent auditors setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements;

- the critical accounting policies and practices of the Company;

- related-party transactions and off-balance sheet transactions and structures;" and

b. "review the Company's internal controls over financial reporting and disclosure controls and procedures. The review of internal control over financial reporting shall include whether there are any significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to affect the Company's ability to record, process, summarize and report financial information and any fraud involving management or other employees with a significant role in internal control over financial reporting."

## FACTUAL ALLEGATIONS

23. On July 5, 2005, Mercury issued a press release which stated:

In response to an informal inquiry of the Securities and Exchange Commission entitled In the Matter of Certain Option Grants, which was initiated by the SEC in November 2004, the Company's Board of Directors has appointed a Special Committee consisting of disinterested members of the Audit Committee to conduct an internal investigation relating to past stock option grants. The Special Committee is being assisted by independent outside legal counsel and accounting experts. Mercury continues to fully cooperate with both of these inquiries.

These inquiries could cause the Company to restate its financial statements for prior periods. Both the SEC inquiry and the Special Committee investigation are ongoing. Mercury is unable to determine at this time whether a restatement will be necessary, and if so, the years affected and the amounts involved. The Company does not believe that a restatement would have an impact on its historical revenues, cash position, or non-stock option related operating expenses.

- 5 -

The Company estimates that it has incurred approximately $1.0 million of unanticipated expenses in the second quarter of 2005 for both the Special Committee investigation and the SEC inquiry, which are excluded in the non-GAAP earnings per share estimates being provided in this press release.

24.   On July 28, 2005, Mercury issued a press release which stated:

As previously disclosed, in response to an informal inquiry initiated by the SEC, Mercury's Board of Directors established a Special Committee consisting of disinterested members of the Audit Committee to conduct an internal investigation relating to past stock option grants. The Special Committee is being assisted by independent outside legal counsel and accounting experts. The Special Committee has not yet completed its work or reached final conclusions. The Special Committee has, however, reached a preliminary conclusion that the actual date of determination for certain past stock option grants differed from the stated grant date for such awards, which would result in additional charges to Mercury for stock-based compensation expenses. The Special Committee is continuing its investigation. Based on the Special Committee's preliminary determination, Mercury believes, but has not yet concluded, that (i) such charges are likely to be material and (ii) accordingly, it is highly likely that Mercury will need to restate its historical GAAP financial statements, including those contained in this press release, and adjust the GAAP guidance in this press release to take into account additional charges for stock-based compensation expenses. Any such charges would have the effect of decreasing GAAP earnings and retained earnings figures contained in Mercury's historical GAAP financial statements and this press release. Mercury does not believe that the restatement, if required, would have an impact on its historical revenues, cash position, non- stock option related operating expenses or non-GAAP information included in this press release.

25.   On August 8, 2005, Mercury issued a press release which stated:

Mercury Interactive Corporation (NASDAQ:MERQ), the global leader in business technology optimization (BTO), today announced that it will not be in a position to timely file its Form 10-Q for its second quarter ended June 30, 2005, which is due on August 9, 2005.

As previously disclosed, Mercury's Board of Directors has established a Special Committee consisting of disinterested members of the Audit Committee to conduct an internal investigation relating to past stock option grants. Also as previously disclosed, the Special Committee has reached a preliminary conclusion that the actual date of determination for certain past stock option grants differed from the stated grant date for such awards, which would result in additional charges to Mercury for stock-based compensation expenses. The Special Committee is continuing its investigation, and has not yet determined the exact magnitude of the additional expenses to be incurred or the specific periods affected. Based on the Special Committee's preliminary determination, Mercury believes, but has not yet concluded that (i) such changes are highly likely to be material and (ii) it is highly likely that Mercury will need to restate its historic GAAP financial statements. Accordingly, Mercury is not in a position to file its Form 10-Q for the second quarter until (1) the Special Committee has reported results of its investigation to the Board of Directors, (2) Mercury has reached a final conclusion as to the need to restate its financial statements, and (3) all necessary restatements relating to periods covered by the Company's presently effective Form 10-K report have been made.

| | |
|---|---|
| 1 | Mercury is unable to determine at this time when the Special Committee will report on its investigation to the Board of Directors. |
| 2 | |
| | 26.  On August 12, 2005, Mercury issued a press release which stated: |
| 3 | |
| 4 | Mercury Interactive Corporation (NASDAQ:MERQ), today announced that due to the delay in the filing of its Form 10-Q for the period ended June 30, 2005, it has received a letter from the The Nasdaq Stock Market indicating that the Company's common stock is subject to delisting pursuant to Nasdaq Marketplace Rule 4310(c)(14). Nasdaq Marketplace Rule 4310(c)(14) requires the Company to make on a timely basis all filings with the Securities and Exchange Commission, as required by the Securities Exchange Act of 1934, as amended. |
| 5 | |
| 6 | |
| 7 | |
| 8 | Mercury will appeal the NASDAQ Staff's determination by requesting a hearing before the Nasdaq Listing Qualifications Panel, which will automatically stay the delisting of MERQ common stock pending the Panel's review and determination. Until the Panel issues a determination and the expiration of any exception granted by the Panel, Mercury's common stock will continue to be traded on The Nasdaq National Market. However, as a result of the delayed filing of its Form 10-Q, the trading symbol for the Company's common stock will be changed from MERQ to MERQE effective as of the opening of business on August 15, 2005. |
| 9 | |
| 10 | |
| 11 | |
| 12 | As previously announced, Mercury has delayed filing its Quarterly Report on Form 10-Q due to the internal investigation relating to past stock option grants being directed by a Special Committee consisting of disinterested members of the Audit Committee. Mercury does not believe that any restatement will have an impact on its historical revenues, cash position or non-stock option related operating expenses. Mercury is unable to determine at this time when the Special Committee will report on its investigation to the Board of Directors. Mercury intends to file its Form 10.Q for the second quarter as soon as practicable following the Special Committee's report to its Board of Directors. Prior to that time, Mercury anticipates that it will file a current report on Form 8-K to furnish certain information relating to Mercury's business overview for the second quarter. |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | "We are working with the Special Committee to complete the internal investigation into past stock option grants and complete our 10-Q filings," said Amnon Landan, chairman and CEO at Mercury. "The people of Mercury are focused on the success of our customers and executing our business plan to capitalize on our large and growing market opportunity." |
| 19 | |
| 20 | |
| 21 | Although the Company is fully cooperating with the Special Committee so that the Special Committee may finalize its investigation and the Company may complete its Form 10-Q, there can be no assurance that the Panel will grant the Company's request for an extension that would allow the continued listing of the Company's common stock on The Nasdaq Stock Market until the Company files its Form 10-Q for the quarter ended June 30, 2005 with the Securities and Exchange Commission. |
| 22 | |
| 23 | |
| 24 | |
| 25 | 27.  On August 29, 2005, Mercury issued a press release which stated: |
| 26 | Mercury Interactive Corporation (NASDAQ:MERQE) previously disclosed that it had created a Special Committee, comprised of disinterested members of the Audit Committee of the Board of Directors, in response to an informal inquiry initiated by the Securities and Exchange Commission. Based on the Special Committee's preliminary investigation, the Company had previously stated that it |
| 27 | |
| 28 | |

was highly likely that it would need to restate its historical financial statements but had not reached a definitive conclusion.

Mercury has now concluded that its previously issued financial statements for the fiscal years 2002, 2003 and 2004, which are included in the Company's Annual Report on Form 10-K for the year ended December 31, 2004, the Quarterly Reports on Form 10-Q filed with respect to each of these fiscal years and the financial statements included in the Company's Quarterly Report on Form 10-Q for the first quarter of fiscal year 2005, should no longer be relied upon and will be restated. In addition, the restatement will affect financial statements for prior fiscal years, and the Company will also require a revision of the previously reported financial information included in its press release of July 28, 2005 and its Current Report on Form 8-K dated August 17, 2005.

Mercury intends to complete the restatements and make the required amended Form 10-K and Form 10-Q filings and to file its Form 10-Q for the second quarter of fiscal year 2005 as soon as practicable following completion of the Special Committee investigation, the Company's review and restatement of its historical financials and completion of the audit process. The Company does not expect that it will be able to complete this process and make the required filings before November 2005.

The errors resulting in the required restatement relate to the Special Committee's conclusion that the actual dates of determination for certain past stock option grants differed from the originally selected grant dates for such awards. Because the prices at the originally selected grant dates were lower than the price on the actual dates of determination, the Company will incur additional charges to its stock-based compensation expense which were not included in the above-referenced financial statements. The Company has determined that the amounts of these charges are material but has not yet determined the final amount of the additional charges to be incurred.

Additionally, Mercury is evaluating Management's Report on Internal Control Over Financial Reporting set forth in Item 9a on page 53 of the Company's 2004 Annual Report. Although Mercury has not yet completed its analysis of the impact of this situation on its internal controls over financial reporting, it has determined that it is highly likely that Mercury had a material weakness in internal control over financial reporting as of December 31, 2004. A material weakness is a control deficiency, or a combination of control deficiencies, that results in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected. The existence of one or more material weaknesses as of December 31, 2004 would preclude Mercury from concluding that its internal controls over financial reporting were effective as of year end. If Mercury were to conclude that a material weakness existed, it would expect to receive an adverse opinion on internal control over financial reporting from its independent registered public accounting firm.

As previously disclosed, Mercury does not believe that any restatement will have an impact on its historical revenues, cash position or non-stock option related operating expenses. Any charges will have the effect of decreasing the earnings and retained earnings figures contained in Mercury's historical financial statements.

Notice From Trustee on Convertible Notes

Mercury today also disclosed that it has received from the trustee for the Company's $500 million aggregate principal amount of Zero Coupon Senior Convertible Notes due 2008 and the Company's $300 million aggregate principal amount of 4.75% Convertible Subordinated Notes due 2007 (together, the "Notes") a notice of default on the Notes. As a result of the Company's failure to file with the Securities and Exchange Commission its Quarterly Report on Form 10-Q for the quarter ended June 30, 2005, the Company has violated indenture provisions that require Mercury to furnish such information promptly to the trustee.

Under the indentures relating to the Notes, the Company has until October 25, 2005 to cure its breach by filing with the Securities and Exchange Commission and providing to the trustee its Quarterly Report on Form 10-Q for the quarter ended June 30, 2005. If Mercury does not cure its breach within that period, either the trustee for the Notes or the holders of at least 25% of the aggregate principal amount of the outstanding Notes could, by giving the Company an additional notice, accelerate the maturity of the Notes, causing the outstanding principal amount plus accrued interest to be immediately due and payable.

"Given the continued strength of Mercury's financial position, we are disappointed to have received the notice," said Doug Smith, chief financial officer at Mercury. "Mercury has the available cash and investment securities to fully retire any and all amounts of the Notes should they accelerate, as well as to provide for the Company's working capital needs."

As of August 26, 2005, all required interest and principal payments have been timely made on the Notes. If the maturity of the Notes is accelerated, the Company intends to fully repay all such amounts due. As of June 30, 2005, the Company had approximately $1.32 billion of cash and investments.

28.     On November 2, 2005, Mercury issued a press release which stated:

Mercury Interactive Corporation (NASDAQ:MERQE) today announced that the Board of Directors has named Anthony ("Tony") Zingale as chief executive officer. Mr. Zingale, who joined Mercury in December 2004 as the Company's president and chief operating officer, is a highly regarded executive with more than twenty years of experience building profitable, high growth information technology companies. David Murphy, who joined the Company in 2003 as senior vice president, corporate development, has been named chief financial officer. Dr. Giora Yaron, a member of the Mercury Board since 1996, has been elected Chairman of the Board.

The appointments of Mr. Zingale, Mr. Murphy, and Dr. Yaron follow the presentation of determinations by the Special Committee and its independent counsel, O'Melveny & Myers LLP to the Board of Directors regarding the previously announced investigation.

As previously announced, the Special Committee was formed in June 2005 to conduct an internal investigation relating to past stock option grants in response to an inquiry which was initiated by the Securities and Exchange Commission in November 2004. The Special Committee, its outside legal counsel and accounting experts reviewed millions of pages of documents, interviewed numerous individuals, and engaged in a forensic audit of the issues under investigation. As a

- 9 -

part of its continuing investigation, the Special Committee has determined the following:

From 1995 to the present, there have been forty-nine instances in which the stated date of a Mercury stock option grant is different from the date on which the option appears to have actually been granted. In almost every such instance, the price on the actual date was higher than the price on the stated grant date. These instances represent the overwhelming majority of the grants between January 1996 and April 2002. The misdating occurred with respect to grants to all levels of employees.

Chief Executive Officer Amnon Landan, Chief Financial Officer Douglas Smith, and General Counsel Susan Skaer were each aware of and, to varying degrees, participated in the practices discussed above. Each of them also benefited personally from the practices. While each of these officers asserts that he or she did not focus on the fact that the practices and their related accounting were improper, the Special Committee has concluded that each of them knew or should have known that the practices were contrary to the options plan and proper accounting. While the Special Committee is appreciative of and sympathetic to the far-reaching demands of these executives' positions during this critical period, missing or overlooking a practice as basic and important as the proper granting of options is not acceptable.

On at least three occasions, between 1998 and 2001, exercise dates for options exercised by Mr. Landan appear to be incorrectly reported, which would have had the effect of reducing Mr. Landan's income and exposing the Company to possible penalties for failure to pay withholding taxes.

In addition, a $1 million loan to Mr. Landan in 1999 (which has since been repaid) did not appear to have been approved in advance by the Board of Directors and was referred to in some of the Company's public filings, but was not clearly disclosed.

Intentional selection of a favorable price for option grants appears to have ended in or about April 2002, at which time the Company began to follow a different dating practice for grants.

The Special Committee believes that questions should have been raised in the minds of the Compensation Committee members from 1995 through 2002 (who included present directors Igal Kohavi, Yair Shamir and Dr. Yaron) whether six grants that they approved by unanimous written consent were properly dated. It appears that the Compensation Committee members reasonably, but mistakenly, relied on management to draft the proper documentation for the option grants and to account for the options properly. The Special Committee believes that changes in Board procedures made in recent years will prevent similar oversights occurring in the future.

During the relevant period, Mercury's internal controls and accounting controls with respect to option grants and exercises were inadequate. The weaknesses allowed dates of both grants and exercises to be manipulated. They also allowed grant dates to be changed to provide employees with more favorably priced options. The Company began to improve its controls and procedures in April 2002 and has continued to improve them. The Special Committee believes that changes that Mercury has made with respect to its option practices will help prevent a recurrence of the problems.

Based on the evidence reviewed during its investigation, the Special Committee has concluded that the actions of Mr. Landan, Mr. Smith and Ms. Skaer are not acceptable.

Accordingly, the Board has accepted the resignations of Mr. Landan as chairman, chief executive officer and director, Mr. Smith as executive vice president and chief financial officer, and Ms. Skaer as vice president, general counsel and secretary. Pursuant to his employment agreement, Mr. Landan is entitled to 60 days prior notice for his resignation being effective. He is being relieved of all his duties immediately.

The Company expects revenue to be $205.0 million to $210.0 million for the third quarter ended September 30, 2005. As a result of these announcements and the findings of the Special Committee, the Company is not in a position to provide its entire financial results for Q3 2005. The Company is working diligently to determine the impact of the misdated stock grants identified by the Special Committee, and the impact of the new issues related to misdated option exercises and certain loans to officers in 1998, 1999, and 2001 on its current and historical financial statements included in its current report on Form 10-K and its report on Form 10-Q for the first quarter of 2005. The Company does not believe that these items will have an impact on its historical revenues, cash position or non-stock option related operating expenses. Due to the pending restatement, the Company is not able to give GAAP fully diluted earnings per share or non-GAAP fully diluted earnings per share at this time. The Company believes that its ability to file amended reports by November 30, 2005 on Form 10-K and Form 10-Q with the Securities and Exchange Commission with respect to such periods is in serious jeopardy.

The Company anticipates that the fourth quarter will be challenging and at this time we will not provide guidance for Q4 2005.

As previously announced, the Company may be delisted by NASDAQ in the event it does not complete such restatements and submit the required filings to the SEC by November 30, 2005. The Company anticipates providing the Panel with a revised plan of compliance by no later than November 15, 2005. There is no assurance that the Panel will provide the Company with any additional extensions beyond November 30, 2005.

The Company's Board of Directors stated, "Amnon Landan should be credited with establishing the Company as a leader in its markets. However, the adverse findings of the Special Committee's investigation make it appropriate for him, and the other two individuals, to relinquish their positions. Mercury is well served having Tony Zingale assume the leadership of the Company. He is a highly respected professional, with a proven track record. He is knowledgeable about Mercury, its markets, and customers. He is uniquely qualified to lead Mercury for long-term success."

"Mercury is committed to achieving consistently strong profitable growth over the long term to the benefit of its customers, people, and in so doing, realizing enhanced value to shareholders," said Tony Zingale, Mercury's new chief executive officer. "Our focus is to ensure we capitalize on our significant market opportunity, clear technology leadership, great people, and loyal customer base."

"Similarly, our constituencies can be fully assured that Mercury will be a model for best business practices and full compliance with all regulatory and legal requirements. This is a responsibility that we have to all our constituencies and is a core element of our business foundation going forward," concluded Mr. Zingale.

### THE INDIVIDUAL DEFENDANTS' BREACHES OF FIDUCIARY DUTIES AND UNJUST ENRICHMENT

29. The Individual Defendants, through their receipt of reports; attendance at Board, Compensation Committee, Audit Committee, and/or management meetings; and discussions with Mercury officers and employees, had actual knowledge of Mercury's improper option granting and accounting practices, as described herein.

30. In breach of their fiduciary duties of loyalty and good faith, each of the Individual Defendants knowingly participated in and/or wilfully ignored the Company's obvious and pervasive misconduct, from which all of the Individual Defendants except Boston and Ostler personally benefitted.

31. As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, the Company has sustained damages, including, but not limited to, costs and expenses incurred in connection with the Company's internal investigation, the SEC's investigation of the Company, the Nasdaq delisting proceedings, and the breach of the Company's convertible note indentures.

32. All of the Individual Defendants except Boston and Ostler personally benefitted from, and were unjustly enriched by, Mercury's improper option granting and accounting practices. From 1995 to 2002, the following Individual Defendants received the following option grants, the values of which were improperly inflated as a result of Mercury's improper option granting and accounting practices:

| Name | Year | No. of Options |
|------|------|----------------|
| Landan | 1995 | 30,000 |
| | 1996 | 780,000 |
| | 1997 | 640,000 |
| | 1998 | 322,680 |
| | 1999 | 720,000 |
| | 2000 | 700,000 |
| | 2001 | 700,000 |
| | 2002 | 700,000 |

| | | | |
|---|---|---|---|
| Smith | 2000 | 450,000 | |
| | 2001 | 500,000 | |
| | 2002 | 0 | |
| Yaron | 1996 | 60,000 | |
| | 1997 | 10,000 | |
| | 1998 | 120,000 | |
| | 1999 | 20,000 | |
| | 2000 | 10,000 | |
| | 2001 | 10,000 | |
| | 2002 | 10,000 | |
| Shamir | 1995 | 10,000 | |
| | 1996 | 10,000 | |
| | 1997 | 10,000 | |
| | 1998 | 120,000 | |
| | 1999 | 20,000 | |
| | 2000 | 10,000 | |
| | 2001 | 10,000 | |
| | 2002 | 10,000 | |
| Kohavi | 1995 | 10,000 | |
| | 1996 | 10,000 | |
| | 1997 | 10,000 | |
| | 1998 | 120,000 | |
| | 1999 | 20,000 | |
| | 2000 | 10,000 | |
| | 2001 | 10,000 | |
| | 2002 | 10,000 | |

33. Furthermore, based on the Company's materially inaccurate financial results for fiscal years 2002 through 2004, defendants Landan and Smith received the following salaries and cash bonuses:

| Name | Year | Salary | Cash Bonus |
|---|---|---|---|
| Landan | 2002 | $756,250 | $425,000 |
| | 2003 | $750,000 | $400,000 |
| | 2004 | $750,000 | $800,000 |
| Smith | 2002 | $350,000 | $212,500 |
| | 2003 | $350,000 | $250,000 |
| | 2004 | $350,000 | $350,000 |

34. For fiscal years 2003 and 2004, based on the Company's materially inaccurate financial results for those fiscal years, defendants Skaer and Zingale received salaries, cash bonuses, and Mercury stock options in amounts that have not been publicly reported.

- 13 -

1      35.    As a direct and proximate result of their breaches of fiduciary duties, as alleged

2  herein, all of the Individual Defendants except Boston and Ostler were unjustly enriched by their

3  receipt of the salaries, cash bonuses, and stock options set forth herein, the values of which

4  would have been substantially lower had the Company's option grants and financial results been

5  accurately recorded.

6

## DEFENDANTS LANDAN AND SMITH ARE LIABLE
## UNDER SECTION 304 OF SARBANES-OXLEY

7

8      36.    Section 304 of Sarbanes-Oxley, 15 U.S.C. § 7243, provides:

9            If an issuer is required to prepare an accounting restatement due to the material
noncompliance of the issuer, as a result of misconduct, with any financial

10           reporting requirement under the securities laws, the chief executive officer and
chief financial officer of the issuer shall reimburse the issuer for--

11

12           (1) any bonus or other incentive-based or equity-based compensation received by
that person from the issuer during the 12-month period following the first public
issuance or filing with the Commission (whichever first occurs) of the financial

13           document embodying such financial reporting requirement; and

14           (2) any profits realized from the sale of securities of the issuer during that 12-
month period.

15

16      37.    Due to the material noncompliance of Mercury, as a result of misconduct,

17  Mercury was required to prepare an accounting restatement for fiscal years 2002, 2003 and 2004.

18      38.    Pursuant to Section 304 of Sarbanes-Oxley, defendants Landan and Smith,

19

20  Chief Executive Officer and Chief Financial Officer of Mercury, respectively, during the

21  pertinent period, are required to reimburse Mercury for any bonus or other incentive-based or

22  equity-based compensation received by them during, or within the 12-month period following,

23  the restated periods.

24

25

26

27

28

# DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

39. Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered by the Company as a result of the breaches of fiduciary duty and other violations of law by the defendants. This is not a collusive action to confer jurisdiction on this Court which it would not otherwise have.

40. Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

41. As a result of the facts set forth herein, plaintiff has not made any demand on the Company's Board of Directors to institute this action. Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action for the following reasons:

      a.    As of the filing of this Complaint, the Board consists of six directors -- defendants Zingale, Yaron, Shamir, Kohavi, Boston, and Ostler. All of the directors of the Company named as defendants herein, who collectively constitute the entire Board, exhibited a sustained and systematic failure to fulfill their fiduciary duties, which could not have been an exercise of good faith business judgment.

      b.    There is a substantial likelihood that the directors will be held personally liable for their breaches of fiduciary duties, and therefore the directors are incapable of independently and disinterestedly considering a demand to commence this action.

      c.    Defendants Zingale, Yaron, Shamir and Kohavi are directly interested in the improperly inflated stock option grants alleged herein, and therefore they are incapable of independently and disinterestedly considering a demand to commence this action.

- 15 -

# COUNT I
## AGAINST THE INDIVIDUAL DEFENDANTS
## FOR BREACH OF FIDUCIARY DUTIES OF LOYALTY AND GOOD FAITH

42. Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

43. As alleged in detail herein, each of the Individual Defendants had a duty to the Company and its shareholders to, *inter alia*, exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner; exercise good faith to ensure that the Company's financial statements were prepared in accordance with GAAP; and refrain from unduly benefitting themselves at the expense of the Company.

44. In breach of their fiduciary duties of loyalty and good faith, each of the Individual Defendants knowingly participated in and/or wilfully ignored the Company's obvious and pervasive misconduct, from which all of the Individual Defendants except Boston and Ostler personally benefitted.

45. As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages as alleged herein.

# COUNT II
## AGAINST THE INDIVIDUAL DEFENDANTS
## FOR UNJUST ENRICHMENT

46. Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

47. As alleged in detail herein, the Individual Defendants were unjustly enriched by their receipt of improperly inflated stock option grants, salaries, and cash bonuses, and it would be unconscionable to allow them to retain the benefits thereof.

48. To remedy the Individual Defendants' unjust enrichment, the Court should order them to disgorge to the Company the stock options, salaries, and bonuses described herein.

### COUNT III
### AGAINST DEFENDANTS LANDAN AND SMITH
### FOR REIMBURSEMENT OF COMPENSATION
### PURSUANT TO SECTION 304 OF SARBANES-OXLEY

49. Plaintiff incorporate by reference all preceding and subsequent paragraphs as if fully set forth herein.

50. Due to the material noncompliance of Mercury, as a result of misconduct, Mercury was required to prepare an accounting restatement for fiscal years 2002, 2003 and 2004.

51. Pursuant to Section 304 of Sarbanes-Oxley, defendants Landan and Smith, Chief Executive Officer and Chief Financial Officer of Mercury, respectively, during the pertinent period, are required to reimburse Mercury for any bonus or other incentive-based or equity-based compensation received by them during, or within the 12-month period following, the restated periods.

WHEREFORE, plaintiff demands judgment as follows:

    A.    Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

    B.    Ordering the Individual Defendants to disgorge to the Company all salaries, cash bonuses, and stock options alleged herein;

    C.    Ordering defendants Landan and Smith to reimburse Mercury for any bonus or other incentive-based or equity-based compensation received by them during, or within the 12-month period following, the restated periods.

    D.    Granting appropriate equitable relief to remedy defendants' breaches of fiduciary duties;

- 17 -


UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ROBERT KORHELY

      Plaintiff(s)

   -v-

BRAD BOSTON

      Defendant(s)

)
)
)
)
)
)
)
)
)
)

**E-Filing**

C 05-04642 PJH

ORDER SETTING INITIAL CASE MANAGEMENT
CONFERENCE

     IT IS HEREBY ORDERED that this action is assigned to the
Honorable Phyllis J. Hamilton.  When serving the complaint or
notice of removal, the plaintiff or removing defendant must
serve on all other parties a copy of this order, the handbook
entitled "Dispute Resolution Procedures in the Northern District
of California" and all other documents specified in Civil Local Rule 4-2.
Counsel must comply with the case schedule listed below unless the
Court otherwise orders.

     IT IS FURTHER ORDERED that this action is assigned to the
Alternative Dispute Resolution (ADR) Multi-Option Program governed
by ADR Local Rule 3.  Counsel and clients must familiarize themselves
with that rule and with the handbook entitled "Dispute Resolution
Procedures in the Northern District of California."

CASE SCHEDULE   [ADR MULTI-OPTION PROGRAM]

| Date | Event | Governing Rule |
|------|-------|----------------|
| 11/14/2005 | Complaint filed | |
| 02/23/2006 | Last day to meet and confer re initial disclosures, early settlement, ADR process selection, and discovery plan | FRCivP 26(f) & ADR LR 3-5 |
| 02/23/2006 | Last day to file Joint ADR Certification with Stipulation to ADR process or Notice of Need for ADR Phone Conference | Civil L.R. 16-8 |
| 03/09/2006 | Last day to complete initial disclosures or state objection in Rule 26(f) Report, file/serve Case Management Statement, and file/serve Rule 26(f) Report | FRCivP 26(a)(1) Civil L.R.16-9 |
| 03/16/2006 | Case Management Conference in Courtroom 3 17th Flr at 2:30 PM | Civil L.R. 16-10 |

E.   Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.   Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: _11/14/05_

Respectfully submitted,

BORNSTEIN & BORNSTEIN

Jonathan Herschel Bornstein (SBN 163392)
Kathryn Quetel (SBN 167100)
2590 Geary Boulevard
San Francisco, CA 94115
Telephone: (415) 409-7611
Fax: (415) 409-9345


SCHIFFRIN & BARROWAY, LLP
Eric L. Zagar
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Fax: (610) 667-7056


*Attorneys for Plaintiff*

- 18 -

## VERIFICATION

I, Robert Korhely, hereby verify that I have reviewed the Complaint and authorize its filing and that the foregoing is true and correct to the best of my knowledge, information and belief.


DATE:  11/11/2005

ROBERT KORHELY