1    FRANCIS M. GREGOREK (144785)
     BETSY C. MANIFOLD (182450)
2    FRANCIS A. BOTTINI, JR. (175783)
     RACHELE R. RICKERT (190634)
3    WOLF HALDENSTEIN ADLER
        FREEMAN & HERZ LLP
4    Symphony Tower
     750 B Street, Suite 2770
5    San Diego, CA 92101
     Telephone:  619/239-4599
6    Facsimile:   619/234-4599
7    Chair of Plaintiffs' Executive Committee
8    [Additional Counsel Appear On Signature Page]
9
10                   **UNITED STATES DISTRICT COURT**
11                  **NORTHERN DISTRICT OF CALIFORNIA**
12                           **SAN JOSE DIVISION**
13   IN RE MERCURY INTERACTIVE CORP.      )   CASE NO.  3:05-cv-04642 JF (PVT)
     DERIVATIVE LITIGATION                )
14                                        )
                                          )
15                                        )   CONSOLIDATED AMENDED
                                          )   DERIVATIVE COMPLAINT
16                                        )
                                          )
17                                        )
                                          )
18   _____ )   <u>JURY TRIAL DEMANDED</u>
19
20
21
22
23
24
25
26
27
28

CONSOLIDATED AMENDED DERIVATIVE COMPLAINT - CASE NO. 3:05-cv-04642 JF (PVT)

Plaintiffs, by and through their attorneys, derivatively on behalf of Mercury Interactive Corporation ("Mercury" or the "Company"), allege upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, based upon, *inter alia,* the investigation conducted by and through their attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings, news reports, press releases, and other publicly available documents regarding Mercury as follows:

## SUMMARY OF THE DERIVATIVE ACTION

1.      This is a stockholders' derivative action brought on behalf of Nominal Defendant Mercury against Amnon Landan ("Landan"), Douglas P. Smith ("Smith"), Susan J. Skaer ("Skaer"), Giora Yaron ("Yaron"), Igal Kohavi ("Kohavi"), Yair Shamir ("Shamir"), Clyde W. Ostler ("Ostler"), Brad Boston ("Boston"), and Anthony Zingale ("Zingale") (collectively "Defendants"), by Plaintiffs who are now, and at all times relevant have been, stockholders of Mercury.  Mercury is a global leader in providing software and consulting services to the business technology optimization marketplace, including software to assist companies in meeting their compliance obligations under the Sarbanes-Oxley Act of 2002 ("SOX").

2.      This action seeks redress for the harm to Mercury, and indirectly its shareholders, resulting from the self-dealing of three of its top executives — Landan, the Company's Chairman of the Board and Chief Executive Officer; Smith, the Company's Chief Financial Officer; and Susan J. Skaer, the Company's General Counsel — who breached their fiduciary duties of loyalty and good faith to the Company by intentionally manipulating their stock option grant dates between 1995 and 2002, in order to secure a huge financial windfall for themselves at the expense of Mercury.  Specifically, these key executives back-dated stock option grants in order to exercise the stock option grant dates at a lower strike price, thus pocketing more money than they otherwise were entitled to receive.  Since 1996, Mercury insiders have sold about $250 million in stock, much of it obtained through options exercises.  According to Professor James Cox of Duke University School of Law, back-dating grants is "a very sorry practice" — "[i]t's like letting the CEOs bet on a race when they know who the winner will be."

CONSOLIDATED AMENDED DERIVATIVE COMPLAINT - CASE NO. 3:05-cv-04642 JF (PVT)

- 1 -

3.      Landan, Smith, and Skaer resigned in disgrace on November 1, 2005, and, the next day, the Company publicly disclosed that an internal investigation conducted by a Special Committee of the Board of Directors (the "Board") had found 49 instances of options manipulation by employees at all levels.  According to the November 2, 2005 interim report by the Special Committee appointed by the Board, the Committee found "this misdating had the effect of permitting recipients of options to exercise at a strike price lower than the price on the actual date of the grant" — the improper practice of intentionally selecting a favorable price for exercising the options.  By virtue of the improper scheme to manipulate their stock option grants, insiders were over-compensated, payments lawfully belonging to the Company were denied, and the Company's compensation expenses were understated, causing the Company's earnings to be artificially inflated.

4.      As a result of this admitted misconduct, Mercury has suffered substantial harm. Mercury will restate its historical results and has delayed filing all quarterly and annual reports since the second quarter of 2004.  Mercury also faces serious and adverse tax consequences, increased premiums of $40 million to be paid under the Company's Indenture Agreements to the holders of its 2007 and 2008 Notes, and faces millions of dollars in cost associated with the Special Committee's investigation and the related restatements.  Mercury had its stock delisted on NASDAQ with no further access to public debt or equity offerings.  Mercury also will likely admit to material weaknesses in its financial controls resulting in a qualified opinion from its outside auditor.  Mercury's executives, including Landan, Skaer, and Smith, were also overpaid improper cash bonuses based on these inflated earnings which created an inflated market capitalization for Mercury common stock.

5.      This action seeks redress for Defendants' collective and individual breaches of their fiduciary duties of loyalty, good faith, candor due care, and their knowing, reckless and/or gross negligence in, *inter alia*: (i) failing to discover and/or prevent the improper manipulation of employee stock options; (ii) failing to discover and/or prevent the public misreporting of earnings caused by the manipulation of employee stock options, including its effect on stock option

1   expenses and tax liabilities; (iii) failing to properly implement, oversee and maintain appropriate

2   and adequate accounting and internal controls, practices and procedures; (iv) improperly loaning

3   $1 million to defendant Landan in 1999, without approval by the Board of Directors, and without

4   adequate disclosure in the Mercury's public filings; and (v) failing to ensure that Mercury operated

5   in compliance with all applicable federal and state laws, rules, and regulations requiring the

6   dissemination of accurate financial statements.

7          6.     This action makes derivative claims for the Defendants' violation of Sections

8   10(b), 14(a), and 16(b) of the Securities and Exchange Act of 1934. This action also seeks

9   disgorgement of bonuses or other incentive-based or equity-based compensation received by the

10  Company's former Chief Executive Officer, Chief Financial Officer, and General Counsel, and for

11  any profits realized from their sale of Mercury securities, pursuant to Section 304 of the Sarbanes-

12  Oxley Act of 2002.

13         7.     This action is also brought against PricewaterhouseCoopers LLP ("PWC") for

14  negligence in conducting annual audits of the Company and the aiding and abetting of direct

15  claims brought against the individual defendants.

16         8.     Defendants' malfeasance has caused, and will continue to cause Mercury great

17  harm, by: (i) indelibly damaging its reputation and business as an expert in SOX compliance and

18  loss of goodwill in general, (ii) exposing the Company to an adverse opinion by its outside

19  auditors, (iii) expending considerable financial cost in having to review and restate previously

20  issued financial statements; (iv) forcing a default under the Company's Indenture Agreements with

21  the holders of its 2007 and 2008 Notes and a $40 million increase in premiums to obtain waivers,

22  (v) exposing the Company to civil liability, including suits for violations of the securities laws,

23  several of which have already been filed in this District; (vi) denying the Company payment for

24  common stock to which it was entitled; and (vii) exposing the Company to potential regulatory

25  fines by the SEC and the Internal Revenue Service for failure to pay withholding taxes as a

26  consequence of the back-dating of options provided to certain members of management.

27

28

CONSOLIDATED AMENDED DERIVATIVE COMPLAINT - CASE NO. 3:05-cv-04642 JF (PVT)

- 3 -

1

**JURISDICTION AND VENUE**

2   9.     This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C.

3   §1331 in that Plaintiffs' claims arise in part under the Constitution and laws of the United States,

4   including the Sarbanes-Oxley Act of 2002 and the Securities and Exchange Act of 1934.  This

5   Court also has jurisdiction pursuant to §16(b) of the Securities Exchange Act of 1934, as amended,

6   15 U.S.C. §78p to obtain disgorgement of profits obtained by defendants in violation of statute.

7   10.    This Court also has jurisdiction over the subject matter of this action pursuant to 28

8   U.S.C. §1332(a) because Plaintiffs and Defendants are citizens of different states and the matter in

9   controversy exceeds $75,000.  This action is not a collusive action designed to confer jurisdiction

10  on a Court of the United States that it would not otherwise have.  This Court also has supplemental

11  jurisdiction pursuant to 28 U.S.C. §1367(a).

12  11.    Venue is proper in this Court pursuant to 15 U.S.C. §78(a)(a), 28 U.S.C. §§1391(a)

13  and 1391(b), because Nominal Defendant Mercury is headquartered in this District, substantially

14  all of the defendants either reside or conduct business in this District, and a substantial portion of

15  the transactions and wrongs complained of herein occurred in this District.

16  12.    While Mercury is incorporated in Delaware, it is headquartered in Mountain View,

17  California, where the center of its worldwide operations are located and managed.  The Mercury

18  executives named as defendants were, for the most part, located in California, and the alleged

19  wrongdoing occurred at Mercury's headquarters in California, where the bulk of the evidence and

20  civil witnesses relevant to this case are located.  Mercury has virtually no operation or employees

21  in Delaware, no significant part of the wrongdoing occurred there, no witnesses reside there and

22  no known documentary evidence is located there.  Not all defendants named herein are subject to

23  personal jurisdiction in Delaware and a jury trial on these claims is not available under Delaware

24  law or in its Chancery Court.  Finally, there are several suits already pending in this District in

25  which Mercury and some or most of the individual defendants in this action are named as

26  defendants and, thus, discovery and pretrial proceedings can be coordinated.

27

28

CONSOLIDATED AMENDED DERIVATIVE COMPLAINT - CASE NO. 3:05-cv-04642 JF (PVT)

## THE PARTIES

**The Plaintiffs**

1. Plaintiff Robert Korhley is a resident of Arizona and has owned at times relevant to this action, and continues to own, Mercury common stock.

2. Plaintiff Reena Gupta is a resident of Michigan and has owned at times relevant to this action, and continues to own, Mercury common stock.

3. Plaintiff Inge Selig is a resident of Israel and has owned at times relevant to this action, and continues to own, Mercury common stock.

4. Plaintiff Robert J. Casey II is a resident of Pennsylvania and has owned at times relevant to this action, and continues to own, Mercury common stock.

5. Plaintiff City of New Orleans Employees' Retirement System is domiciled in the parish of New Orleans, Louisiana and has owned at times relevant to this action, and continues to own, Mercury common stock.

6. Plaintiffs, as current holders of Mercury common stock, and as holders continuously during the period of the wrongdoings alleged herein, have standing to assert these claims on behalf of Mercury and will fairly and adequately protect the interests of Mercury and its other stockholders.

**The Nominal Defendant Mercury**

7. Nominal Defendant Mercury is incorporated in the state of Delaware and maintains its executive offices at 379 North Whisman Road, Mountain View, CA 94043-3969. Mercury common stock was delisted from the NASDAQ Stock Market on January 4, 2006. The Company was delisted for failure to file timely annual and quarterly financial reports with the SEC under the NASDAQ filing requirements, Market Place Rule 4310(c)(14). Mercury now trades in the Pink Sheets under trading symbol MERQ.

8. Mercury provides software and services to the business technology optimization ("BTO") marketplace. Its offerings consist of integrated software, services, and practices that enable companies to use a centralized approach to manage software applications and information

CONSOLIDATED AMENDED DERIVATIVE COMPLAINT - CASE NO. 3:05-cv-04642 JF (PVT)

technology ("IT").  One of the main components of the Company's BTO business is providing

software and services to enable companies to comply with SOX requirements.  Mercury describes

its "Sarbanes-Oxley IT Assessment Accelerator" as follows:

> **A Complete BTO Solution**
>
> Mercury Sarbanes-Oxley IT Assessment Accelerator is part of Mercury Quality Center$^{tm}$, an integrated suite of applications that automate the processes, controls, audits, and assessments required for sustainable compliance.  Quality Center provides automated software testing and quality assurance across a wide range of IT and application environments.
>
> Mercury Sarbanes-Oxley IT Assessment Accelerator and Mercury Quality Center are an integral part of Mercury's overall Business Technology Optimization (BTO) strategy to provide integrated support for SOX compliance across Mercury Optimization Centers$^{tm}$.

9.  According to Mercury's website:

> Mercury's business technology optimization (BTO) offerings provide a comprehensive yet manageable way to address Sarbanes-Oxley requirements in an integrated framework that:
>
> - Significantly improves overall IT performance.
> - Optimize the business outcome of IT.
> - Automates service support controls within IT.
> - Provides comprehensive IT control testing.
>
> Mercury BTO offerings can be implemented independently or concurrently, delivering tremendous benefit no matter how you start.  You get the strongest available foundation for sustainable compliance and the elements to turn IT into a strategic business weapon through digitized and enforced processes.  We can help you provide a permanent foundation for business-IT alignment, enabling sustainable, corporate-wide compliance.

**The Defendants**

10.  Defendant Landan was Chairman of Mercury's Board from July 1999 to November

1, 2005, served as its Chief Executive Officer ("CEO") from 1997 to November 1, 2005, and its

CEO and President from 1997 to 2004.  Upon information and belief, Landan served on the Stock

Options Committee of the Board from 1998 to November 2005.  Landan resigned his positions as

Chairman of the Board and CEO on November 1, 2005, after a Special Committee created by the

1   Board found that he engaged in improper practices, including mispricing stock option grants for

2   his own benefit.  As Chairman and CEO, Landan prepared, reviewed, and signed the Company's

3   public filings.  Upon information and belief, Landan received the following compensation, not

4   including stock options, for fiscal years 2000 through 2004: in 2004, $750,000 salary and

5   $800,000 bonus; in 2003, $750,000 salary and $400,000 bonus; in 2002, $756,250 salary and

6   $400,000 bonus; in 2001, $466,667 salary and $425,000 bonus; and in 2000, $480,000 salary and

7   $600,000 bonus.  Based on Mercury's Proxy Statements, Landan received 160,000 stock option

8   grants in 1997 and 1998, 720,000 stock options in 1999, and 700,000 stock option grants per year

9   from 2000 through 2003.  Landan now admits, at a minimum, that the stock option grant to

10  acquire 700,000 shares in 2001 was improper and that stock option grants to acquire 322,680

11  shares awarded in 1998, 120,000 shares awarded in 1999, and 700,000 shares awarded in 2002

12  were improperly priced by him as a member of the Stock Options Committee.  Upon information

13  and belief, during the period of wrongdoing, Landan paid $5.5 million to exercise 813,000 options

14  in Mercury, and sold 1.04 million shares for a total of $73.6 million.

15       11.    Defendant Smith was the Executive Vice President and Chief Financial Officer

16  ("CFO") of Mercury from November 2001 until his resignation on November 1, 2005, after the

17  Special Committee found that he engaged in improper practices, including mispricing stock option

18  grants for his own benefit.  As CFO, Smith prepared, reviewed, and signed the Company's public

19  filings.  Upon information and belief, Smith served on the Stock Options Committee of the Board

20  from November 2001 to November 2005.  Smith received, exclusive of stock option grants, the

21  following compensation for fiscal years 2000 through 2004: in 2004, $350,000 salary and

22  $350,000 bonus; in 2003, $350,000 salary and $250,000 bonus; in 2002, $350,000 salary and

23  $250,000 bonus; in 2001, $332,500 salary and $212,500 bonus; and in 2000, $165,019 salary.

24  Upon information and belief, Smith also received 450,000 stock option grants in 2000; 500,000

25  stock option grants in 2001, and 200,000 stock option grants in 2003.  Smith has conceded that the

26  400,000 stock option grants he received in November 2001 were improperly priced and not priced

27  on the day the grants were actually determined.  The strike price should have been $28.05 and not

28  CONSOLIDATED AMENDED DERIVATIVE COMPLAINT - CASE NO. 3:05-cv-04642 JF (PVT)

- 7 -

$24.29.  On October 27, 2003 and January 5, 2004, Smith exercised that option to purchase 120,000 shares at the improper price of $24.29 and sold the same 100,000 shares for $45,727 and 20,000 for $51.0233, for proceeds of over $2.6 million.  Approximately $450,000 of the $2.6 million in proceeds from these transactions was gained through the admitted improper manipulation of stock option grant dates and prices.

12.    Defendant Skaer was the Vice President, General Counsel and Secretary of the Company from November 2000 until her resignation on November 1, 2005, after the Special Committee found that she engaged in improper practices, including mispricing stock option grants for her own benefit.  Upon information and belief, Skaer received, exclusive of stock option grants, a base salary and $350,000 in bonus compensation in fiscal year 2004.  Upon information and belief, during the period of wrongdoing, Skaer exercised 65,170 options and by selling the shares, reaped profits of $1.1 million.

13.    Defendant Yaron has served as a Director of Mercury since February 1996 and, on November 2, 2005, was elected Chairman of the Board replacing Landan.  Yaron is a member of the Compensation Committee and the Nominating and Corporate Governance Committee, and was a member of the Compensation Committee during almost the entire period of wrongdoing.  Yaron, along with Defendants Kohavi and Shamir, who were also members of the Compensation Committee during the period of wrongdoing, was singled out in the report of the Special Committee as having failed to ensure that six grants the Committee approved by unanimous consent were properly dated, and for mistakenly relying on management to document and account for the options properly.  Since 1996, Yaron has been the Chairman of Comsys Communications and Signal Processing Ltd.  Yaron also serves as a director of Prolify, Inc., Yissum Research & Development Company of the Hebrew University, and is a member of the Board of Governors and the Executive Committee of the Hebrew University.  For the fiscal year 2004, Yaron received an annual retainer in the amount of $37,500 and a grant of 10,000 shares of the Company's common stock.  Between 1996 and 2005, Yaron sold 185,000 shares of stock, with proceeds of $9,208,704, most if not all of which, upon information and belief, were exercises of stock option grants.

14.    Defendant Kohavi has served as a Director of Mercury since January 1994 and is a member of the Audit Committee and the Nominating and Corporate Governance Committee. Kohavi, who was also a member of the Board's Compensation Committee during the period of wrongdoing and, along with Yaron and Shamir, was singled out in the report of the Special Committee as having failed to ensure that six grants the Committee approved by unanimous consent were properly dated, and for mistakenly relying on management to document and account for the options properly.   Kohavi is currently retired. He has held several executive positions with various companies.   Kohavi is also on the Board of Directors of VCON Telecommunications, Ltd., a developer of videoconferencing solutions.   For the fiscal year 2004, Kohavi received an annual retainer in the amount of $37,500 and a grant of 10,000 shares of the Company's common stock.   Between 1996 and 2005, Kohavi sold 194,960 shares of stock, with proceeds of $8,783,816, most if not all of which, upon information and belief, were exercises of stock option grants.

15.    Defendant Shamir has served as a Director of Mercury since August 1994.  He is a member of the Audit Committee and the Compensation Committee, and was a member of the Compensation Committee during the period of wrongdoing.  Shamir, along with Yaron and Kohavi, was singled out in the report of the Special Committee as having failed to ensure that six grants the Committee approved by unanimous consent were properly dated, and for mistakenly relying on management to document and account for the options properly.  From March 1997 until present, Shamir has served as the Chairman of VCON Telecommunications, Ltd., a developer of videoconferencing solutions. Shamir also serves on the Board of Directors of DSP Group, Inc., Orckit Communications Ltd., InfraCom, and Shamir-Optica, Ltd.  For the fiscal year 2004, Shamir received an annual retainer in the amount of $37,500 and a grant of 10,000 shares of the Company's common stock.  Between 1996 and 2005, Shamir sold 238,000 shares of stock, with proceeds of $9,249,460, most if not all of which, upon information and belief, were exercises of stock options.

16.    Defendant Ostler has served as a director of Mercury since May 2002 and was

appointed lead director in December 2004, with responsibility for (i) presiding at all meetings of the board at which the chairman is not present, including executive sessions of the independent directors, (ii) serving as a liaison between the chairman and the independent directors, (iii) approving information sent to the board, (iv) approving the meeting agenda for the board, and (v) approving meeting schedules to assure that there is sufficient time for discussion of all items. Ostler is the Chairman of the Special Committee formed in June 2005 to conduct an internal investigation concerning employee stock option grants in response to an investigation by the SEC commenced in November 2004.   Ostler is also a member of the Audit Committee and the Nominating and Corporate Governance Committee.  The Board determined that Ostler qualifies as a "financial expert" as defined by the rules of the SEC.  Ostler has served as the Group Executive Vice President of Wells Fargo & Company and its affiliates since January 2003, and has held several positions in that company since 1971.  Ostler is also on the Director's Advisory Council for Scripps Institution of Oceanography.  For the fiscal year 2004, Ostler received an annual retainer in the amount of $37,500 and a grant of 10,000 shares of the Company's common stock.

17.   Defendant Boston has served as a Director of Mercury since May 2004 and has also served as a member of the Audit Committee and Compensation Committee since May 2004. Upon information and belief, Boston is a member of the Special Committee and the Special Litigation Committee (the "SLC").  From August 2001 to May 2004, Boston served as Senior Vice President and CIO of Cisco Systems, Inc.   From June 1996 to July 2000, Boston was Executive Vice President of Operations at Corio, Inc., an enterprise-focused Internet ASP.  Boston is also on the Board of Directors of NetNumber Inc., the Harvard Group Board of Advisers and the E-business Advisory Board for Texas Christian University M.J. Neeley School of Business. For the fiscal year 2004, Boston received an annual retainer in the amount of $13,333 and a grant of 50,000 shares of the Company's common stock.

18.   Defendant Zingale has served on the Mercury's Board since July 2002.  From July 2002 to December 2004, Zingale was Mercury's lead outside director and a member of the Compensation and Nominating and Corporate Governance Committees.  For the fiscal year 2004,

CONSOLIDATED AMENDED DERIVATIVE COMPLAINT - CASE NO. 3:05-cv-04642 JF (PVT)

Zingale received an annual retainer in the amount of $37,500 and a grant of 10,000 shares of the Company's stock.  Zingale served as Mercury's President and Chief Operating Officer ("COO") from December 1, 2004 to November 1, 2005 and then became Chief Executive Officer of Mercury on November 2, 2005. As President and COO, he received an initial annual base salary of $500,000 and was eligible to receive a target bonus equal to 100% of his annual base salary, received an initial stock option grant for 400,000 shares of the Company's stock, and was eligible to receive an option to purchase 50,000 shares of the Company's common stock.  Once Zingale joined Mercury's executive management team, he resigned his committee positions and his role as lead outside director.  In 2005, Zingale received grants for 50,000 shares of Mercury common stock as part of Mercury's annual refresh grants.  Under his employment agreement as CEO, Zingale received a $1 million sign-on bonus and receives a base salary of $800,000, and executive target bonus of 100% base salary, and a grant of options of 500,000 shares.  Zingale also serves on the Board of Directors of Interwoven, Inc. and Blazent, Inc.  Zingale had previously been an executive at Clarity, Nortee Networks, Inc. and Cadence Design Systems, Inc.

19.     All Defendants, with the exception of defendants Landan, Smith, and Skaer, are collectively referred to as "Director Defendants."

20.     Defendant PWC is an accounting partnership that maintains an office at 100 Almaden Boulevard, Suite 1600, San Jose, California.  PWC is and has been retained by Mercury to serve as the Company's independent auditor at all times relevant hereto.  PWC issued unqualified audit reports for Mercury from 1996 through 2004. As part of its audit responsibilities, PWC is obligated to review the financial accounting reporting practices at Mercury including the review and verification of compensation issues (including stock option grants and other forms of executive compensation) for the all of the individual defendants. PWC had full access to the internal recordkeeping and business information at Mercury, including interim financial statements and compensation files maintained by the Company.

21.     Each of the individual defendants and PWC engaged in a common course of activity that aided and abetted commission of the breaches of fiduciary duties, violations of the

1    federal securities laws, and breaches of common law. All of the Defendants acted with knowledge

2    of the wrongdoing and are liable for breach of the principal obligations and the contributory

3    breach by aiding and abetting such wrongdoing.

4                    **OBLIGATIONS OF DIRECTOR AND OFFICER DEFENDANTS**

5         22.    Each of the Defendants owed to Mercury the duty of loyalty, good faith, due care

6    and diligence in the management and administration of the affairs of the Company and in the use

7    and preservation of its property and assets, and owed the duty of full and candid disclosure of all

8    material facts related thereto.  Further, the Defendants owed a duty to Mercury to ensure that

9    Mercury operated in compliance with all applicable federal and state laws, rules, and regulations,

10   and that Mercury did not engage in any unsafe, unsound, or illegal business practices.

11        23.    To discharge these duties, the Defendants were required to exercise reasonable and

12   prudent supervision over the management, policies, practices, controls, and financial and corporate

13   affairs of Mercury.  By virtue of their obligations to carry out their duties with the utmost loyalty,

14   good faith, due care, and diligence, Defendants were required, among other things, to:

15              a.    manage, conduct, supervise, and direct the employees, businesses
16                    and affairs of the Company in accordance with all applicable laws,
                      rules and regulations, and the Company's charter and by-laws;

17              b.    neither violate nor knowingly or recklessly permit any officer,
18                    director or employee of the Company to violate applicable laws,
                      rules and regulations and to exercise reasonable control and
19                    supervision over such officers and employees;

20              c.    ensure the prudence and soundness of policies and practices
                      undertaken or proposed to be undertaken by the Company;
21
                d.    remain informed as to how the Company, in fact, was operating,
22                    and upon receiving notice or information of unsafe, imprudent or
                      unsound practices, to make reasonable investigation in connection
23                    therewith and to take steps to correct that condition or practice;

24              e.    supervise the preparation, filing and/or dissemination of any SEC
25                    filing, press releases, audits, reports or other information
                      disseminated by the Company and to examine and evaluate any
26                    reports of examinations or investigations concerning the practices,
                      products or conduct of officers of the Company and to make full
27                    and accurate disclosure of all material facts, concerning, *inter alia*,
                      each of the subjects and duties set forth above;

28
     CONSOLIDATED AMENDED DERIVATIVE COMPLAINT - CASE NO. 3:05-cv-04642 JF (PVT)

f.   to maintain and implement an adequate system of controls and information systems, such that no officer, director or employee of the Company would make false statements about Mercury to the securities markets or would be able to misappropriate internal confidential information for his or her own benefit and profit, by insider stock trading or otherwise;

g.   to ensure that Mercury was operated in a diligent, honest and prudent manner in compliance with all applicable federal and state laws, rules and regulations; and

h.   to preserve and enhance the Company's reputation as befits a public corporation and to maintain public trust and confidence in the Company as a prudently managed institution fully capable of meeting its duties and obligations.

24.    The Defendants, as corporate officers and/or directors, owed Mercury and its shareholders the duty of due care in the performance of their responsibilities with respect to Mercury's operations.  Defendants in this action, individually or jointly, as alleged herein, failed to exercise reasonable diligence and due care, was grossly negligent or reckless, and committed one or more of the following actions or omissions constituting waste, mismanagement and breaches of fiduciary duty:

a.   The Defendants authorized, caused or permitted Mercury to conduct its business in an unsafe, imprudent and dangerous manner by pursuing unsound practices, including concealing their reckless, unsafe and unsound practices and the serious adverse impact of these practices;

b.   The Defendants authorized, caused or permitted Mercury to operate and report information in a manner that was contrary to federal regulations, thus exposing it to liability for violation of the federal securities and tax laws; and

c.   The Defendants' conduct as alleged herein has also damaged Mercury by exposing it to the cost of the defense of and possible cost of liability for violation of the federal securities laws as a result of the securities law class action lawsuits now pending against it in federal court, damage to the goodwill and reputation of Mercury due to the negative adverse publicity.

25.    By reason of their corporate positions and their ability to control the business and corporate affairs of Mercury, the Defendants owed Mercury and its stockholders fiduciary obligations of candor, fidelity, trust, and loyalty, and are and were required to use their ability to

CONSOLIDATED AMENDED DERIVATIVE COMPLAINT - CASE NO. 3:05-cv-04642 JF (PVT)

- 13 -

1   control Mercury in a fair, just and equitable manner, as well as to act in furtherance of the best

2   interests of Mercury and its stockholders and not in furtherance of their own personal interests.  In

3   addition, each Director Defendant owed Mercury, while he or she occupied such directorship, the

4   fiduciary duty to exercise due care and diligence in the management and administration of the

5   affairs of Mercury and in the use and preservation of its property and assets.  In violation of their

6   fiduciary duties, the defendants permitted and/or caused Mercury to conduct its business in an

7   unsafe, imprudent and dangerous manner by violating the federal securities and tax laws and

8   permitting certain insiders to misappropriate and misuse confidential non-public corporate

9   information for their personal profit.

10        26.     Further, as members of Mercury's Board, the Director Defendants named herein

11  were themselves directly responsible for authorizing or permitting the authorization of, or failing

12  to monitor, the practices that resulted in the misappropriation of confidential corporate

13  information, and violation of the federal securities and tax laws, as alleged herein.  Each of them

14  had knowledge of and actively participated in and approved of the wrongdoings alleged or

15  abdicated his responsibilities with respect to these wrongdoings.  The alleged acts of wrongdoing

16  subjected Mercury to unreasonable risks without any reward to the Company or its shareholders.

17        27.     All of the Defendants participated in the wrongdoing complained of herein in order

18  to improperly benefit themselves by remaining as officers and/or directors of the corporation, to

19  inflate the price of the Company's common stock and to conceal defendants' wrongful conduct, so

20  that they could: (a) protect and perpetuate their directorial and/or executive positions and increase

21  the substantial compensation, perks, and prestige they obtained thereby; and (b) inflate the price of

22  the Company's common stock in order to enhance the value of their securities holdings and

23  options to purchase Mercury stock. Such participation involved, among other things, planning and

24  creating (or causing to be planned and created), proposing (or causing the proposal of), and

25  authorizing, approving and acquiescing in the conduct complained of herein.

26        28.     By reason of their membership on the Mercury Board of Directors and/or positions

27  as executive officers of the Company, Defendants were each controlling persons of Mercury and

28  CONSOLIDATED AMENDED DERIVATIVE COMPLAINT - CASE NO. 3:05-cv-04642 JF (PVT)

had the power and influence to cause, and did cause, the Company to engage in and/or permit the conduct complained of herein.

## DUTIES AND RESPONSIBILITIES OF THE COMPENSATION, AUDIT AND CORPORATE GOVERNANCE COMMITTEES

**Compensation Committee**

29.   All the Director Defendants except Ostler served on the Compensation Committee of the Board of Directors at certain times during the relevant period:

| Compensation Committee | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | <u>1997</u> | <u>1998</u> | <u>1999</u> | <u>2000</u> | <u>2001</u> | <u>2002</u> | <u>2003</u> | <u>2004</u> | <u>2005</u> |
| Kohavi | M | M | M | M | M | M | | | |
| Shamir | M | M | M | M | M | M | M | M | M |
| Yaron | M | M | M | M | M | M | C | C | C |
| Zingale | | | | | | | M | M (last meeting 9/14/04) | |
| Ostler | | | | | | | | | |
| Boston | | | | | | | | | M |
| *Meetings Per Year* | *1* | *1* | *1* | *4* | *2* | *5* | *4* | *9* | |

M = Member  C = Chair

30.   On October 29, 2002, the Board adopted a written "Compensation Committee Charter." According to the Compensation Committee Charter, the purpose of the Compensation Committee "is to discharge the Board's responsibilities relating to the compensation of the Company's executives." The Committee's principal functions include executive compensation, stock plan administration and compensation committee reports. The Committee members have the following responsibilities:

> • The Committee will review and approve the compensation arrangements, including annual salary, bonus, stock options and other benefits, direct or indirect. The Committee will review the operation of the Company's executive compensation programs on

CONSOLIDATED AMENDED DERIVATIVE COMPLAINT - CASE NO. 3:05-cv-04642 JF (PVT)

- 15 -

a periodic basis and approve appropriate modifications to such programs.

- The Committee will supervise the Company's administration of and make recommendations to the Board regarding the Stock Plans. The Committee will: (i) approve grants of stock, stock options or stock purchase rights to individuals eligible for such grants (including grants in compliance with Rule 16b-3 promulgated under the Exchange Act to individuals who are subject to Section 16 of the Exchange Act); (ii) interpret the Stock Plans and agreements thereunder; and (iii) determine acceptable forms of consideration for stock acquired pursuant to the Stock Plans.

- The Committee will periodically review the Company's procedures with respect to employee loans, and will not approve any arrangement in which the Company, directly or indirectly, extends or maintains credit, arranges for extension of credit or renews an extension of credit, in the form of a personal loan to or for any director or executive officer (or equivalent thereof) of the Company. The Committee will assist the Board and management of the Company in complying with this prohibition.

31. According to the 2005 Proxy Statement, duties of the Compensation Committee are summarized as:

Compensation Committee.   The compensation committee is responsible for:

- overseeing the overall compensation and benefits policies for Mercury;

- overseeing and setting salaries, incentives and other forms of compensation for senior executives; and

- evaluating the performance of senior executives, and reviewing our management succession plan.

**Audit Committee**

32. All the Director Defendants, except Zingale, served on the Audit Committee of the Board of Directors at certain times during the relevant time period:

| Audit Committee | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | <u>1997</u> | <u>1998</u> | <u>1999</u> | <u>2000</u> | <u>2001</u> | <u>2002</u> | <u>2003</u> | <u>2004</u> | <u>2005</u> |
| Kohavi | M | M | M | M | M | M | M | M | |
| Shamir | M | M | M | M | M | M | M | M | M |

CONSOLIDATED AMENDED DERIVATIVE COMPLAINT - CASE NO. 3:05-cv-04642 JF (PVT)

- 16 -

| Yaron | M | M | M | M | M | M | M | | |
| Zingale | | | | | | | | | |
| Ostler | | | | | | | C | C | C |
| Boston | | | | | | | | M | M |
| *Meetings Per Year* | *4* | *4* | *4* | *4* | *6* | *7* | *6* | *6* | |

M = Member  C = Chair

33.      In May 2000, the Board adopted a written charter for the Audit Committee.  One of the functions of Audit Committee listed in the May 2000 Charter was "discuss with management and the outside auditors the quality and adequacy of the Company's internal controls."  In July 2003, the Board adopted a new Audit Committee and Qualified Legal Compliance Committee Charter.  Under the membership requirements, the Charter stated: "at least one member of the Audit Committee shall be an 'audit committee financial expert' within the meaning of Securities and Exchange Commission rules."  From 2003 to date, Ostler was designated as the Audit Committee's "financial expert."  The July 2003 Charter also stated that the Audit Committee shall, in conjunction with the CEO and CFO, "review the Company's internal controls and disclosure controls and procedures, including whether there are any significant deficiencies in the design or operation of such controls and procedures, material weaknesses in such controls and procedures, any corrective actions taken with regard to such deficiencies and weaknesses…"

34.      In February 2005, the Audit Committee amended and restated the July 2003 Audit Committee and Qualified Legal Compliance Committee Charter.  The February 2005 Charter defined the duties and responsibilities of the Audit Committee in pertinent part as follows:

> •      The Audit Committee shall, in conjunction with the CEO and CFO of the Company, review the Company's internal controls over financial reporting and disclosure controls and procedures.  The review of internal control over financial reporting shall include whether there are any significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to affect the Company's ability to record, process summarize and report financial information and any fraud involving management or

CONSOLIDATED AMENDED DERIVATIVE COMPLAINT - CASE NO. 3:05-cv-04642 JF (PVT)

- 17 -

other employees with a significant role in internal control over financial reporting.

- The Audit Committee shall establish procedures for:

  ▪ the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and

  ▪ the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters.

- The Audit Committee shall review any significant complaints regarding accounting, internal accounting controls or auditing matters received pursuant to such procedures.

35. PWC, as outside auditor to the Company, was specifically retained to assist and report to the Audit Committee. As a result of what was or should have been the frequent interaction between PWC and members of the Audit Committee, PWC had access to internal financial information, including records concerning compensation and stock options. Despite this access, PWC was professionally negligent in failing to discover and report on the incorrect financial accounting and treatment of stock options for Landan, Smith, and Skaer.

36. The duties of the Audit Committee are summarized in the 2005 Proxy as follows:

Audit Committee.    The audit committee, which constitutes our qualified legal compliance committee, is responsible for the oversight of the quality and integrity of Mercury's financial statements, its compliance with legal and regulatory requirements, the qualifications and independence of its independent auditors, the performance of its internal audit function and independent auditors and other significant financial matters ... In discharging its duties, the audit committee has the sole authority to appoint, retain, compensate, oversee and terminate the independent auditors and is expected to:

- review and approve the scope of the annual internal and external audit;

- review and pre-approve the engagement of Mercury's independent auditors to perform audit and non-audit services and the related fees;

- review the integrity of Mercury's financial reporting process;

- review Mercury's financial statements and disclosures and U.S. Securities & Exchange Commission ("SEC") filings;

CONSOLIDATED AMENDED DERIVATIVE COMPLAINT - CASE NO. 3:05-cv-04642 JF (PVT)

- review funding and investment policies; and
- review disclosures from Mercury's independent auditors regarding Independence Standards Board Standard No. 1.

**Corporate Governance Standards**

37.    The following Director Defendants served on the Nominating and Corporate Governance Committee during the relevant period:

| Nominating and Corporate Governance Committee | | | |
|---|---|---|---|
| | <u>2003</u> | <u>2004</u> | <u>2005</u> |
| Kohavi | C | C | C |
| Yaron | M | M | M |
| Zingale | | M (last meeting 10/12/04) | |
| Ostler | M | M | M |
| *Meetings Per Year* | *1* | *5* | *5* |

M = Member  C = Chair

38.    On July 30, 2003, the Mercury Board adopted a Nominating and Corporate Governance Committee Charter.  The Charter was amended and restated on February 23, 2005. According to the Charter, a Corporate Governance Committee was created to "oversee and set compensation for directors..."  The Committee was also responsible for the rotation of committee members and committee Chairmen.  The committee was to determine annually (at a minimum) whether the board and its committees are functioning effectively.

39.    According to Mercury's 2004 Proxy Statement, Mercury's purported corporate governance procedures and the directors' purported commitment to "good corporate governance."

CONSOLIDATED AMENDED DERIVATIVE COMPLAINT - CASE NO. 3:05-cv-04642 JF (PVT)

CORPORATE GOVERNANCE PRINCIPLES AND BOARD MATTERS

Our board of directors and management have been and remain committed to good corporate governance to ensure that we are managed for the long-term benefit of our stockholders. To that end, during the past year, as well as in prior years, our board of directors and management have periodically reviewed and updated our corporate governance policies and practices in accordance with the requirements of the Sarbanes-Oxley Act of 2002 and the rules and listing standards issued by the SEC and NASDAQ.

In doing so, our board reviews current best practices of similarly situated public companies. *We have in place a variety of policies and practices to promote good corporate governance*. Consistent with our Corporate Governance Guidelines, a majority of our board of directors is independent in accordance with the rules of NASDAQ; and all members of the audit committee, compensation committee, and nominating and corporate governance committee also meet the NASDAQ guidelines for independence. Compensation of our chief executive officer is approved by our compensation committee, which evaluates our CEO's performance in light of corporate goals and objectives. We have also established and review annually:

- charters for our audit committee, which also constitutes our qualified legal compliance committee, compensation committee, and nominating and corporate governance committee that address corporate governance practices in accordance with the Sarbanes-Oxley Act, current NASDAQ corporate governance guidelines, and other applicable rules and regulations;

- disclosure control policies and procedures in accordance with the requirements of the Sarbanes-Oxley Act;

- a procedure for receipt and treatment of anonymous and confidential complaints or concerns regarding audit or accounting matters; and

- a Code of Business Conduct and Ethics applicable to our officers, directors and employees. (Emphasis added).

**Failure of Committees of the Board of Directors to Act**

40.     Based on information and belief, Mercury's Board was well aware of the persistent pattern of long delays between an option grant date and notice of a stock option grant to employees through employee complaints and delays in the Board's unanimous consent process. Under the Charters of all three Committees (Compensation, Audit, and Nominating and Corporate Governance), the Director Defendants had an obligation to investigate such delays but failed to do so until the SEC began its own investigation.

1

**FORMATION OF SLC IMPROPER**

2      41.      On February 8, 2006, the Board appointed Boston and Stanley Keller ("Keller") as

3   the SLC, to review and investigate issues related to this derivative litigation.  On the same date,

4   Keller was appointed to the Mercury's Board and the Mercury's Bylaws were concurrently

5   amended to increase the number of directors from 7 to 8.   Thus concluding there was no

6   independent majority on the Board prior to this date.

7      42.      Defendant Boston, a member of the Mercury Board since May 2004 and also a

8   member of ***both*** its Audit Committee and Compensation Committee in 2004, is one of the primary

9   wrongdoers in this case.   These positions and his failure to act until the SEC triggered an

10  investigation inhibits the SLC to act independently or disinterestedly.   According to Mercury's

11  2004 Proxy Statement, Mercury's Audit Committee was responsible for "the oversight of the

12  quality and integrity of Mercury's financial statements, its compliance with legal and regulatory

13  requirements … the performance of its internal audit function and independent auditors."   *Id.*

14  Mercury now admits it is almost certain the Company will conclude that one or more material

15  weaknesses existed in Mercury's financial reporting as of December 3, 2004, which will result in a

16  qualified report by Mercury's outside auditor, thus directly implicating Defendant Boston in the

17  Board's failure to oversee the Company's business.

18     43.      Defendant Boston also served on Mercury's Compensation Committee which was

19  to oversee "the overall compensation and benefits policies for Mercury," to oversee and set

20  "salaries, incentives and other forms of compensation for senior executives" and evaluate "the

21  performance of senior executives, and reviewing our management succession plan."

22     44.      Mercury has admitted that stock option grants were back-dated by senior

23  management in the Company.   This misconduct fell within the responsibilities of the

24  Compensation Committee and resulting in: a restatement of the Company's financial statements

25  for 2004; the Company's failure to file SEC quarterly and annual reports as required; the delisting

26  of the Company's stock; a default on the Company's bonds and a $40 million increase in

27  indenture premiums; and will likely result in a qualified audit opinion.

28

CONSOLIDATED AMENDED DERIVATIVE COMPLAINT - CASE NO. 3:05-cv-04642 JF (PVT)

- 21 -

45.     Boston cannot objectively and in good faith decide whether to continue litigation in which he faces the substantial likelihood of personal liability as one of the primary wrongdoers for breach of the duties that he owed to the Company as a director and as a member the Board's Audit and Compensation Committees.

**BACKGROUND**

46.     On April 19, 2006, Anna Driver of *Reuters* reported disclosed that an uproar existed over option awards.  According to *Reuters*, "[b]ack-dating options appears to be a long-standing and common practice.  A working paper on stock option grants published in January 2005 by the University of Michigan Ross School of Business found managers had 'substantial influence…" on the practice of back-dating options  Citing the "[a]nalysis of 605,106 option grants at publicly traded companies from 1992 to 2002…" the University of Michigan study concluded that "prices fell significantly prior to option grant dates and rose significantly following grant dates, some of which may be explained by back-dating options."

47.     On April 28, 2005, Mercury issued a press release reporting its preliminary results for the first quarter of 2005, which were positive, and again increased its earnings guidance.  The press release exposed the Company to liability because it did not disclose the existence of the SEC investigation, which was by then in its fifth month, or that the Company had known compliance problems.

48.     Finally, on July 5, 2005, the Company issued a press release, in which it reported disappointing results for the second quarter of 2002, which it partially attributed to "proactive" measures in the second quarter in connection with restructuring charges to be taken in the third quarter relating to the SEC investigation of the Company's internal controls:

> "The disappointing second quarter results are due primarily to a shortfall in Europe," stated Mercury Chairman and Chief Executive Officer Amnon Landon. "Mercury has a large market opportunity, strong competitive position, and global customer base.  We have also been engaged over the past several months in a thorough review of our business operations and are now taking proactive actions to position us to execute in the second half of 2005.  These actions will result in third quarter restructuring charges."

In response to an informal inquiry of the Securities and Exchange Commission

entitled <u>In the Matter of Certain Option Grants</u>, which was initiated by the SEC in November 2004, the Company's Board of Directors has appointed a Special Committee consisting of [purportedly] disinterested members of the Audit Committee to conduct an internal investigation relating to past stock option grants.  The Special Committee is being assisted by independent outside legal counsel and accounting experts.  Mercury continues to fully cooperate with both of these inquiries.

These inquiries could cause the Company to restate its financial statements for prior periods.  Both the SEC inquiry and the Special Committee investigation are ongoing.  Mercury is unable to determine at this time whether a restatement will be necessary, and if so, the years affected and the amounts involved.  The Company does not believe that a restatement would have an impact on its historical revenues, cash position, or non-stock option related operating expenses.

49.     By that time, Mercury already had incurred expenses of $1 million in connection with the SEC investigation:

The Company estimates that it has incurred approximately $1.0 million of unanticipated expenses in the second quarter of 2005 for both the Special Committee investigation and the SEC inquiry, which are excluded in the non-GAAP earnings per share estimates being provided in this press release.

## SUBSTANTIVE ALLEGATIONS

50.     Defendants are liable for their individual and collective breaches of their fiduciary duties of loyalty, good faith, candor, and due care in connection with, *inter alia*, the following:

a.     Employees' intentional manipulation of their stock option grants by changing the dates on which they actually were granted to dates on which the stock was trading at a lower price, in order to get a lower "strike price" at which the options could be exercised, for the purpose of generating bigger profits upon the exercise of the options;

b.     Employees' intentional misreporting of stock option grant exercise dates by reporting an exercise date on which the stock was trading at a lower price than on the date on which the option actually was exercised, which has the effect of reducing the taxable income of the employees, but exposes the Company to tax penalties for failure to pay withholding taxes;

c.     Employees' self-dealing, including the improper manipulation of options and other misconduct, resulting in higher costs and other financial harm to Company;

d.     The Director Defendants' approval, based on the recommendation of the Compensation Committee, of executive compensation plans, including stock option grants, with improper practices for the dating of the grants, or which could be manipulated to increase stock option grant proceeds or other compensation under the plans;

CONSOLIDATED AMENDED DERIVATIVE COMPLAINT - CASE NO. 3:05-cv-04642 JF (PVT)

- 23 -

e.   Defendants' failure to discover and/or prevent the improper manipulation of employee stock option grants and employees' wrongdoing;

f.   Defendants' failure to discover and/or prevent the public misreporting of earnings caused by the manipulation of employee stock options, including its effect on stock option grant expenses and tax liabilities;

g.   Defendants' improper loan of $1 million to defendant Landan in 1999, without approval by the Board, and which was not properly disclosed in the Company's SEC filings;

h.   Defendants' failure to properly implement, oversee and maintain appropriate and adequate accounting and internal controls, practices and procedures;

i.   Defendants' failure to ensure that Mercury operated in compliance with all applicable federal and state laws, rules, and regulations requiring the dissemination of accurate financial statements;

j.   Defendants' failure to ensure that Mercury not engage in any unsafe, unsound, or illegal business practices;

k.   Defendants' failure to discover and/or prevent circumstances that could cause harm to the reputation and business of Mercury; and

l.   Defendants' failure to discover and/or prevent the exposure of the Company and its executives to civil and criminal liabilities.

51.   The Defendants' actions and their failures to act resulted in Mercury's announcement on November 2, 2005, that it was unable to timely report its financial results for the third quarter of 2005, and would restate its results from 2002 through the first quarter of 2005. Mercury subsequently was delisted by NASDAQ, and the Trustee for holders of 25% of each series of Mercury Notes declared principal and interest on the notes immediately due and payable based on Mercury's failure to timely file quarterly and annual reports with the SEC. As a result, the Company's market capitalization plummeted from $3.3 billion to $2.22 billion. In addition, the Company is the subject of myriad lawsuits, and is exposed to both civil and criminal liability.

52.   Based on the interim report issued by the Special Committee in November 2005 (described in detail below), stock option grants were back-dated and Defendants should have known about the practice. Defendants admit that their misconduct caused the Company to restate

CONSOLIDATED AMENDED DERIVATIVE COMPLAINT - CASE NO. 3:05-cv-04642 JF (PVT)

- 24 -

1  its financial reports, resulting in the delisting of Mercury stock, and will likely result in an adverse

2  opinion by its outside auditor relating to material weaknesses in Mercury's internal financial

3  controls.  The issue is not whether Defendants breached their duties to the Company, as this issue

4  is admitted by the Special Committee, but rather the measure of damages.

5  **Mercury Admits Manipulation of Stock Option Grants and Backdating**

6        53.    On November 2, 2005, Mercury issued a press release stating that an internal

7  investigation had revealed that an "overwhelming majority" of stock option grants granted to

8  employees during the period from January 1995 through November 2005 were manipulated by

9  employees by changing the actual dates of stock option grants to dates on which the stock was

10  priced lower, which generally has the effect of generating greater profits (or minimizing losses) on

11  the date the stock option is exercised.  As the Company stated in the press release:

12          ***From 1995 to the present, there have been forty-nine instances in which the
13  stated date of a Mercury stock option grant is different from the date on which
the option appears to have actually been granted.*** In almost every such instance,
14  the price on the actual date was higher than the price on the stated grant date.
***These instances represent the overwhelming majority of the grants between
15  January 1996 and April 2002.*** The misdating occurred with respect to grants to
all levels of employees.  (Emphasis added).

16      54.    The Company detailed the rampant stock manipulation as follows:

17  The misdated stock option grants fall largely into three categories: (i) "look back"
18  grants, in which the date of the grant was picked retroactively (*e.g.*, a decision in
February to pick a January date); (ii) "wait and see" grants, in which a grant date
19  was selected, but the decision was finalized — and sometimes changed — at a
later date (*e.g.*, a decision on January 1 to issue a grant on January 15, but there is
20  a period after January 15 in which the grantor waits to see if a more advantageous
price occurs and, if one does, uses that later date instead); and (iii) grants where
21  there was failure to complete the option grant process by the date of the grant
(*e.g.,* where there is a decision to issue a grant as of a certain date, but after that
22  date there are changes in the grantees or amounts to grantees, and although the
work is not complete on those grants as of the stated grant date, that date is
23  nonetheless used).

24  During the 1995 to April 2002 period, most grants fell into the "look back" and
25  "wait and see" categories.  Since April 2002, there have been a small number of
instances of the third category identified above, in which the Company appears to
26  have been making changes to the grantees or amounts of the options after the
stated date of the option grant.  However, intentional selection of a favorable price
27  for option grants appears to have ended in or about April 2002, at which time the
Company began to follow a different dating practice for new-hire, transfer and

28  CONSOLIDATED AMENDED DERIVATIVE COMPLAINT - CASE NO. 3:05-cv-04642 JF (PVT)

1   promotion grants.  Pursuant to that practice, which is in effect now, all such grants
are to be made on a fixed date based on the employee's hire date.

2   55.    The November 2, 2005 press release further announced that Defendants Landan,

3   Smith, and Skaer were aware of, participated in, and benefited from the wrongdoing, and that their

4   "resignations" from the Company were accepted by the Board as a result:

5        Chief Executive Officer Amnon Landan, Chief Financial Officer Douglas Smith,
         and General Counsel Susan Skaer were each aware  of and, to varying degrees,
6        participated in the practices discussed above. Each of them also benefited
         personally from the practices. ... [E]ach of them knew or should have known that
7        the practices were contrary to the options plan and proper accounting. ... [T]he
         Special Committee has concluded that the actions of Mr. Landan, Mr. Smith and
8        Ms. Skaer are not acceptable. Accordingly, the Board has accepted the
         resignations of Mr. Landan as chairman, chief executive officer and director, Mr.
9        Smith as executive vice president and chief financial officer, and Ms. Skaer as
         vice president, general counsel and secretary.
10

11   56.    The press release reported that the Special Committee had uncovered additional

12   examples of improper conduct by Defendant Landan.  First, on at least three occasions between

13   1998 and 2001, Landan had incorrectly reported the dates on which he exercised stock option

14   grants, which reduced Landan's reported income, and exposed the "Company to possible penalties

15   for failure to pay withholding taxes."  The Company reported that "[i]n at least one instance, Ms.

16   Skaer was involved in Mr. Landan's exercise of options as of a prior date." Second, as detailed

17   below, Landan borrowed $1 million from the Company, without prior approval by the Board,

18   which was not adequately disclosed in the Company's public filings.

19   57.    The Company announced that as a result of this wrongdoing it was unable to report

20   its financial results for the third quarter of 2005 by November 30, 2005, as required.  Further, the

21   Company stated that it would have to restate its reported results from 2002 through the first

22   quarter of 2005 to take into account the financial effects of the improper manipulation of the stock

23   option grants from 1995 through 2002, the misdating of the stock option grant exercises and the $1

24   million loan to Landan in 1998, 1999 and 2001.  The press release warned that "[t]he Company

25   believes that its ability to file amended reports by November 30, 2005 on Form 10-K and Form

26   10-Q with the Securities and Exchange Commission with respect to such periods is in serious

27   jeopardy."

28

CONSOLIDATED AMENDED DERIVATIVE COMPLAINT - CASE NO. 3:05-cv-04642 JF (PVT)

1    58.    The Company also announced that "the fourth quarter will be challenging and at

2    this time we will not provide guidance for Q4 2005."

3    **How the Existing Stock Option Plans Were Manipulated**

4    59.    On February 26, 1998, the Compensation Committee of Mercury's Board, then

5    composed of Defendants Landan, Kohavi, Shamir, and Yaron, and non-defendant Aryeh Finegold

6    ("Finegold"), approved the 1998 Employee Stock Purchase Plan (the "1998 Plan").   The

7    Compensation Committee was comprised of non-employee members of the Board, and had the

8    responsibility for: (i) overseeing the overall compensation and benefits policies for Mercury; (ii)

9    overseeing and setting salaries, incentives and other forms of compensation for senior executives;

10    and (iii) evaluating the performance of senior executives, and reviewing the management

11    succession plan.

12    60.    Under the Plan, to be administered by Mercury's Board or one or more committees

13    appointed by the Board, stock option grants were to be priced as follows:

> The Plan permits the granting of stock options that are intended to qualify as
> either ISOs or NSOs.  In the case of ISOs, the option exercise price for each share
> shall not be less than 100% of fair market value of a share of common stock on
> the date of grant of such option.  In the case of NSOs, the option exercise price for
> each share covered shall be determined by the Administrator.  The fair market
> value of the Common Stock shall be the closing price as of such date as reported
> by the NASDAQ National Market System or other stock exchange.  The term of
> each option will be fixed by the Administrator but may not exceed ten years from
> the date of grant for ISOs.  The Administrator will determine the time or times
> that each option may be exercised.

20    61.    The 1999 Stock Option Plan ("1999 Plan") was adopted by the Board and approved

21    by the shareholders in August 1998.  The 1999 Plan is administered by the Board of Directors,

22    except with respect to grants to executive officers which is administered by the Compensation

23    Committee.  The 1999 Plan replaced the 1998 Plan, which expired in August 1999.  ***Under the***

24    ***1999 Plan, stock option grants could not be re-priced without prior shareholder approval.  All***

25    ***options were required to carry a minimum exercise price of fair market value at grant date.***

26    62.    Under the terms of the 1999 Plan, options may be granted to employees (including

27    employees and directors of Mercury).  The 1999 Plan "may be administered by the Board of

28

CONSOLIDATED AMENDED DERIVATIVE COMPLAINT - CASE NO. 3:05-cv-04642 JF (PVT)

Directors of Mercury of by one or more Committees appointed by the Board."  The Board appointed an Options Committee to act as Administrator which largely consisted of Landan, Skaer, Smith, and/or Abrams.  "The Administrator has full power to select the individuals to whom options will be granted from among the officers and employees directors or other employees eligible for grants, to make any combination of grants to any participant and to determine the specific terms of each grant," subject to the provision that no outstanding option may be re-priced without approval of the stockholders for such re-pricing.

63.    According to Mercury's Proxy Statements, membership on the Options Committee included Finegold and Defendant Landan in 1999 and Landan and Abrams in 2000.  The Proxy Statement provides no information from 2001 to date on the Options Committee.

64.    Under the 1999 Option Plan, the following executives and directors were granted options:

| YEAR ENDED DECEMBER 31, 2004 (Shares/Price/*Grant Date*) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 |
| Landan | 160,000 ($9.75) *3/31/97* | 161,340 ($12.63) *1/9/98* | 600,000 ($12.03) *1/2/99*<br><br>120,000 ($18.25) *7/15/99* | 700,000 ($40.71) *1/6/00* | 700,000 ($60.87) *1/8/01* | 700,000 ($29.29) *1/22/02* | 600,000 ($31.41) *1/3/03* | |
| Kenneth Klein | 30,000 ($9.75) *3/31/97* | 81,554 ($12.63) *1/9/98* | 300,000 ($12.03) *1/2/99*<br><br>42,000 ($18.25) *7/15/99* | 300,000 ($40.71) *1/6/00* | 350,000 ($60.87) *1/8/01* | 350,000 ($29.29) *1/22/02* | 175,000 ($31.41) *1/3/03* | |
| Sharlene Abrams | 25,000 ($9.75) *3/31/97* | 40,934 ($12.63) *1/9/98* | 80,000 ($12.03) *1/2/99*<br><br>21,000 ($18.25) *7/15/99* | 100,000 ($40.71) *1/6/00* | 125,000 ($60.87) *1/8/01* | | | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Moshe Egert | | 40,932 ($12.63) *1/9/98* | 80,000 ($12.03) *1/2/99*<br><br>15,000 ($18.25) *7/15/99* | 100,000 ($40.71) *1/6/00* | 150,000 ($60.87) *1/8/01* | | | |
| Smith | | | | 450,000 ($65.20) *5/23/00* | 100,000 ($60.87) *1/8/01*<br><br>400,000 ($24.29) *11/2/01* | | 200,000 ($31.41) *1/3/03* | |
| James Larson | | | | | | | | 150,000 ($45.55) *12/31/04* |
| Zohar Gilad | | | | | | 150,000 ($29.29) *1/22/02* | 100,000 ($31.41) *1/3/03* | |
| Yuval Scarlat | | | | | | 150,000 ($29.29) *1/22/02* | 125,000 ($31.41) *1/3/03* | |

65.   Landan has publicly admitted that, at a minimum, that certain stock option grants were misdated and contained incorrect strike price.  The following stock option grants to Landon were improper:  (i) 700,000 shares with a record date of January 9, 2001 had a back-dated exercise price; (ii) option to acquire 322,680 shares with a record grant date of January 1, 1998 *should have an exercise price of $8.75 and not $6.31 as originally granted*; (iii) option to acquire 120,000 shares with a record grant date of July 15, 1999 *should have an exercise price of $21.94 not $18.25 as originally granted*; and (iv) the option to acquire 700,000 with a record grant date of January 22, 2002 *should have an exercise date of $36.43 and not $29.29 as originally granted*.

66.   Smith has also admitted the stock option grants that he received in November 2001 were improperly priced to give him a more favorable strike price and were not priced on the day that the grants were actually determined.  *The exercise price of Smith's options to purchase 400,000 shares under his November 2, 2001 option agreement should have been $28.05 not*

*$24.29*.  On October 27, 2003 and January 5, 2004, Smith exercised that option to purchase 120,000 shares at the improper price of $24.29 and sold the same 100,000 shares for $45,727 and 20,000 for $51.0233, for proceeds of over $2.6 million.  Approximately $450,000 of the $2.6 million on these transactions alone was the result of the improper manipulation of grant dates.

67.   In its Form 10-K Annual Reports filed with the SEC for 1998 through 2002, the Company represented that it used the "fair value on the date of grant" method of accounting for stock-based compensation.  For example, the relevant section of the Form 10-K Annual Report for 2000 states that:

> The Company accounts for stock-based compensation using the intrinsic value method presented in Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees" ("APB 25"), and related interpretations.  The Company's policy is to grant options with an exercise price equal to the quoted market price of its stock on the grant date.  Accordingly, no compensation cost has been recognized in the statements of operations.  Additional pro forma disclosure is provided as required under Statement of Financial Accounting Standard No.123 ("SFAS 123"), "Accounting for Stock-based Compensation" (see Note 3).  The Company has not issued stock options to non-employees.

68.   As first disclosed in the Company's November 2, 2005 press release, nearly all of the stock option grants granted by the Company were misdated and therefore mispriced in violation of the Plan.  Moreover, as a result of the misdating, the Company did not use the "fair value on the date of grant" method of accounting, as represented in the Company's public filings.  Thus, the Company admitted in that press release:

> During the relevant period, Mercury's internal controls and accounting controls with respect to option grants and exercises were inadequate. The weaknesses allowed dates of both grants and exercises to be manipulated. They also allowed grant dates to be changed to provide employees with more favorably priced options.

69.   As reported by the Wall Street Journal on November 11, 2005:

> The company's stock-price pattern shows it chose low points for every major grant from 1996 to 2002. For instance, Mercury gave 1.3 million options to executives on March 31, 1997. Its stock, which trades on the Nasdaq Stock Market, fell 21% over the 10 prior trading days, and rose 22% in the 10 days afterward.
> Similarly, on Jan. 6, 2000, top executives were given 1.2 million new options. The stock had dropped 20% over the 10 previous trading days. It rose 56% in the 10 trading days afterward – creating a paper gain of $27 million for the recipients.

CONSOLIDATED AMENDED DERIVATIVE COMPLAINT - CASE NO. 3:05-cv-04642 JF (PVT)

70.     According to Thomson Financial, since 1996, insiders of Mercury sold about $250 million worth of stock, much of it by exercising stock option grants.

71.     On November 2, 2005, the Company also disclosed that its Special Committee found that the Compensation Committee during the relevant period did not adequately discharge their responsibility as the overseers of executive compensation:

> In reviewing the evidence, *the Special Committee believes that questions should have been raised in the minds of the Compensation Committee members from 1995 through 2002 (who included present directors Mr. Kohavi, Mr. Shamir and Dr. Yaron) whether six grants that they approved by unanimous written consent were properly dated.* The evidence indicates that the Compensation Committee members were focused on the substance of who received options and how many options they received, as opposed to the effective dates of the unanimous written consents. It appears that the Compensation Committee members reasonably, but mistakenly, relied on management to draft the proper documentation for the option grants and to account for the options properly. The Special Committee believes that changes in Board procedures made in recent years will prevent similar oversights occurring in the future. (Emphasis added).

72.     Inexplicably, Yaron, who was one of the Compensation Committee members who blindly approved the stock options grants, was made Chairman of the Board contemporaneously with the disclosure of the wrongdoing. The other two Compensation Committee members, Kohavi and Shamir, were also permitted to remain on the Board.

73.     Between 1996 and 2005, Yaron sold 185,000 shares of stock, with proceeds of $9,208,704; Kohavi sold 94,960 shares of stock, with proceeds of $8,783,816; and Shamir sold 238,000 shares of stock, with proceeds of $9,249,460, most if not all of which, upon information and belief, were exercises of stock options.

74.     In another surprise move by the Board, Zingale, who also served on the Compensation Committee in 2003 and 2004 and blindly approved stock option grants and then benefited from the award of stock option grants in 2004 as the President of Mercury, became Mercury's new CEO. In 2003, Zingale sold approximately 13,000 shares for proceeds of over $560,000.

**The Improper $1 Million Loan To Landan**

75.     The November 2, 2005 press release also disclosed that the Special Committee also

CONSOLIDATED AMENDED DERIVATIVE COMPLAINT - CASE NO. 3:05-cv-04642 JF (PVT)

1    found an improper $1 million loan to Defendant Landan which heretofore was not properly

2    disclosed in Mercury's filings.  The press release stated in part:

> Mr. Landan received three loans from Mercury. Two of the loans were for a total
> of approximately $3.4 million in connection with the exercise of options by him
> and other executives. In September 1999, Mr. Landan received a $1 million loan
> from Mercury. The Special Committee has not been able to find any record that
> the $1 million loan was approved in advance by the Board of Directors, although
> the board did approve an extension of the loan in December 2000.  The loan was
> referred to in some of the Company's public filings, but was not clearly disclosed.
> Nor did Mr. Landan disclose it in his Directors and Officers questionnaire in
> February 2000.  The Special Committee has not yet been able to ascertain the
> purpose or use of the loan.  Each of the loans, together with applicable interest,
> has subsequently been repaid in full.

     76.      The Defendants' concealment of the loan to Defendant Landan has further injured

Mercury because it is an intentional breach and/or reckless disregard of their fiduciary duties

which exposes the Company to continued liability.

**DEFENDANTS' CONDUCT CAUSED SUBSTANTIAL HARM TO COMPANY**

     77.      On November 3, 2005, *The Wall Street Journal* published an article reporting on

the scandal the Company disclosed on the previous day and the impact on the Company:

> Three top executives of Silicon Valley software company Mercury Interactive
> Corp. resigned amid disclosures about improper pricing of employee stock
> options, an issue under increased scrutiny lately by the Securities and Exchange
> Commission.

> The management shakeup, which included the resignations of Mercury's chief
> executive and chief financial officer, caused shares of the Mountain View, Calif.,
> company to plunge 27% in 4 p.m. composite trading on the Nasdaq Stock Market.
> Mercury, a supplier of software for monitoring Web-based business applications,
> also said its shares could be delisted from Nasdaq if it can't file restated financial
> reports by the end of this month.  The company was due to release third-quarter
> earnings yesterday but said it couldn't because of the possible financial
> ramifications of the stock-option pricing.  The disclosures at Mercury come as the
> SEC is examining whether some companies – particularly high-tech outfits, many
> of which rely on stock options as a significant form of employee compensation –
> are manipulating the timing of stock-option grants to lift the compensation of
> employees.  The practice could cast questions over some companies' reported
> earnings, as the alleged manipulation could affect stock-option expenses and even
> tax liabilities.

     78.      As the article noted, the highest executive officers of the Company profited most

handsomely from the manipulation of their stock option grants:

CONSOLIDATED AMENDED DERIVATIVE COMPLAINT - CASE NO. 3:05-cv-04642 JF (PVT)

Since 1995, Mr. Landan paid $5.5 million to exercise 813,000 options in Mercury, and sold 1.04 million shares for a total of $73.6 million, according to Thomson Financial. Because the purchases and disposals were at a variety of times, it isn't clear what profit he made on the sales. Ms. Skaer reaped a gain of $1.1 million from exercising 65,170 options and selling the shares, while Mr. Smith reaped a gain of $2.7 million from exercising 120,000 options and selling the same number of shares, according to Thomson Financial.

**Defendants Admittedly Harmed the Company's Reputation and Business Prospects**

79.     In November 2005, Mercury, a company which provides integrated support for SOX compliance, had to admit its own internal controls especially with regard to stock option grants and exercises were inadequate from 1995 to 2002. Defendants conduct harmed Mercury's reputation and business prospects.

80.     On November 4, 2005, in an article entitled "Off the Scale," part of "The Five Dumbest Things on Wall Street This Week" feature that appears weekly in the Street.com, Companies Editor Colin Barr commented on the irony of Mercury, which is in the business of selling SOX compliance software and services to other companies, having its own compliance problems:

> New procedures [relating to options pricing] surely won't hurt. And in a stroke of good luck, Mercury specializes selling software aimed at automating procedures of that very sort. "Having wrestled the first Sarbanes-Oxley compliance period to the ground through brute force, many CIOs are now grappling with the realization that this is a permanent change in their business," Mercury says on its Web site. "It feels like we are starting to make some money – but not a ton – in this area," Chris Lochhead, Mercury's marketing chief, told TheStreet.com's Bill Snyder in April. He said Mercury expected to release enhanced Sarbanes-Oxley products by the end of the second quarter.

> So the bad news is that Mercury faces possible delisting for its failure to file regulatory documents in timely fashion. The good news? Well, there's nothing like finding a new customer close to home.

81.     In a conference call with the securities analysts on November 2, 2005, Defendant Zingale, who replaced Landan as CEO, acknowledged that Defendants' breaches of fiduciary duties will directly injure Mercury:

> **Tom Klasell** — *Thomas Weisel Partners — Analyst*

> Just sort of a clarification of some of your prior comments. ***When you mentioned that Q4 would be challenging, you are mentioning that this is totally around maybe changed customer perceptions given today's announcement;*** this has

CONSOLIDATED AMENDED DERIVATIVE COMPLAINT - CASE NO. 3:05-cv-04642 JF (PVT)

- 33 -

nothing to do with the business environment; is that correct?

**Tony Zingale** — *Mercury Interactive* — *Chairman, President & CEO*

***That's correct.  It surrounds the uncertainty of reaction globally, given that we do business around the world to these announcements today.***  And it's strictly an uncertainty comment, a caveat, if you will, nothing to do with the strength of the market opportunity, the size of the installed base of customers that we sell into, the new opportunities, our pipeline.  Any of those activities has nothing to do with that.  In fact, quite the contrary from what we observed and experienced at the Mercury World event, where we hosted 2500 of our customers. (Emphasis added).

82.     During that same conference call, one securities analyst questioned why Mercury had not caught the misconduct earlier:

**David Rudow** — *Piper Jaffray* — *Analyst*

…it's obviously a pretty information rich project underway that you guys did last year on the internal controls.  Why wasn't this caught in the internal control audit of last year?

**David Murphy** — *Mercury Interactive* — *CFO*

As we stated in the press release, the Company, since the April timeframe of 2002, has been working to improve the practices around the compliance and activities related to stock option grants.  That work has been ongoing.  It was the view of the special committee in their report out that we had indeed made significant progress since the time of the 49 identified grant dates.  And as a result, we continue to make improvements to those practices, but that is work that's ongoing and we are taking the recommendations from both the special committee and our ongoing improvement of our controls within the Company.

83.     In response to a question from a different securities analyst, David Murphy, Mercury's newly appointed CFO, explained that the complexity of the restatement increased because the misreporting problems uncovered by the Special Committee went beyond the falsification of the option grant dates:

**Michael Turits** — *Prudential Equity Group* — *Analyst*

A couple of clarifications.  First, when did you say you will be able to give the first third-quarter non-GAAP results?  And second, just to make sure it's clear to me why the option grant issue prevents you from doing that now.  I know you answered it, but wasn't clear to me.  And then lastly, I know you said just now, Anthony, that the fourth quarter challenging comment (ph) was with regards to Dave's statement, but I though you also said that on the preannouncement.  So what was that one in reference to?  Was that one in reference to the business outlook?

CONSOLIDATED AMENDED DERIVATIVE COMPLAINT - CASE NO. 3:05-cv-04642 JF (PVT)

- 34 -

**David Murphy** — *Mercury Interactive* — *CFO*

So, as we've already stated, the Company is not — we're not in a position to give a date or timeframe on Q3. As we've talked about, we are working diligently through the accounting issues around that, and it does tie to your second question around the complexity. We cannot give you a non-GAAP number without correlating GAAP numbers for comparison, per Reg G. And as I've already mentioned, we have just received in the last couple days new information from a report out of the special committee that includes in addition to the option grant date, option exercise date variability and a set of officer loans that we need to incorporate into the accounting. The complexity of that is both the accounting and the tax treatments around those sets of activities.

84.     As a direct result of these disclosures, Mercury's market capitalization decreased from $3.3 billion to $2.2. billion.

85.     In an interview published on November 9, 2005, in *BusinessWeek online*, Defendant Zingale admitted that: "yes, we've damaged the company's reputation. We've damaged its credibility with Wall Street a bit," and stated that, given recent developments, it was important to "rebuild credibility."

**Company Harmed By Restated Financials and Likely Admissions of Material Weaknesses in Financial Reporting**

86.     Mercury has admitted that the Company will restate its financials from 2002 to 2004. For example, the Company's income for the years 2002 through 2004 was materially overstated because it failed to account for reported stock-based compensation expenses. Mercury has advised shareholders and the market that its Annual Reports and Quarterly Reports from 2002 to date may no longer be relied upon.

87.     As a result of Defendants' conduct, the financial information contained in Mercury's 2004 Annual Report on Form 10-K filed with the SEC (the "Form 10-K") on March 14, 2005 and signed by the Defendants is false and misleading. In the Form 10-K Mercury represented that the Company's net income in 2002, 2003 and 2004 was $65,204,000, $41,513,000 and $84,600,000, respectively. The Company further represented that stock-based compensation expense in 2002, 2003 and 2004 was $1,163,000, $5,992,000 and $821,000, respectively.

88.     As a result of Defendants' conduct, the foregoing representations in the Form 10-K

CONSOLIDATED AMENDED DERIVATIVE COMPLAINT - CASE NO. 3:05-cv-04642 JF (PVT)

were materially false and misleading when made because they failed to disclose that:

      a.      The Company's reported stock-based compensation expense for the years 2002 through 2004 was materially understated as a consequence of the stock option backdating scheme;

      b.      The Company's income for the years 2002 through 2004 was materially overstated because it failed to account for the Company's true stock-based compensation expense over those years;

      c.      The Company's disclosure controls and procedures were not adequate; and

89.      In addition to restating its financials, in a SEC Form 12b-25 dated March 17, 2006, the Company admitted it would be harmed by the admission of its material weaknesses in financial reporting and will face an adverse opinion by its outside auditor.  The Form 12b-25 stated:

> Because of the restatement adjustments identified to date, the Company has evaluated the Management's Report on Internal Control Over Financial Reporting set forth in Item 9a on page 53 of the Company's 2004.  As previously disclosed in the Form 8-K dated August 26, 2005, it is highly likely that the Company will conclude that there were one or more material weaknesses in the Company's internal control over financial reporting at December 31, 2004.  A material weakness is a control deficiency, or a combination of control deficiencies, that results in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected.  If the Company's management concludes that one or more material weaknesses existed, it will be unable to conclude that the Company maintained effective internal control over financial reporting as of December 31, 2004.  Also, if one or more material weaknesses existed, the Company's independent registered public accounting firm will issue an adverse opinion with respect to the effectiveness of the Company's internal control over financial reporting as of December 31, 2004.  The Company intends to disclose a more detailed description of any identified material weaknesses, including its remediation efforts, in its 2004 Annual Report on Form 10K/A.

90.      Mercury's Internal Control Over Financial Reporting for the year ended December 31, 2005 is also under assessment.  The Company "has not determined whether any material weaknesses in the Company's internal control over financial reporting existed at December 31, 2005."

91.      The November 2005 Special Committee also reported that during the relevant period, Mercury's internal controls and accounting controls with respect to stock option grants and

CONSOLIDATED AMENDED DERIVATIVE COMPLAINT - CASE NO. 3:05-cv-04642 JF (PVT)

1   exercises were inadequate.  As a result, the various statements in the Company's Form 10-Ks for

2   the period that Mercury's controls are "adequate" were false and misleading when made.

3          92.    For example, in the Company's Form 10-K Annual Reports filed with the SEC for

4   1998 through 2002, the Company represented that its Chief Executive Officer and Chief Financial

5   Officer, after evaluating the Company's "disclosure controls and procedures," found them to be

6   adequate.  Again, in the relevant section of the Form 10-K Annual Report the fiscal year ended

7   December 31, 2003, the Company represented that the CEO and CFO found the Company's

8   controls were adequate for the 1998-2002 10-Ks:

9          **Item 9A.        Controls and Procedures**

10              a.      Disclosure controls and procedures. Our Chief Executive Officer
                        and Chief Financial Officer, after evaluating the effectiveness of
11                      our "disclosure controls and procedures" (as defined in the
                        Exchange Act Rules 13a-15(e) and 15d-15(e)) as of the end of the
12                      period covered by this Annual Report on Form 10-K, have
                        concluded that as of the end of the period covered by this report,
13                      our disclosure controls and procedures were adequate and designed
                        to ensure that material information related to us and our
14                      consolidated subsidiaries would be made known to them by others
                        within these entities.
15

16              b.      Changes in internal controls over financial reporting. There were
                        no changes in our internal controls over financial reporting
17                      identified in connection with the evaluation required by paragraph
                        (d) of Exchange Act Rule 13a-15 or 15d-15 that occurred during
18                      the fourth fiscal quarter that have materially affected, or are
                        reasonably likely to materially affect, our internal controls over
19                      financial reporting.

20         93.    Also, in a section of the 2004 Form 10-K titled "Controls and Procedures,"

21   Mercury represented that Landan and Smith conducted an evaluation of Mercury's disclosure

22   controls and procedures and determined that these were "effective," stating as follows in relevant

23   part:

24         Item 9A. Controls and Procedures
           Evaluation of Disclosure Controls and Procedures
25

26         Under the supervision and with the participation of our management, including
           our Chief Executive Officer (CEO) and Chief Financial Officer (CFO), we
27         conducted an evaluation of our disclosure controls and procedures, as such term is
           defined under Rule 13a-15(e) promulgated under the Securities Exchange Act of

28   CONSOLIDATED AMENDED DERIVATIVE COMPLAINT - CASE NO. 3:05-cv-04642 JF (PVT)

1934, as amended (the Exchange Act). Based on this evaluation, our CEO and CFO concluded that our disclosure controls and procedures were effective as of the end of the period covered by this annual report.

94.     The 2004 Form 10-K included certifications signed by Defendants Landan and Smith, respectively, pursuant to Section 302 of the Sarbanes-Oxley Act.  Based on admissions by both Landan and Smith as well as the preliminary report of the Special Committee, the certifications signed by Smith and Landan pursuant to Section 302 of the Sarbanes-Oxley Act, which attested to the purported accuracy of the financial statements contained in the 2004 Form 10-K and the effectiveness of its internal controls, were false.  The Company's controls and procedures as to stock option grants were inadequate and Landan and Smith used these inadequacies to their own benefit.  Landan and Smith falsely certified that:

> (1)     I have reviewed this annual report on Form 10-K of Mercury Interactive Corporation;
>
> (2)     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> (3)     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report;
>
> (4)     The company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the company and have:
>
> > a.     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
> >
> > b.     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable

CONSOLIDATED AMENDED DERIVATIVE COMPLAINT - CASE NO. 3:05-cv-04642 JF (PVT)

- 38 -

assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c.   Evaluated the effectiveness of the company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d.   Disclosed in this report any change in the company's internal control over financial reporting that occurred during the company's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting; and

(5)   The company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's independent registered public accounting firm and the audit committee of the company's board of directors (or persons performing the equivalent functions):

a.   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information; and

b.   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

95.   PWC, as the independent auditor charged with accurately reviewing and certifying Mercury's financial reporting, was either aware or should have been aware of the material weaknesses and the harm likely to result by failing to correct and disclose the accounting issues.

**Mercury Overpaid Bonuses to Executives Based on False Finances and Was Underpaid for Stock**

96.   Cash bonus paid to Mercury's executives based on the aforementioned false and misleading financial information and should be repaid to the Company. In fact, when Landan's, Skaer's, and Smith's self-dealing conduct was disclosed, Mercury's market capitalization plunged 27% in just one day of trading in early November 2005. From 2002 to 2004, Defendant Landan

CONSOLIDATED AMENDED DERIVATIVE COMPLAINT - CASE NO. 3:05-cv-04642 JF (PVT)

1   received cash bonuses of $800,000, $400,000 and $400,000 based on achievement of certain

2   financial goals relating to Mercury's revenue growth, increase in operating margin, cash flow from

3   operations, and growth in market capitalization.   In 2004, 2003, and 2002, defendant Smith

4   received cash bonuses of $350,000, $350,000 and $350,000 based on similar criteria.   These

5   bonuses were determined by the Compensation Committee which consisted of Defendants Zingale

6   (2002-2004), Boston (2004), Shamir (2002-2004) and Yaron (2202-2004).

7         97.    Furthermore, by underpricing the stock to themselves, Landan, Skaer, and Smith

8   paid less for Company stock than they would have done if the option price had been accurate.  As

9   a result, Mercury lost and continues to lose millions in stock revenue.  For example, Landan's

10  options, granted in 1998, 1999, and 2002, were properly priced at $8.75, $21.94 and $36.43

11  (instead of $6.31, $18.25 and $29.29, respectively), then Mercury would gain an additional $6.2

12  million in stock revenue for Landon's stock purchase alone.  Adding the nearly one million stock

13  option grants made annually, Mercury has lost tens of millions of dollars in stock revenue.

14  **The Company is Harmed by Inability to File Any Further Financial Reports with the SEC**

15        98.    Based on the investigation of Special Committee, the Company is in the process of

16  restating its historical financial statements and has determined that Mercury's previously issue

17  financial statements for the fiscal years 2002, 2003 and 2004 must be restated and that Mercury's

18  Annual Reports and Quarterly Reports on Form 10-Q filed with the SEC, including the Quarter

19  Report for the first fiscal quarter of 2005, can no longer be relied upon.  Mercury remains unable

20  to file amended reports and, as a result, has been unable to file Quarterly Reports with the SEC for

21  the second, third and fourth quarter of 2005 as well as an 2005 Annual Report.

22        99.    On May 11, 2006, Mercury announced that it had not filed a Quarterly Report for

23  the first quarter of 2006 and was unable to state when the Company would be able to file its 10-Q

24  for the quarter.

25        100.   Mercury is also unable to issue comparable results.  As Mercury advised the SEC

26  on March 17, 2006, "[d]ue to the Company's restatement of its financial statements for the periods

27  covered by the Form 10-K/A for the year ended December 31, 2004, the Company at this time

28
CONSOLIDATED AMENDED DERIVATIVE COMPLAINT - CASE NO. 3:05-cv-04642 JF (PVT)

1 | cannot provide a reasonable estimate and comparison of the results of its operations for the fiscal
2 | year ended December 31, 2005 compared to 2004 results." Thus, Mercury cannot even tell its
3 | shareholders whether the Company performed better or worse in 2005 compared to 2004 —
4 | critical information to Mercury shareholders and any potential investors.

5 |       101.    Due to the pending restatement, Mercury is also not able to give Generally
6 | Accepted Accounting Principles ("GAAP") net income or fully diluted earnings per share, or non-
7 | GAAP net income or fully diluted earnings for 2005 or 2006. Mercury's inability to prepare
8 | financial reports is likely to increase interest rates under any lines of credit and prevents any
9 | successful public or private debt or equity offerings.

10 |       102.    PWC, as the independent auditor charged with accurately reviewing and certifying
11 | Mercury's financial reporting, was either aware or should have been aware that Mercury was not
12 | in compliance with GAAP reporting requirements and should not have issued the previous
13 | unqualified audit opinions.

14 | **Mercury Delisting as a Result of Defendants' Conduct Harms the Company**

15 |       103.    On November 10, 2005, Mercury notified the SEC that it would not meet the
16 | negotiated late filing date of November 30, 2005 for its quarterly report on Form 10-Q for the
17 | third quarter of 2005.

18 |       104.    On January 3, 2006, the NASDAQ Listing Qualification Panel delisted the
19 | Company's stock from The NASDAQ National Market because the Company was not in
20 | compliance with the NASDAQ continued listing requirement that the Company be compliant with
21 | its filing requirements (such as filing quarterly reports with the SEC) under Marketplace Rule
22 | 4310(c)(14).

23 |       105.    On January 4, 2006, Mercury began trading in the Pink Sheets under trading
24 | symbol MERQ.

25 |       106.    On March 17, 2006, Mercury notified the SEC that it would not be filing its Annual
26 | Report for 2005 on Form 10-K within the prescribed time period as required. The reason for the
27 | delay was that the Company was in the process of restating certain of its historical financial

28

CONSOLIDATED AMENDED DERIVATIVE COMPLAINT - CASE NO. 3:05-cv-04642 JF (PVT)

statements based on accounting and tax issues relating to options dating back to 1993. As of the date of this complaint, Mercury still has not filed its quarterly reports for third quarter of 2005 and the first quarter of 2006 or its annual report for 2005. Mercury has also been unable to set a date by which the Company intends to file such reports. Absent compliance with all NASDAQ filing requirements, Mercury's common stock may not be re-listed on NASDAQ which restricts the Company's ability to raise money through public secondary stock offerings.

**Mercury's Delayed Financial Reporting Triggered Default and Increased Indenture Premiums**

107.    On March 17, 2006, Mercury announced that the Company will not make its required SEC filings for the second and third quarter of 2005 prior to the expiration of a waiver period granted by the holders of its 2007 and 2008 Notes. As a result, the Trustee or holders of 25% of each series of Notes sent Mercury a notice of default under the relevant Indenture Agreement in order to declare the principal and interest on the applicable Note series immediately due and payable.

108.    Due to the Trustees' notice of default under both series of Notes, Mercury was forced in April 2006 to solicit consents to waive the default from the holders of its $300 million of 4.75% Convertible Subordinated Notes due 2007 ("2007 Notes") and from the holders of its $500 million of Zero Coupon Senior Convertible Notes due 2008 ("2008 Notes'). In exchange for the waivers, which Mercury obtained on May 4, 2006, Mercury agreed to increase the premium in the Indenture Agreements for holders of both 2007 and 2008 Notes. Mercury agreed to repurchase the 2007 Notes at a repurchase price equal to 101.3% of principal (an increased premium of $3.9 million) and to repurchase the 2008 Notes at a repurchase price equal to 107.25% of principal (an increased premium of $36 million). Thus, defendants' manipulation of stock option grants damaged Mercury through a $40 million premium increase under its Indenture Agreements with holders of its 2007 and 2008 Notes.

109.    Thus based on Defendants' conduct, Mercury paid an increased indenture premium of $40 million and still faces potential default under other terms of the relevant Indenture Agreement.

CONSOLIDATED AMENDED DERIVATIVE COMPLAINT - CASE NO. 3:05-cv-04642 JF (PVT)

**Defendants' Failure to Terminate Landan, Smith, and Skaer for Cause Harmed the Company**

110.    Mercury's acceptance of the resignations of Defendants Landan, Smith, and Skaer were after the wrongful acts, instead of terminating these faithless employees for cause, further harmed the Company. Despite the Special Committee's finding that these defendants' "missing or overlooking a practice as basic and important as the proper granting of options is not acceptable," Landan, Smith, and Skaer were not fired such that they would immediately lose any benefits to which they would otherwise be entitled under their employment agreements.

111.    Under Landan's February 11, 2005 employment agreement as CEO, if his employment ends by involuntary termination, he receives the following benefits: severance pay equal to 75% of his annual base salary and target bonus (his base salary was $750,000 in 2004): present value lump sum payment of his long-term service bonus (estimated to cost $1.8 million as of February 2005); 36 months of health insurance; pro-rated target bonus for the year; 24 months of accelerated vesting of his options; 12 months to exercise any options; and any outstanding award under the long term incentive plan would immediately vest.

112.    On November 3, 2005, the Company filed a Form 8-K disclosing that, on November 1, 2005, the Company had entered into a termination agreement with defendant Landan, pursuant to which he resigned his positions with the Company, effective in 60 days, but that the Special Committee would wait until May 15, 2006 to determine whether Landan should be treated as having been terminated for cause.

113.    The November 3, 2005 Form 8-K states, in relevant part:

On November 1, 2005, Mercury Interactive Corporation (the "Company") entered into an agreement (the "Agreement") with Amnon Landan, the Company's Chief Executive Officer and Chairman of the Company's Board of Directors, pursuant to which Mr. Landan has resigned from his positions as Chief Executive Officer and member of the Board of Directors effective November 1, 2005. Mr. Landan will terminate his employment with the Company, to be effective in 60 days, during which period he will cooperate in the management transition. Under the terms of the Agreement, the Company will not consider Mr. Landan's resignation voluntary. The Special Committee of the Board of Directors (the "Special Committee") will determine by May 15, 2006 whether Mr. Landan should be treated as having been terminated for cause under the terms of his employment agreement dated February 11, 2005 (the "Employment Agreement"), and no

CONSOLIDATED AMENDED DERIVATIVE COMPLAINT - CASE NO. 3:05-cv-04642 JF (PVT)

- 43 -

1

2

statutes of limitations on any claims the Company or Mr. Landan may have under the Employment Agreement shall begin to run until the Special Committee makes its determination.

3

4

5

6

7

8

114.    The termination agreement provides, *inter alia*, that defendant Landan will be paid his unpaid base salary and that he will get his severance package if the Special Committee determines that he was not terminated for cause. It also provides that the amount of vacation and bonus due Landan, and the amounts he may be required to pay to the Company in connection with the option mispricing, will be negotiated, and if not agreement is reached, will be settled by arbitration.  As stated in the Form 8-K:

9

10

11

12

13

14

15

16

> Under the terms of the Agreement, the Company will pay Mr. Landan's unpaid base salary. Under the Employment Agreement, in the event Mr. Landan is terminated for cause Mr. Landan will receive no severance benefits. Severance benefits which may be due Mr. Landan will not become due until ten days after the Special Committee determines whether Mr. Landan should be considered to have been terminated for cause. Other than partial vesting acceleration and extension of the exercise period, no severance payment or benefit to which Mr. Landan may be entitled is to be paid to him until the end of the six-month period measured from the date of termination of his employment. Mr. Landan and the Special Committee have agreed that they will attempt to reach agreement on the amount of vacation days and bonus due to Mr. Landan and on an amount to be paid or repaid to the Company in connection with Mr. Landan's stock options or otherwise within 30 days of the execution of the Agreement. In the event they are unable to agree on any of these matters, these amounts will be determined through arbitration.

17

18

19

20

115.    The Form 8-K also disclosed that the Company entered into an agreement with Defendant Smith, but, unlike the case of Defendant Landan, the agreement provides that Smith will pay back monies owed to the Company in connection with his improper exercise of stock options using the correct grant dates:

21

22

23

24

25

26

27

> On October 31, 2005, the Company entered into an agreement with Doug Smith, the Company's Chief Financial Officer, pursuant to which the parties agreed that Mr. Smith's existing stock options will be repriced to the closing price of the Company's stock on the day in November 2001 these grants were actually determined. In addition the parties agreed that, to the extent Mr. Smith has exercised options, he will pay to the Company the difference between the exercise price of the options and the closing price of the Company's stock on the day in November 2001 the grants were actually determined. Under the terms of the Company's agreement with Mr. Smith, if the date to be used as "the day the grants were actually determined" cannot be agreed between the Special Committee and Mr. Smith within 30 days of the execution of the Company's agreement with Mr. Smith, such date will be selected through arbitration.

28

CONSOLIDATED AMENDED DERIVATIVE COMPLAINT - CASE NO. 3:05-cv-04642 JF (PVT)

**Defendants' Conduct Caused the Issuance of the Materially False and Misleading 2005 Proxy Statement**

116.    The Defendants caused Mercury to file a proxy statement with the SEC on March 31, 2005 (the "2004 Proxy Statement"). The Proxy Statement sought shareholder approval for reelection of each of the Director Defendants named herein.

117.    The Proxy Statement purported to describe the 2004 compensation of the directors and, with respect to stock option grants granted to defendants Boston (50,000 shares), Kohavi (10,000 shares), Ostler (10,000 shares), Shamir (10,000 shares), Yaron (10,000), and Zingale (10,000 shares), the Proxy Statement represented that "[t]hese options were granted on May 19, 2004 with an exercise price of $44.64, representing the fair market value of Mercury's common stock on such date."

118.    In addition, the Proxy Statement represented as follows regarding the 2000 Supplemental Stock Option Plan:

> 2000 Supplemental Stock Option Plan.       In July 2000, our board adopted the 2000 Supplemental Stock Option Plan which allows options and stock purchase rights to be granted only to any employee who is not a U.S. citizen and who is not one of our executive officers or directors. This plan has not been approved by our stockholders. A total of 6,000,000 shares have been reserved for issuance upon exercise of stock options under this plan, and as of December 31, 2004, options to purchase a total of 4,632,944 shares of common stock were outstanding under this plan and 415,541 options are available for grant. ***Option grants under this plan must be at exercise prices not less than 100% of the fair market value of the stock on the date of grant.*** The other material provisions of this plan are identical to those of the 1996 Supplemental Stock Option Plan, except that all the term of options granted in certain European countries may be different and this plan provides for the grant of stock purchase rights. (Emphasis added).

119.    The representations in the 2004 Proxy Statement referenced above were materially false and misleading because they failed to disclose that:

> a.      The dates on options granted to employees, including the Director Defendants who were up for board reelection, were backdated to favor the grantees;

> b.      The Company did not calculate the exercise price of options using the method stated in the Proxy Statement;

> c.      The Company's internal controls and accounting practices were inadequate and the Company did not "have in place a variety of policies and practices to promote good corporate governance"; and

d.    The Compensation and Audit Committees did not adequately perform their function because top executives were allowed to manipulate the Company's stock option grant programs to their benefit since 1995.

120.    PWC, as the independent auditor charged with accurately reviewing and certifying Mercury's financial reporting, was either aware or should have been aware of the material weaknesses and information contained in the 2005 Proxy Statement was materially false and misleading.

**Defendants' False Statements Subject Mercury to Violations of Federal Securities Law**

121.    Defendants also harmed the Company by intentionally making false and optimistic statements about the Company's earnings and prospects, while knowing that an SEC investigation had been underway since November 2004 that jeopardized the reliability of the Company's results. Defendants thus exposed the Company to liability, including for violations of the federal securities laws.

122.    For example, on December 2, 2004, after the SEC's investigation commenced, defendant Landan made a presentation at a Credit Suisse First Boston Technology Conference addressing Mercury's own compliance with Sarbanes-Oxley:

> And if I look at Mercury's sales, *as we are not in the home stretch of becoming SOX compliant,* all of my IT organizations, all of my financial organizations are doing two shifts a day. They have a day job and they have a SOX job. And I'm not exaggerating. And it's the same in many, many other companies. This forces a totally different approach and discipline to IT organizations. Right now, everyone is trying to patch it. But next year, organizations are going to take a much more methodical (indiscernible) way to deal with these compliance demands. Because all these compliance requests end up being around governing IT. As we said before, the IT is the business, so on and so forth. So all these regulations end up into make sure that you control the environments and the processes that you have in your IT and technology environment. I think next year, the notion of governance and specifically compliance is going to be a key, key driver for the growth of our IT governance business. (Emphasis added).

123.    Defendant Landan's statements on December 2, 2004 exposed the Company to liability for, among other things, securities law violations, because, while publicly claiming that the Company was "in the home stretch of being SOX compliant," Landan concealed that, just weeks earlier, the SEC had opened an informal inquiry into the Company's accounting practices

1  and internal controls, as they related to stock option grants.  Landan knew that the accuracy of the

2  Company's financial reports were subject to the uncertainties and issues presented by the SEC

3  inquiry, including the potential for financial restatements.  Yet he concealed these facts, and

4  instead knowingly misrepresented that the Company was in "the home stretch" of SOX

5  compliance.  At the same conference, he also touted the Company's prospects for continued

6  growth.

7  124.    On December 21, 2004, the Company also filed an amended registration statement

8  updating a prospectus in connection with a previous note offering.  In that registration statement,

9  the Company did not disclose the SEC investigation, or provide any information concerning the

10  Company's accounting practices and internal controls, despite knowing that the SEC was

11  investigating the Company's accounting practices and internal controls, which could cause the

12  Company to restate its historical results.

13  125.    Similarly, on January 24, 2005, the Company issued a press release reporting its

14  preliminary results for the fourth quarter of 2004, which were positive, and increased its earnings

15  guidance, without disclosing the SEC investigation. The press release exposed the Company to

16  liability because it did not disclose the existence of the SEC investigation, which was by then in its

17  third month, or that the Company had its own compliance problems.

18  126.    On March 9, 2005, Defendant Smith addressed the Lehman Brothers Global

19  Software IT Services & Internet Conference, and once again failed to disclose the SEC

20  investigation, while claiming that the Company was finishing up its "SOX compliance process this

21  week."  Defendant Smith stated in part:

22  Lastly and one that has really shown up more in the course of 2004, is the overall
23  focus on managing IT like a business and addressing to the compliance challenges
   that IT organizations, as well as finance organizations, have encountered, as the
24  world of compliance is becoming increasingly demanding and an increasingly
   demanding world, as well as one taking on a much higher priority and focus for
25  both the chief information officer as well as the chief financial officer, not to
   mention all of the executive officers of the company. *Just finishing up my SOX*
26  *compliance process this week. So we can spend a minute talking about that*
   *later.*

27  * * *

28  CONSOLIDATED AMENDED DERIVATIVE COMPLAINT - CASE NO. 3:05-cv-04642 JF (PVT)

On the compliance and governance side, I know Mercury just spent several million dollars.  We estimated that we spent over 14,000 hours internally, direct, with all the people in accounting and finance and IT and HR over the last six months.  We have hope successfully implementing our 404 compliance activities, documenting over 900 controls that run our business.  You just take that and explode that around the world and it is obviously a huge effort to overcome.  Those 14,000 hours had to come, for example, from people who all had day jobs as well.

So the impact I believe on most finance and IT organizations around the world was significant.  I think what we realized as we were doing it, and I suspect many other companies, is that driving a compliance project is not unlike driving an IT project.  *That when you get these changes in regulations, when you get these changes in policies, whether that be banking regulations, pharmaceutical regulations, or SEC regulations in the case of 404 SOX, you have to both – it causes you to impact your business and it causes you to not only document your business processes, but frankly change many of them in order to assure that you're going to be able to meet the regulations that are in place.* (Emphasis added).

127.    After these disclosures, including the November 2, 2005 press releases disclosing 49 instances of misdating stock option grants, which was followed by several other updates over the next several months, a number of shareholder class action suits were filed against the Company and various members of its management in the United States District Court for the Northern District of California, alleging violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. §§78j(b) and t(a)) and Rule 10b-5 (17 C.F.R. §240.10b-5) based on the Company's concealment of the flawed and deficient internal controls and corporate compliance, and of the auditing expenses in connection with the "highly likely" need to restate earnings for multiple quarters and years.  That likelihood has now become a certainty, and the Company has been purged of its CEO, CFO and general counsel, who are guilty of self-dealing.  The Special Committee has admitted that the Compensation Committee — and by extension the Board — failed to adequately perform its duties in overseeing the compensation for the Company's executives.

## INSIDER SALES AND IMPROPER PROFITS

128.    In disregard of their duties of trust and fidelity, during the relevant period, while in the possession of materially adverse non-public information regarding Mercury, Mercury insiders, including Landan and Smith, either sold or acquiesced in and/or permitted the sale of significant

CONSOLIDATED AMENDED DERIVATIVE COMPLAINT - CASE NO. 3:05-cv-04642 JF (PVT)

amounts of Company stock by the officers, directors and/or insiders of the Company.  Defendants were motivated to engage in the wrongdoing alleged herein because it allowed Mercury insiders, to sell their shares at artificially inflated prices during the relevant period. The backdating scheme allowed insiders to sell Mercury stock obtained through options exercises for greater profit, as the Special Committee concluded.

129.   From January 2002 to October   2005 (the period covered by Mercury's restatement), Mercury insiders sold a total of 2,103,964 shares of Mercury common stock for gross proceeds of $85,148,105, as follows:

### Sharlene Abrams: Former CFO

| Transaction Date | # of Shares | Price/share ($) | Proceeds ($) |
| --- | --- | --- | --- |
| 1/29/2002 | 5,000 | 39.22 | 196,100.00 |
| 1/29/2002 | 2,500 | 39.00 | 97,500.00 |
| 1/31/2002 | 3,750 | 39.00 | 146,250.00 |
| 2/1/2002 | 27,000 | 39.00 | 1,053,000.00 |
| 2/14/2002 | 35,715 | 39.00 | 1,392,885.00 |
| 3/5/2002 | 5,000 | 39.00 | 195,000.00 |
| 3/8/2002 | 67,375 | 38.98 | 2,626,365.09 |
| 3/8/2002 | 12,625 | 38.98 | 492,138.91 |
| 3/14/2002 | 766 | 40.32 | 30,885.12 |
| 4/18/2002 | 2,978 | 39.40 | 117,333.20 |
| 4/18/2002 | 1,667 | 39.40 | 65,679.80 |
| | **164,376** | | **6,413,137.12** |

### Moshe Egert: Division President

| Transaction Date | # of Shares | Price/share ($) | Proceeds ($) |
| --- | --- | --- | --- |
| 5/15/2002 | 14,136 | 37.22 | 526,141.92 |
| 5/15/2002 | 5,000 | 37.42 | 187,100.00 |
| 5/15/2002 | 5,000 | 37.55 | 187,750.00 |
| | **24,136** | | **900,991.92** |

### Zohar Gilad: Senior VP

| Transaction Date | # of Shares | Price/share ($) | Proceeds ($) |
| --- | --- | --- | --- |
| 7/18/2003 | 20,000 | 42.10 | 842,000.00 |
| 7/18/2003 | 9,760 | 40.65 | 396,744.00 |

CONSOLIDATED AMENDED DERIVATIVE COMPLAINT - CASE NO. 3:05-cv-04642 JF (PVT)

| Transaction Date | # of Shares | Price/share ($) | Proceeds ($) |
|---|---|---|---|
| 7/18/2003 | 8,200 | 41.00 | 336,200.00 |
| 7/18/2003 | 8,100 | 41.11 | 332,991.00 |
| 7/18/2003 | 1,900 | 41.20 | 78,280.00 |
| 7/18/2003 | 1,000 | 41.02 | 41,020.00 |
| 7/18/2003 | 500 | 41.01 | 20,505.00 |
| 7/18/2003 | 300 | 41.02 | 12,304.50 |
| 7/18/2003 | 200 | 40.65 | 8,130.02 |
| 7/18/2003 | 40 | 40.67 | 1,626.80 |
| 8/21/2003 | 3,400 | 43.75 | 148,750.00 |
| 8/21/2003 | 2,899 | 43.74 | 126,802.26 |
| 8/21/2003 | 2,700 | 43.80 | 118,260.00 |
| 8/21/2003 | 2,000 | 43.81 | 87,620.00 |
| 8/21/2003 | 1,808 | 43.79 | 79,172.32 |
| 8/21/2003 | 1,300 | 43.77 | 56,901.00 |
| 8/21/2003 | 1,100 | 43.76 | 48,136.00 |
| 8/21/2003 | 500 | 43.84 | 21,920.00 |
| 8/21/2003 | 400 | 43.77 | 17,508.40 |
| 8/21/2003 | 400 | 43.71 | 17,484.00 |
| 8/21/2003 | 300 | 43.85 | 13,155.00 |
| 8/21/2003 | 200 | 43.73 | 8,746.00 |
| 8/21/2003 | 101 | 43.74 | 4,417.84 |
| 8/21/2003 | 100 | 43.86 | 4,386.00 |
| 8/21/2003 | 100 | 43.78 | 4,377.60 |
| 8/21/2003 | 100 | 43.72 | 4,372.00 |
| 9/2/2003 | 10,000 | 43.95 | 439,500.00 |
| 10/1/2003 | 10,000 | 45.69 | 456,869.00 |
| 11/3/2003 | 10,000 | 47.05 | 470,520.00 |
| 5/24/2004 | 100 | 46.20 | 4,620.00 |
| 5/24/2004 | 100 | 46.31 | 4,631.00 |
| 5/24/2004 | 43 | 46.18 | 1,985.74 |
| | **97,651** | | **4,209,935.48** |

### Raj Jain: VP

| Transaction Date | # of Shares | Price/share ($) | Proceeds ($) |
|---|---|---|---|
| 8/18/2003 | 166,668 | 39.00 | 6,500,052.00 |
| 8/19/2003 | 59,118 | 41.25 | 2,438,848.06 |
| | **225,786** | | **8,938,900.06** |

### Kenneth Klein: Former COO

| Transaction Date | # of Shares | Price/share ($) | Proceeds ($) |
|---|---|---|---|
| 1/28/2002 | 70,169 | 39.00 | 2,736,871.68 |

CONSOLIDATED AMENDED DERIVATIVE COMPLAINT - CASE NO. 3:05-cv-04642 JF (PVT)

| | | | |
|---|---|---|---|
| 1/28/2002 | 26,723 | 39.00 | 1,042,303.89 |
| 1/28/2002 | 3,108 | 39.00 | 121,212.00 |
| 1/29/2002 | 2,500 | 39.00 | 97,500.00 |
| 2/1/2002 | 18,750 | 39.00 | 731,250.00 |
| 2/14/2002 | 25,000 | 39.00 | 975,000.00 |
| 4/19/2002 | 50,000 | 39.23 | 1,961,500.00 |
| 4/19/2002 | 50,000 | 39.18 | 1,959,000.00 |
| 4/23/2002 | 50,000 | 39.18 | 1,959,000.00 |
| 5/8/2002 | 50,000 | 38.32 | 1,915,810.00 |
| 2/18/2003 | 25,000 | 35.02 | 875,400.00 |
| 2/18/2003 | 25,000 | 35.00 | 875,000.00 |
| 2/18/2003 | 20,000 | 35.28 | 705,500.00 |
| 2/18/2003 | 20,000 | 35.30 | 706,010.00 |
| 2/18/2003 | 20,000 | 35.53 | 710,692.00 |
| 2/18/2003 | 10,000 | 35.33 | 353,287.00 |
| 8/13/2003 | 13,000 | 39.80 | 517,400.00 |
| 8/14/2003 | 27,100 | 40.00 | 1,084,000.00 |
| 8/14/2003 | 4,900 | 40.06 | 196,294.00 |
| 8/14/2003 | 3,100 | 40.01 | 124,031.00 |
| 8/14/2003 | 700 | 40.03 | 28,021.00 |
| 8/14/2003 | 400 | 40.05 | 16,020.00 |
| 8/14/2003 | 400 | 40.10 | 16,040.00 |
| 8/14/2003 | 100 | 40.02 | 4,002.10 |
| 8/14/2003 | 100 | 40.04 | 4,004.00 |
| 8/14/2003 | 100 | 40.05 | 4,005.20 |
| 8/14/2003 | 100 | 40.11 | 4,011.00 |
| 8/19/2003 | 7,027 | 42.55 | 298,998.85 |
| 8/19/2003 | 3,900 | 42.24 | 164,736.00 |
| 8/19/2003 | 3,232 | 42.60 | 137,683.20 |
| 8/19/2003 | 3,000 | 42.27 | 126,810.00 |
| 8/19/2003 | 1,000 | 42.21 | 42,210.00 |
| 8/19/2003 | 964 | 42.23 | 40,709.72 |
| 8/19/2003 | 865 | 42.32 | 36,606.80 |
| 8/19/2003 | 841 | 42.17 | 35,464.97 |
| 8/19/2003 | 800 | 42.28 | 33,824.00 |
| 8/19/2003 | 600 | 42.19 | 25,314.00 |
| 8/19/2003 | 500 | 42.26 | 21,130.00 |
| 8/19/2003 | 500 | 42.25 | 21,125.00 |
| 8/19/2003 | 400 | 42.29 | 16,916.00 |
| 8/19/2003 | 300 | 42.30 | 12,690.00 |
| 8/19/2003 | 200 | 42.16 | 8,432.00 |
| 8/19/2003 | 200 | 42.26 | 8,452.20 |
| 8/19/2003 | 171 | 42.21 | 7,218.08 |
| 8/19/2003 | 100 | 42.18 | 4,218.00 |
| 8/19/2003 | 100 | 42.22 | 4,222.00 |

CONSOLIDATED AMENDED DERIVATIVE COMPLAINT - CASE NO. 3:05-cv-04642 JF (PVT)

| Date | # of Shares | Price/share ($) | Proceeds ($) |
|---|---|---|---|
| 8/19/2003 | 100 | 42.25 | 4,225.10 |
| 8/19/2003 | 100 | 42.26 | 4,225.60 |
| 8/19/2003 | 100 | 42.31 | 4,231.00 |
| 11/3/2003 | 44,200 | 47.75 | 2,110,550.00 |
| 11/3/2003 | 9,586 | 48.10 | 461,086.60 |
| 11/3/2003 | 7,200 | 48.03 | 345,816.00 |
| 11/3/2003 | 3,700 | 47.77 | 176,749.00 |
| 11/3/2003 | 1,600 | 48.04 | 76,864.00 |
| 11/3/2003 | 800 | 47.79 | 38,232.00 |
| 11/3/2003 | 700 | 47.78 | 33,446.00 |
| 11/3/2003 | 600 | 47.76 | 28,656.00 |
| 11/3/2003 | 600 | 48.04 | 28,821.00 |
| 11/3/2003 | 400 | 48.04 | 19,215.60 |
| 11/3/2003 | 200 | 48.04 | 9,608.60 |
| | **610,836** | | **24,111,652.19** |

**Igal Kohavi: Director**

| Transaction Date | # of Shares | Price/share ($) | Proceeds ($) |
|---|---|---|---|
| 1/30/2002 | 5,000 | 38.50 | 192,500.00 |
| 1/31/2002 | 5,000 | 39.00 | 195,000.00 |
| 2/1/2002 | 7,000 | 38.50 | 269,500.00 |
| 2/1/2002 | 3,000 | 38.55 | 115,650.00 |
| 4/16/2002 | 10,000 | 38.30 | 383,000.00 |
| 4/19/2002 | 10,000 | 39.40 | 394,000.00 |
| 5/15/2002 | 20,000 | 39.38 | 787,600.00 |
| 5/15/2002 | 20,000 | 39.38 | 787,600.00 |
| 7/28/2003 | 20,000 | 41.00 | 820,000.00 |
| | **100,000** | | **3,944,850.00** |

**Amnon Landan: Former CEO, Chairman and Director**

| Transaction Date | # of Shares | Price/share ($) | Proceeds ($) |
|---|---|---|---|
| 7/22/2003 | 97,047 | 41.00 | 3,978,927.00 |
| 7/22/2003 | 55,696 | 41.05 | 2,286,320.80 |
| 7/22/2003 | 29,500 | 41.01 | 1,209,795.00 |
| 7/22/2003 | 12,735 | 41.02 | 522,389.70 |
| 7/22/2003 | 12,599 | 41.06 | 517,314.94 |
| 7/22/2003 | 10,072 | 41.08 | 413,757.76 |
| 7/22/2003 | 5,600 | 41.14 | 230,384.00 |
| 7/22/2003 | 5,113 | 40.97 | 209,479.61 |
| 7/22/2003 | 3,773 | 41.10 | 155,070.30 |
| 7/22/2003 | 3,669 | 41.09 | 150,759.21 |

CONSOLIDATED AMENDED DERIVATIVE COMPLAINT - CASE NO. 3:05-cv-04642 JF (PVT)

| Transaction Date | # of Shares | Price/share ($) | Proceeds ($) |
|---|---|---|---|
| 7/22/2003 | 3,535 | 41.13 | 145,394.55 |
| 7/22/2003 | 2,400 | 41.03 | 98,472.00 |
| 7/22/2003 | 2,397 | 40.95 | 98,157.15 |
| 7/22/2003 | 2,100 | 40.96 | 86,016.00 |
| 7/22/2003 | 1,500 | 41.07 | 61,605.00 |
| 7/22/2003 | 800 | 41.17 | 32,936.00 |
| 7/22/2003 | 600 | 41.12 | 24,672.00 |
| 7/22/2003 | 364 | 41.04 | 14,938.56 |
| 7/22/2003 | 200 | 41.15 | 8,230.00 |
| 7/22/2003 | 200 | 41.16 | 8,232.00 |
| 7/22/2003 | 100 | 40.98 | 4,098.00 |
| 2/2/2004 | 2,000 | 46.80 | 93,600.00 |
| 3/1/2004 | 2,000 | 48.14 | 96,280.00 |
| 4/1/2004 | 1,000 | 44.77 | 44,773.50 |
| 5/3/2004 | 1,000 | 42.75 | 42,750.00 |
| 6/1/2004 | 1,000 | 47.38 | 47,380.00 |
| 6/23/2004 | 2,000 | 50.00 | 100,000.00 |
| 7/1/2004 | 1,000 | 49.55 | 49,550.00 |
| 10/21/2004 | 3,000 | 40.00 | 120,000.00 |
| 1/3/2005 | 3,000 | 45.61 | 136,844.70 |
| 2/1/2005 | 1,000 | 43.60 | 43,602.70 |
| 3/1/2005 | 1,000 | 45.92 | 45,918.60 |
| 4/1/2005 | 1,000 | 47.43 | 47,427.80 |
| 5/2/2005 | 1,000 | 41.27 | 41,270.00 |
| | **270,000** | | **11,166,346.88** |

**Bryan LeBlanc: VP**

| Transaction Date | # of Shares | Price/share ($) | Proceeds ($) |
|---|---|---|---|
| 8/13/2003 | 5,000 | 40.00 | 200,000.00 |
| 10/27/2003 | 2,000 | 45.89 | 91,780.00 |
| 11/3/2003 | 2,000 | 47.05 | 94,104.00 |
| | **9,000** | | **385,884.00** |

**David Murphy: Current CFO**

| Transaction Date | # of Shares | Price/share ($) | Proceeds ($) |
|---|---|---|---|
| 3/9/2004 | 14,157 | 44.63 | 631,838.24 |
| 3/10/2004 | 843 | 44.39 | 37,420.77 |
| 6/9/2004 | 15,000 | 48.86 | 732,904.50 |
| 9/10/2004 | 15,000 | 35.00 | 525,000.00 |
| 12/9/2004 | 15,000 | 44.22 | 663,352.50 |

CONSOLIDATED AMENDED DERIVATIVE COMPLAINT - CASE NO. 3:05-cv-04642 JF (PVT)

| 1/24/2005 | 5,000 | 41.45 | 207,254.00 |
| 2/15/2005 | 5,000 | 47.52 | 237,579.00 |
| 3/15/2005 | 5,000 | 46.36 | 231,798.00 |
| 4/15/2005 | 5,000 | 43.17 | 215,850.00 |
| | **80,000** | | **3,482,997.01** |

**Yuval Scarlat: Senior VP**

| Transaction Date | # of Shares | Price/share ($) | Proceeds ($) |
| --- | --- | --- | --- |
| 7/22/2003 | 10,600 | 40.90 | 433,540.00 |
| 7/22/2003 | 3,300 | 40.88 | 134,904.00 |
| 7/22/2003 | 2,717 | 40.90 | 111,125.30 |
| 7/22/2003 | 2,300 | 40.85 | 93,955.00 |
| 7/22/2003 | 2,000 | 40.94 | 81,880.00 |
| 7/22/2003 | 2,000 | 40.87 | 81,740.00 |
| 7/22/2003 | 1,400 | 40.92 | 57,288.00 |
| 7/22/2003 | 1,400 | 40.93 | 57,302.00 |
| 7/22/2003 | 1,200 | 40.86 | 49,032.00 |
| 7/22/2003 | 1,155 | 40.89 | 47,227.95 |
| 7/22/2003 | 900 | 40.91 | 36,819.00 |
| 7/22/2003 | 800 | 40.91 | 32,728.80 |
| 7/22/2003 | 500 | 40.97 | 20,485.50 |
| 7/22/2003 | 500 | 40.85 | 20,425.05 |
| 7/22/2003 | 400 | 40.93 | 16,372.04 |
| 7/22/2003 | 400 | 40.96 | 16,384.00 |
| 7/22/2003 | 400 | 40.96 | 16,384.40 |
| 7/22/2003 | 300 | 40.90 | 12,270.33 |
| 7/22/2003 | 300 | 40.91 | 12,271.50 |
| 7/22/2003 | 300 | 40.90 | 12,270.30 |
| 7/22/2003 | 300 | 40.97 | 12,291.00 |
| 7/22/2003 | 200 | 40.95 | 8,190.00 |
| 7/22/2003 | 200 | 40.96 | 8,192.02 |
| 7/22/2003 | 200 | 40.97 | 8,194.02 |
| 7/22/2003 | 200 | 40.98 | 8,196.00 |
| 7/22/2003 | 100 | 40.91 | 4,091.40 |
| 7/22/2003 | 100 | 40.92 | 4,092.01 |
| 7/22/2003 | 100 | 40.97 | 4,097.10 |
| 7/22/2003 | 100 | 40.89 | 4,089.01 |
| 7/22/2003 | 100 | 40.89 | 4,089.11 |
| 7/22/2003 | 28 | 40.85 | 1,143.83 |
| 9/3/2003 | 8,997 | 47.70 | 429,156.90 |
| 9/3/2003 | 5,615 | 47.56 | 267,049.40 |
| 9/3/2003 | 3,700 | 47.62 | 176,194.00 |
| 9/3/2003 | 2,400 | 47.60 | 114,240.00 |

CONSOLIDATED AMENDED DERIVATIVE COMPLAINT - CASE NO. 3:05-cv-04642 JF (PVT)

| | | | |
|---|---|---|---|
| 9/3/2003 | 2,200 | 47.63 | 104,786.00 |
| 9/3/2003 | 2,100 | 47.69 | 100,149.00 |
| 9/3/2003 | 1,725 | 47.59 | 82,092.75 |
| 9/3/2003 | 1,700 | 47.58 | 80,886.00 |
| 9/3/2003 | 1,500 | 48.07 | 72,105.00 |
| 9/3/2003 | 1,300 | 47.64 | 61,932.00 |
| 9/3/2003 | 1,300 | 47.61 | 61,893.00 |
| 9/3/2003 | 1,063 | 47.75 | 50,758.25 |
| 9/3/2003 | 1,000 | 47.71 | 47,710.00 |
| 9/3/2003 | 1,000 | 47.67 | 47,674.00 |
| 9/3/2003 | 800 | 47.57 | 38,056.00 |
| 9/3/2003 | 700 | 47.72 | 33,404.00 |
| 9/3/2003 | 700 | 47.67 | 33,369.00 |
| 9/3/2003 | 600 | 48.14 | 28,884.00 |
| 9/3/2003 | 300 | 47.68 | 14,304.00 |
| 9/3/2003 | 300 | 47.60 | 14,278.80 |
| 9/3/2003 | 200 | 48.21 | 9,642.00 |
| 9/3/2003 | 200 | 48.16 | 9,632.40 |
| 9/3/2003 | 200 | 47.66 | 9,532.00 |
| 9/3/2003 | 100 | 48.16 | 4,816.00 |
| 9/3/2003 | 100 | 48.11 | 4,811.00 |
| 9/3/2003 | 100 | 47.68 | 4,768.20 |
| 9/3/2003 | 100 | 47.67 | 4,767.10 |
| 7/1/2004 | 312 | 50.00 | 15,600.00 |
| 11/3/2004 | 1,296 | 45.00 | 58,320.00 |
| 11/3/2004 | 1,296 | 45.00 | 58,320.00 |
| 11/3/2004 | 772 | 45.00 | 34,740.00 |
| 11/3/2004 | 772 | 45.00 | 34,740.00 |
| 11/3/2004 | 520 | 45.00 | 23,400.00 |
| 11/3/2004 | 520 | 45.00 | 23,400.00 |
| 11/3/2004 | 312 | 45.00 | 14,040.00 |
| 11/3/2004 | 312 | 45.00 | 14,040.00 |
| 11/17/2004 | 4,784 | 45.00 | 215,280.00 |
| 11/17/2004 | 4,297 | 45.00 | 193,365.00 |
| 11/17/2004 | 2,308 | 45.00 | 103,860.00 |
| 11/17/2004 | 2,308 | 45.00 | 103,860.00 |
| 11/17/2004 | 2,189 | 45.00 | 98,505.00 |
| 11/17/2004 | 2,094 | 45.00 | 94,230.00 |
| 11/17/2004 | 1,648 | 45.00 | 74,160.00 |
| 11/17/2004 | 1,256 | 45.00 | 56,520.00 |
| 12/1/2004 | 1,174 | 45.31 | 53,193.94 |
| 12/1/2004 | 520 | 45.31 | 23,561.20 |
| 12/1/2004 | 306 | 45.31 | 13,864.86 |
| 1/3/2005 | 1,648 | 45.61 | 75,173.36 |
| 1/3/2005 | 1,520 | 45.61 | 69,334.65 |

CONSOLIDATED AMENDED DERIVATIVE COMPLAINT - CASE NO. 3:05-cv-04642 JF (PVT)

| | | | |
|---|---|---|---|
| 1/3/2005 | 520 | 45.61 | 23,719.75 |
| 1/3/2005 | 312 | 45.61 | 14,231.85 |
| 2/3/2005 | 653 | 47.66 | 31,123.29 |
| 2/3/2005 | 520 | 47.66 | 24,784.24 |
| 2/3/2005 | 520 | 47.66 | 24,784.24 |
| 2/3/2005 | 307 | 47.66 | 14,632.23 |
| 3/1/2005 | 653 | 45.94 | 29,996.21 |
| 3/1/2005 | 520 | 45.94 | 23,886.72 |
| 3/1/2005 | 520 | 45.94 | 23,886.72 |
| 3/1/2005 | 307 | 45.94 | 14,102.35 |
| 4/1/2005 | 1,654 | 47.23 | 78,118.59 |
| 4/1/2005 | 1,520 | 47.23 | 71,789.75 |
| 4/1/2005 | 520 | 47.23 | 24,559.65 |
| 4/1/2005 | 306 | 47.23 | 14,452.41 |
| | **115,496** | | **5,183,537.48** |

### Yair Shamir: Director

| Transaction Date | # of Shares | Price/share ($) | Proceeds ($) |
|---|---|---|---|
| 2/21/2002 | 15,000 | 34.10 | 511,500.00 |
| 2/21/2002 | 10,000 | 34.12 | 341,200.00 |
| 2/21/2002 | 10,000 | 34.13 | 341,300.00 |
| 2/21/2002 | 7,500 | 33.03 | 247,725.00 |
| 2/21/2002 | 7,500 | 33.73 | 252,975.00 |
| 2/21/2002 | 5,000 | 33.65 | 168,250.00 |
| 2/21/2002 | 5,000 | 33.71 | 168,550.00 |
| 8/21/2002 | 20,000 | 26.53 | 530,600.00 |
| 8/21/2002 | 15,000 | 26.51 | 397,650.00 |
| 8/21/2002 | 5,000 | 26.53 | 132,650.00 |
| 8/6/2003 | 20,000 | 38.50 | 770,000.00 |
| | **120,000** | | **3,862,400.00** |

### Susan Skaer: former VP/General Counsel

| Transaction Date | # of Shares | Price/share ($) | Proceeds ($) |
|---|---|---|---|
| 7/18/2003 | 10,416 | 41.89 | 436,377.28 |
| 7/18/2003 | 5,312 | 42.02 | 223,210.24 |
| 9/2/2003 | 520 | 43.95 | 22,854.00 |
| 9/2/2003 | 518 | 43.95 | 22,766.10 |
| 9/2/2003 | 312 | 43.95 | 13,712.40 |
| 10/1/2003 | 520 | 45.49 | 23,654.80 |
| 10/1/2003 | 518 | 45.49 | 23,563.82 |
| 10/1/2003 | 312 | 45.49 | 14,192.88 |

CONSOLIDATED AMENDED DERIVATIVE COMPLAINT - CASE NO. 3:05-cv-04642 JF (PVT)

| 11/3/2003 | 520 | 47.05 | 24,467.04 |
| 11/3/2003 | 518 | 47.05 | 24,372.94 |
| 11/3/2003 | 312 | 47.05 | 14,680.22 |
| | **19,778** | | **843,851.72** |

### Larry Wear: VP/General Manager

| Transaction Date | # of Shares | Price/share ($) | Proceeds ($) |
| --- | --- | --- | --- |
| 7/18/2003 | 35,741 | 41.32 | 1,476,793.10 |
| 7/18/2003 | 20,833 | 41.32 | 860,804.98 |
| 7/18/2003 | 8,009 | 41.32 | 330,926.27 |
| 8/19/2003 | 2,528 | 41.45 | 104,785.60 |
| 8/19/2003 | 597 | 41.45 | 24,745.65 |
| 9/18/2003 | 3,125 | 49.67 | 155,219.69 |
| 10/17/2003 | 2,680 | 49.73 | 133,276.40 |
| 10/17/2003 | 445 | 49.73 | 22,129.85 |
| | **73,958** | | **3,108,681.54** |

### Douglas Smith: former CFO and VP

| Transaction Date | # of Shares | Price/share ($) | Proceeds ($) |
| --- | --- | --- | --- |
| 10/27/2003 | 100,000 | 45.73 | 4,572,700.00 |
| 1/5/2004 | 20,000 | 51.02 | 1,020,466.00 |
| | **120,000** | | **5,593,166.00** |

### Giora Yaron: Chairman of the Board

| Transaction Date | # of Shares | Price/share ($) | Proceeds ($) |
| --- | --- | --- | --- |
| 5/20/2002 | 7,000 | 38.04 | 266,280.00 |
| 7/18/2003 | 20,000 | 40.58 | 811,630.00 |
| 7/18/2003 | 20,000 | 41.25 | 825,000.00 |
| 7/18/2003 | 13,000 | 41.25 | 536,250.00 |
| | **60,000** | | **2,439,160.00** |

CONSOLIDATED AMENDED DERIVATIVE COMPLAINT - CASE NO. 3:05-cv-04642 JF (PVT)

**Anthony Zingale: current CEO, Director**

| Transaction Date | # of Shares | Price/share ($) | Proceeds ($) |
|---|---|---|---|
| 7/18/2003 | 10,000 | 41.02 | 410,150.00 |
| 9/19/2003 | 1,725 | 51.74 | 89,243.57 |
| 9/19/2003 | 1,222 | 51.74 | 63,220.66 |
| | **12,947** | | **562,614.23** |

## DEMAND FUTILITY ALLEGATIONS

130.    Plaintiffs have not made any demand upon the current Board to bring an action asserting the claims herein for the damages suffered by Mercury since such demand would be futile and is therefore excused.

131.    Demand is excused because the unlawful acts and practices alleged herein cannot be defended by the Director Defendants and are not subject to the protection of any independent business judgment. Because it would undoubtedly benefit Mercury to recover the damages caused by these Defendants' wrongdoing, and to assert these derivative claims, it would be an exercise in futility to make a demand on the Directors.

132.    Demand is excused because the wrongs alleged herein constitute violations of the fiduciary duties owed by Mercury's Board.  The Director Defendants are substantially likely to be held liable for breaching their fiduciary duties to Mercury by, *inter alia*, failing to adequately monitor Mercury's financial reporting, and to detect, prevent and/or halt the options manipulation and accounting misstatements complained of herein which renders them of exercising independent business judgment.

133.    Demand is also excused because the overwhelming majority of the Director Defendants have ratified the egregious actions outlined herein, and these same Directors Defendants cannot be expected to prosecute claims against themselves, and persons with whom they have extensive business and personal entanglements, if Plaintiffs demanded that they do so.

134.    When the first derivative action was filed on November 14, 2005, the Board was comprised of six directors, ***all of whom are direct participants in the wrongdoing alleged herein***. From 1995 to present, the Special Committee found 49 instances in which the stated date of a

CONSOLIDATED AMENDED DERIVATIVE COMPLAINT - CASE NO. 3:05-cv-04642 JF (PVT)

Mercury stock option grant differed from the date on which the option was actually granted.  In almost every case, the actual price was higher than the price on the stated grant date benefiting the executive and harming the Company.  *See* ¶¶___.   After meeting over twenty-seven (27) times between 1997 and 2005, the Compensation Committee repeatedly ratified this pervasive conduct of improperly back-dating stock option grants.  Making a demand on a Board where five (Kohavi, Shamir, Yaron, Zingale and Boston) out of the six Board members had all served on the Compensation Committee at some point during the relevant time period when the Compensation Committee was responsible for overseeing executive compensation including options grants and ratified this improper conduct was futile.  *See* ¶¶___.

135.  Appointment of an SLC, including the addition of a new independent director concedes the majority of the Board is not independent.

136.  Specifically, as was recently admitted by the Board, Yaron, the newly appointed Chairman of the Mercury's Board, and present Directors Kohavi and Shamir, all of whom were members of the Compensation Committee during the relevant period, failed to exercise proper business judgment in overseeing the executive compensation.  As disclosed in the Company's November 2, 2005 press release:

> The Special Committee believes that questions should have been raised in the minds of the Compensation Committee members from 1995 through 2002 (who included present directors Igal Kohavi, Yair Shamir and Dr. Yaron) whether six grants that they approved by unanimous written consent were properly dated.  The evidence indicates that the Compensation Committee members were focused on the substance of who received options and how many options they received, as opposed to the effective dates of the unanimous written consents.  It appears that the Compensation Committee members reasonably, but mistakenly, relied on management to draft the proper documentation for the option grants and to account for the options properly.  The Special Committee believes that changes in Board procedures made in recent years will prevent similar oversights occurring in the future.

137.  Similarly, the Audit Committee met nineteen (19) times between 2002 and 2004, the period over which Mercury will restate its financials.  Throughout this period, the Special Committee concluded that "Mercury's internal controls and accounting controls with respect to grant options and exercises were inadequate."  According to the Special Committee, "the

CONSOLIDATED AMENDED DERIVATIVE COMPLAINT - CASE NO. 3:05-cv-04642 JF (PVT)

weakness allowed dates of both grants and exercises to be manipulated" and allowed executives to change grant dates and obtain more favorably priced options.  Again, making a demand on a board where four (Boston, Kohavi, Ostler, and Shamir) out of the six board directors served on the Audit Committee, which failed to note a material weakness existed in the Company's financial controls which is now highly likely to result in an adverse opinion from the Company's outside auditors is futile.   Three out of the four directors who served on the Audit Committee also served on Compensation Committee, which ratified the improper conduct.

138.    In fact, Ostler, the Lead Director, was considered to be the "financial expert' on the Audit Committee under the SEC guidelines in 2003 and 2004 and would be required to bring suit against himself for the Board's negligence in overseeing the Company's internal controls and accounting controls in 2003 and 2004.

139.    These directors indisputably lack independence and are interested because they were direct participants in the wrongdoing disclosed by the Special Committee on November 2, 2005 and in the malfeasance alleged herein.   The misconduct of the Compensation Committee during the period of wrongdoing, 1995 through 2002, can be imputed to the entire Board because the Board received or should have received regular reports from the Compensation Committee. Of the six then current directors of Mercury, five were members of the Board in 2002: Yaron, Kohavi and Shamir, the three members of the Compensation Committee, and Ostler and Zingale, the Chairman of the Special Committee and the Company's new CEO, respectively. Thus a majority of the Board is interested and lacks independence.

140.    Despite its findings concerning Director Defendants Yaron, Kohavi, and Shamir, the Special Committee, comprised of Defendants Ostler and Boston, did not recommend that they be relieved of their duties as Directors. Instead, the entire Board, including Zingale, elected Yaron as Chairman of Mercury's Board. On the same day, the Board appointed defendant Zingale, another Board Member, the new CEO of the Company.  By electing Yaron Chairman of the Board, the entire Board did not exercise proper business judgment and therefore lacks independence. Zingale lacks independence for the additional reason that he had a personal,

professional, and financial interest in being appointed the CEO of the Company and acquiring a lucrative employment contract, which gave him incentive to go along with the Board.

141.    Moreover, the Board, through the Special Committee, elected to allow of Defendants Landan, Smith, and Skaer to retain their employment benefits, when they clearly abused their executive positions and injured the Company, instead of terminating them for cause. Despite knowing of the egregious conduct of these faithless executives, by not firing them for cause, the Board thus left open the possibility that one or more of these defendants would receive severance and other benefits, including vacation and bonus pay.

142.    Most egregiously, the Board did not require that Defendants Landan, Smith, and Skaer immediately disgorge all of their ill-gotten gains from their improper manipulation of their stock option grants and other misconduct, did not require them to return all unexecuted stock option grants to the Company, and did not require them to disgorge their bonuses and equity-based compensation to the Company, despite their indisputable breaches of fiduciary duties, which worked a direct harm to the Company.  Nor did they take any other action, including commencing legal proceedings, to protect the interests of the Company.

143.    The Board, or any committee thereof, knew or should have known of the weaknesses in the Company's internal controls relating to stock option grants since at least April 2002 for another reason. At that time, Mercury implemented a new dating practice for certain stock option grants, namely new hire, transfer and promotion grants.  Yet, the Board, either acting directly or through a committee, did not investigate dating practices for other types of stock option grants, such as those granted to long time employees of the Company including defendants Landan, Smith, and Skaer.  Five members of the current Board — Yoran, Kohavi, Shamir, Ostler, and Zingale — were Board members in 2002.

144.    In addition, the Board, acting directly or through a committee, failed to ensure that stock option grants were properly dated and exercised after April 2002.  The Company admitted in the November 2, 2005 press release that "Since April 2002, there have been a small number of instances of the third category identified above [*i.e.*, grants where there was a failure to complete

CONSOLIDATED AMENDED DERIVATIVE COMPLAINT - CASE NO. 3:05-cv-04642 JF (PVT)

the stock option grant process by the date of the grant], in which the Company appears to have been making changes to the grantees or amounts of the options after the stated date of the option grant."

145.    The Board breached its fiduciary duties of good faith, due care and due diligence, and did not exercise proper business judgment, in connection with the improper $1 million loan that the Company made to Defendant Landan in 1999.  The loan was made to Landan without prior approval of the Board and without adequate disclosures in the Company's public filings.  As the Company admitted in the November 2, 2005 press release, the Board approved the extension of the loan in December 2000 even though it had never approved the loan when it was made. The Board, at a minimum, should have known that it did not approve the loan in the first place, it should have made inquiries as to the circumstances in which the loan was initially made, and it should have determined the propriety of the loan.  The Board also should have inquired about and ensured that the loan was properly disclosed in the Company's public filings, with any necessary accompanying disclosures.  Instead, the Board blindly approved the extension of the loan without even realizing that it had not approved the loan initially.

146.    Demand is also excused because the Director Defendants participated in, approved and/or permitted the wrongs alleged herein, concealed or disguised those wrongs or recklessly and/or negligently disregarded them, and are therefore not disinterested and lack sufficient independence to exercise business judgment as set forth herein.

147.    Defendant Yaron suffers from irreconcilable conflicts of interest. Yaron was a member of Mercury's Board and Compensation Committee during the period of wrongdoing, as described above.  As such, during the relevant time period, Yaron was responsible for approving the Company's compensation plans, including stock option grants, and for ensuring they were properly dated and accounted for.  The Special Committee named Yaron as one of three directors who should have questioned whether the grants of Company stock he approved in his role as a member of the Compensation Committee were properly dated and who "mistakenly relied on management to draft the paper documentation for the stock option grants and to account for the

CONSOLIDATED AMENDED DERIVATIVE COMPLAINT - CASE NO. 3:05-cv-04642 JF (PVT)

1   options properly." Yaron was a member of the Board and the Compensation Committee in April

2   2002, and, as set forth above, should have discovered the options mispricing and taken appropriate

3   action to protect the interests of the Company. In December 2000, Yaron also approved the

4   extension of the $1 million loan to Landan, despite not having approved the loan at the time it was

5   made, and did not ensure the loan was proper or properly disclosed. In addition, Yaron breached

6   his fiduciary duties to the Company by not immediately terminating Landan, Smith, and Skaer for

7   cause despite knowing of their malfeasance, and by not immediately requiring them to disgorge

8   their ill-gotten gains, bonuses and equity-based compensation, and to return any unexecuted stock

9   option grants. Yaron took no action during the relevant time period and cannot be expected to

10  take action now. Moreover, his breaches of fiduciary duty during the relevant period expose him

11  to a substantial likelihood of liability such that he cannot be expected to consider a demand, if one

12  were made, in an independent and disinterested manner.

13      148.    Defendant Kohavi suffers from irreconcilable conflicts of interest. Kohavi is a

14  member of the Audit Committee and the Nominating and Corporate Governance Committee and

15  during the relevant time period was a member of the Compensation Committee. As such, during

16  the relevant time period, Kohavi was responsible for approving the Company's compensation

17  plans, including stock option grants, and for ensuring they were properly dated and accounted for.

18  The Special Committee named Kohavi as one of three directors who should have questioned

19  whether the grants of Company stock he approved in his role as a member of the Compensation

20  Committee were properly dated, and who "mistakenly relied on management to draft the paper

21  documentation for the options grants and to account for the options properly." Kohavi was a

22  member of the Board and the Compensation Committee in April 2002, and, as set forth above,

23  should have discovered the options mispricing and taken appropriate action to protect the interests

24  of the Company. In December 2000, Kohavi also approved the extension of the $1 million loan to

25  Landan, despite not having approved the loan at the time it was made, and did not ensure the loan

26  was proper or properly disclosed. In addition, Kohavi breached his fiduciary duties to the

27  Company by not immediately terminating Landan, Smith, and Skaer for cause despite knowing of

28

CONSOLIDATED AMENDED DERIVATIVE COMPLAINT - CASE NO. 3:05-cv-04642 JF (PVT)

their malfeasance, and by not immediately requiring them to disgorge their ill-gotten gains, bonuses and equity-based compensation, and to return any unexecuted stock option grants. Kohavi took no action during the relevant time period and cannot be expected to take action now. Moreover, his breaches of fiduciary duty during the relevant period expose him to a substantial likelihood of liability such that he cannot be expected to consider a demand, if one were made, in an independent and disinterested manner.

149.    Defendant Shamir suffers from irreconcilable conflicts of interest. Shamir is a member of the Mercury's Board and Compensation Committee, and was a member of the Compensation Committee during the period of wrongdoing. As such, during the relevant time period, Shamir was responsible for approving the Company's compensation plans, including stock option grants, and for ensuring they were properly dated and accounted for.   The Special Committee named Shamir as one of three directors who should have questioned whether the grants of Company stock he approved in his role as a member of the Compensation Committee were properly dated and who "mistakenly relied on management to draft the paper documentation for the stock options grants and to account for the options properly."   Shamir was a member of the Board and the Compensation Committee in April 2002, and, as set forth above, should have discovered the options mispricing and taken appropriate action to protect the interests of the Company.   In December 2000, Shamir also approved the extension of the $1 million loan to Landan, despite not having approved the loan at the time it was made, and did not ensure the loan was proper or properly disclosed.   In addition, Shamir breached his fiduciary duties to the Company by not immediately terminating Landan, Smith, and Skaer for cause despite knowing of their malfeasance, and by not immediately requiring them to disgorge their ill-gotten gains, bonuses and equity-based compensation, and to return any unexecuted stock option grants. Shamir took no action during the relevant time period and cannot be expected to take action now. Moreover, his breaches of fiduciary duty during the relevant period expose him to a substantial likelihood of liability such that he cannot be expected to consider a demand, if one were made, in an independent and disinterested manner.

150.    Defendant Ostler suffers from irreconcilable conflicts of interest. Ostler is a member of the Mercury's Board, Audit Committee and Nominating and Corporate Governance Committee.  Ostler is also the Chairman of the Special Committee appointed by the Board in June 2002 to conduct an internal investigation of the Company's options mispricing and related internal control issues. As a member of the Company's Audit Committee, Ostler was responsible for approving the Company's financial statements and for reviewing the accounting work of the financial statements' preparation. Ostler was a member of the Board and the Compensation Committee as of May 2002, and, as set forth above, should have discovered the options mispricing and taken appropriate action to protect the interests of the Company.  In addition, Ostler breached his fiduciary duties to the Company by, *inter alia*, not immediately terminating Landan, Smith, and Skaer for cause despite knowing of their malfeasance; not immediately requiring them to disgorge their ill-gotten gains, bonuses and equity-based compensation, and to return any unexecuted stock option grants; and not recommending that Yaron, Kohavi, and Shamir be relieved of their duties as members of the Board, and, instead, electing Yaron, despite his inadequacies, as Chairman of Mercury's Board.  Ostler took no action during the relevant time period and cannot be expected to take action now.  Moreover, his breaches of fiduciary duty during the relevant period expose him to a substantial likelihood of liability such that he cannot be expected to consider a demand, if one were made, in an independent and disinterested manner.

151.    Defendant Boston suffers from irreconcilable conflicts of interest. Boston is a member of the Mercury's Board, Audit Committee and Compensation Committee.  Boston is also a member of the Special Committee appointed by the Board in June 2005 to conduct an internal investigation of the Company's options mispricing and related internal control issues. Boston breached his fiduciary duties to the Company by, *inter alia*, not immediately terminating Landan, Smith, and Skaer for cause despite knowing of their malfeasance; not immediately requiring them to disgorge their ill-gotten gains, bonuses and equity-based compensation, and to return any unexecuted stock option grants; and not recommending that Yaron, Kohavi, and Shamir be relieved of their duties as members of the Board, and, instead, electing Yaron, despite his

1    inadequacies, as Chairman of Mercury's Board.  Boston took no action during the relevant time
2    period and cannot be expected to take action now.  Moreover, his breaches of fiduciary duty
3    during the relevant period expose him to a substantial likelihood of liability such that he cannot be
4    expected to consider a demand, if one were made, in an independent and disinterested manner.  As
5    a member of the Compensation and Audit Committee, Boston faces a substantial likelihood of
6    personal liability and is hopelessly conflicted and cannot exercise independent judgment as a
7    member of the SLC.

8         152.    Defendant Zingale suffers from irreconcilable conflicts of interest. Zingale has
9    served on the Board since July 2002, and was appointed Chief Executive Officer to replace
10   Landan who resigned on November 2, 2005.  In his role as Director and as President of Mercury,
11   Zingale was privy to the Company's wrongs alleged herein. Zingale was a member of the Board
12   and the Compensation Committee as of July 2002, and, as set forth above, should have discovered
13   the options mispricing and taken appropriate action to protect the interests of the Company.  In
14   addition, Zingale breached his fiduciary duties to the Company by, *inter alia*, not immediately
15   terminating Landan, Smith, and Skaer for cause despite knowing of their malfeasance; not
16   immediately requiring them to disgorge their ill-gotten gains, bonuses and equity-based
17   compensation, and to return any unexecuted stock option grants; and not recommending that
18   Yaron, Kohavi, and Shamir be relieved of their duties as members of the Board, and, instead,
19   electing Yaron, despite his inadequacies, as Chairman of the Board.  Zingale was appointed by the
20   Board as the Company's CEO on November 2, 2005 and thus had a personal interest in
21   maintaining the status quo in the Board.  Zingale took no action during the relevant time period
22   and cannot be expected to take action now.  Moreover, his breaches of fiduciary duty during the
23   relevant period expose him to a substantial likelihood of liability such that he cannot be expected
24   to consider a demand, if one were made, in an independent and disinterested manner.

25        153.    Demand is futile because the Mercury's Board cannot be presumed to exercise
26   independent judgment in assessing the merits of a demand, if one were made, due to their personal
27   and financial interest in the subject matter of many of the claims raised in this Complaint.  During

28   CONSOLIDATED AMENDED DERIVATIVE COMPLAINT - CASE NO. 3:05-cv-04642 JF (PVT)

1   the relevant period, members of the Board received remuneration from the Company and sold
2   stock of the Company for substantial profit. The Mercury Board would thus be required
3   potentially to investigate and bring claims against themselves for their own misconduct, and
4   subject themselves to liability, embarrassment and risk of adverse consequences from their other
5   business engagements or interests.  No stockholder demand could or would prompt Mercury's
6   Board to take action.  As such, demand is excused.

7          154.   Finally, demand is excused because insurance policies covering the liability of a
8   company's officers and directors purport to exclude legal claims asserted directly by the company
9   against such persons.  Thus, there was, and is, a substantial disincentive for Mercury to bring any
10  action directly against the Defendants.  Generally, under the terms of such directors' and officers'
11  insurance policies, a company would be required by the carriers to cooperate in the defense of any
12  claims, such as in the present action, which seek to impose liability upon certain officers and
13  directors of Mercury, including the Defendants in this action, for misconduct and mismanagement.
14  Thus, if the policy or policies which Mercury maintains contain the foregoing provision, the
15  insurance carriers would argue that Mercury and its Board are thereby contractually disabled from
16  complying with any demand that would cause Mercury to institute, and/or prosecute any action
17  against the Defendants for such misconduct and mismanagement, because to do so could result in
18  the loss to Mercury of its insurance coverage.  Similarly, Mercury would be disabled from
19  pursuing the Defendants as it would not benefit from any insurance they may have.

20         155.   Actions by the Board to add independent directors and to insure that the Chairman
21  is disinterested *after* the first derivative action was filed also supports the conclusion that demand
22  was futile.  On December 15, 2005, the Board adopted an amendment and restatement of the
23  Bylaws of the Company to reflect that the Chairman shall be selected by the Board from the
24  independent directors.  On February 8, 2006, Mercury's Board elected Keller to the Board and
25  increased the size of the board to 8 persons under the Bylaw of the Company.  On February 22,
26  2006, Mercury appointed a second independent director to its Board.  The Board appointed Joseph
27  Costello, formerly CEO and president of Cadence Design Systems, Inc.  Having added two new
28

CONSOLIDATED AMENDED DERIVATIVE COMPLAINT - CASE NO. 3:05-cv-04642 JF (PVT)

1   independent directors to the Board since the Derivative Action was filed, Mercury concedes that

2   its Board was neither independent nor disinterested when the first Derivative Action was filed and

3   demand was futile.

### COUNT I

**Derivative Claim for Breach of Fiduciary Duty**
**(Against All Defendants)**

156.   Plaintiffs incorporate by reference all paragraphs above as if set forth herein.

157.   Defendants all owed fiduciary duties of loyalty and good faith to Mercury and its stockholders, including the duty to exercise due care and diligence in the management and administration of the affairs of the Company, as well as in the financial accounting, auditing and reporting of the Company, and owed the duty of full and candid disclosure of all material facts thereto.

158.   As fiduciaries, to discharge these duties, all of the Defendants were required to exercise prudent supervision over the management, policies, practices, controls, and financial and corporate affairs of Mercury.

159.   In performing the aforementioned services, Defendants all breached, and continue to breach, their fiduciary duties, causing damages to Mercury, in connection, *inter alia*, with:

   a.   Employees' intentional manipulation of their stock option grants by changing the dates on which they actually were granted to dates on which the stock was trading at a lower price, in order to get a lower "strike price" at which the options could be exercised, for the purpose of generating bigger profits upon the exercise of the options;

   b.   Employees' intentional misreporting of stock option grant exercise dates by reporting an exercise date on which the stock was trading at a lower price than on the date on which the option actually was exercised, which has the effect of reducing the taxable income of the employees, but exposes the Company to tax penalties for failure to pay withholding taxes;

   c.   Employees' self-dealing, including the improper manipulation of options and other misconduct, resulting in higher costs and other financial harm to Company;

   d.   The Director Defendants' approval, based on the recommendation

CONSOLIDATED AMENDED DERIVATIVE COMPLAINT - CASE NO. 3:05-cv-04642 JF (PVT)

of the Compensation Committee, of executive compensation plans, including stock option grants, with improper practices for the dating of the grants, or which could be manipulated to increase stock option grants proceeds or other compensation under the plans;

e.  Defendants' failure to discover and/or prevent the improper manipulation of employee stock option grants and employees' wrongdoing;

f.  Defendants' failure to discover and/or prevent the public misreporting of earnings caused by the manipulation of employee stock option grants, including its effect on stock option grant expenses and tax liabilities;

g.  Defendants' improper loan of $1 million to defendant Landan in 1999, without approval by the Board, and which was not properly disclosed in the Company's SEC filings;

h.  Defendants' failure to properly implement, oversee and maintain appropriate and adequate accounting and internal controls, practices and procedures;

i.  Defendants' failure to ensure that Mercury operated in compliance with all applicable federal and state laws, rules, and regulations requiring the dissemination of accurate financial statements;

j.  Defendants' failure to ensure that Mercury not engage in any unsafe, unsound, or illegal business practices;

k.  Defendants' failure to discover and/or prevent circumstances that could cause harm to the reputation and business of Mercury; and

l.  Defendants' failure to discover and/or prevent the exposure of the Company and its executives to civil and criminal liabilities.

160.   The Defendants' breaches of their fiduciary duties have proximately caused, and will continue to cause, Mercury to suffer substantial monetary damages as a result of the wrongdoing described herein, as well as further and even greater damage in the future, including damage to Mercury's reputation, business and good will.

161.   Mercury has been directly and substantially injured by reason of the Defendants' intentional breach and/or reckless disregard of their fiduciary duties to the Company. Plaintiff, as a shareholder and representative of Mercury, seeks damages and other relief for the Company, in an amount to be proven at trial.

CONSOLIDATED AMENDED DERIVATIVE COMPLAINT - CASE NO. 3:05-cv-04642 JF (PVT)

**COUNT II**

**Derivative Claim for Negligent Breach of Fiduciary Duties**
**(Against All Defendants)**

162.    Plaintiffs incorporate by reference all paragraphs above as if set forth herein.

163.    The Defendants engaged in the aforesaid conduct without exercising the reasonable and ordinary care owed to the Company by directors, officers, managing agents and employees of the Company.

164.    Mercury and its shareholders have been injured by reason of the Defendants' negligent breaches of their fiduciary duties.   Plaintiffs, as shareholders and representatives of Mercury, seeks damages and other relief for the Company as hereinafter set forth

**COUNT III**

**Derivative Claim for Unjust Enrichment**
**(Against Defendants Landan, Smith, and Skaer)**

165.    Plaintiffs incorporate by reference all paragraphs above as if set forth herein.

166.    Plaintiffs, derivatively on behalf of Mercury, allege unjust enrichment against Defendants Landan, Smith, and Skaer individually.

167.    These Defendants have been unjustly enriched, to the detriment of Mercury, as result of, *inter alia,* the improper exercise of stock option grants by intentionally selecting a favorable price for option grants and other misconduct, as alleged herein.

168.    During the period of wrongdoing, Landan received stock option grants as part of his executive compensation.  Upon information and belief, during the relevant period, Landan paid $5.5 million to exercise 813,000 options in Mercury, and sold 1.04 million shares for a total of $73.6 million. Landan also realized tax benefits while exposing the Company to tax penalties. Moreover, he was the recipient of an improper $1 million from the Company.

169.    During the period of wrongdoing, Smith received stock option grants as part of his executive compensation.  Upon information and belief, during the relevant period, Smith exercised 120,000 options and sold the same number of shares for a gain of $2.7 million.

170.    During the period of wrongdoing, Skaer received stock option grants as part of her

CONSOLIDATED AMENDED DERIVATIVE COMPLAINT - CASE NO. 3:05-cv-04642 JF (PVT)

executive compensation.  Upon information and belief, during the relevant period, Skaer exercised 65,170 options and by selling the shares, reaped profits of $1.1 million..

171.    Landan, Smith, and Skaer are liable and must account to Mercury for any and all profits that they unjustly derived from such executive compensation or improper manipulation of stock option grants.

172.    Mercury has been directly and substantially injured by reason of these individual Defendants' unjust enrichment.  Plaintiffs, as stockholders and representatives of Mercury, seek restitution, damages, an order of this Court disgorging all profits, benefits and other compensation, including unexercised stock option grants, obtained by these Defendants, imposition of a constructive trust over all profits, benefits and other compensation, including unexercised stock option grants, and other relief for the Company, in an amount to be proven at trial.

## COUNT IV

### Derivative Claim for Contribution and Indemnification
### (Against All Defendants)

173.    Plaintiffs incorporate by reference all paragraphs above as if set forth herein.

174.    Mercury is alleged to be liable to various persons, entities and/or classes by virtue of the same facts or circumstances as are alleged herein to give rise to the Defendants' liability to Mercury.

175.    In addition, the Defendants' misconduct and wrongdoing, and the disclosures and events described herein, have had, and will continue to have, a series of deleterious effects on Mercury, including but not limited to:

a.    Loss of confidence of the investing public in the integrity and management of Mercury, thereby resulting in Mercury losing market value;

b.    Serious and adverse tax consequences;

c.    Increased premium of $40 million under the Company's Indenture Agreement with the holders of Mercury's 2007 and 2008 Notes;

d.    Increased costs relating to the investigation (already over $1 million) by the Special Committee and the SEC, costs associated with NASDAQ hearings on delisting, costs associated with the

CONSOLIDATED AMENDED DERIVATIVE COMPLAINT - CASE NO. 3:05-cv-04642 JF (PVT)

financial restatements, and increased cost for lines of credit; and

e.   As a result of the Defendants' misconduct, Mercury is now exposed to SEC scrutiny and inquiry, and to suit by investors for losses resulting from their misconduct and fraudulent activities, thereby, at a minimum, causing the Company to incur unnecessary direct and indirect investigatory, litigation and administrative costs, and potentially resulting in awards, judgments or settlements against Mercury.

176.   By reason of the accounting misstatements and other related misconduct described herein, Mercury's alleged liability arises, in whole or in part, from the intentional, knowing, reckless, disloyal and bad faith acts or omissions of the Defendants as previously alleged herein.

177.   Mercury is therefore entitled to contribution and indemnification from each of the Defendants in connection with all such claims that have been, are or may in the future be asserted against Mercury by virtue of Defendants' misconduct and wrongdoing.

## COUNT V

### Derivative Claim for Disgorgement under Sarbanes-Oxley Act Of 2002 (Against Defendants Landan and Smith)

178.   Plaintiffs incorporate by reference all paragraphs above as if set forth herein.

179.   Pursuant to Sarbanes-Oxley Act of 2002 §304, 15 U.S.C. §7243, because Mercury announced that it will prepare accounting restatements for fiscal years 2002, 2003 and 2004, and the first quarter of 2005, due to material noncompliance with the financial reporting requirements under the securities laws as a result of the misconduct alleged herein between 1995 through the present, Defendants Landan and Smith, Mercury's CEO and CFO, respectively, are required to reimburse Mercury for all bonuses or other incentive-based or equity-based compensation received by them from Mercury during the restatement period, including the return of all unexercised stock option grants.

180.   Defendants Landan and Smith are also liable to Plaintiffs for reasonable costs and attorneys' fees in the prosecution of this derivative action on behalf of Mercury.

CONSOLIDATED AMENDED DERIVATIVE COMPLAINT - CASE NO. 3:05-cv-04642 JF (PVT)

1

## COUNT VI

2

### Derivative Claim for Violation of Section 10(b) of the
3  ### Securities and Exchange Act Of 1934
### (Against Defendants Landan, Smith, and Skaer)

4       181.    Plaintiffs incorporate by reference all paragraphs above as if set forth herein.

5       182.    During the period of wrongdoing, Defendants Landan, Smith, and Skaer employed
6  devices, schemes or artifices to defraud and engaged in acts, practices or a course of business that
7  operated as a fraud on the Company by, among other things: (a) securing stock option grants from
8  the Company, and knowingly and intentionally backdating such stock option grants in order to
9  reap higher but unlawful profits upon the exercise of the options; (b) knowingly and intentionally
10 exercising stock option grants in order to unlawfully overcompensate themselves to the detriment
11 of the Company; (c) knowingly and intentionally exercising stock options in order to reduce their
12 taxable income and thereby exposing the Company to tax liability; (d) knowingly and intentionally
13 misreporting to the Company and to the public the dates of their stock option grants and exercise
14 dates of stock option grants; and (e) knowingly and intentionally causing the Company to file
15 inflated financial statements during the period of wrongdoing.

16      183.    By virtue of the foregoing, Landan, Smith, and Skaer violated Section 10(b) of the
17 Securities and Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated
18 thereunder.

19      184.    As a direct and proximate result of defendants' wrongful conduct, the Company has
20 suffered damages in connection with Landan, Smith, and Skaer's receipt and exercise of stock
21 option grants, in an amount to be proven at trial.

22

## COUNT VII

23

### Derivative Claim for Violation of Section 14(A) of the Exchange Act
24 ### (Against All Defendants)

      185.    Plaintiffs incorporate by reference all paragraphs above as if set forth herein.
25
      186.    This claim is brought by Plaintiffs derivatively on behalf of Mercury against the
26
Defendants for violations Section 14(a) of the Exchange Act and Rule 14a-9 promulgated
27
thereunder by the SEC.
28

CONSOLIDATED AMENDED DERIVATIVE COMPLAINT - CASE NO. 3:05-cv-04642 JF (PVT)

187.   The Proxy Statement, which was circulated to Mercury's shareholders, sought shareholder approval for the reelection of each of the Director Defendants named herein.

188.   The Proxy Statement was materially false and misleading in that the Defendants were aware, or should have been aware, but did not disclose that:

   a.   The dates on options granted to employees, including the Individual Defendant who were up for board reelection, were backdated to favor the grantees;

   b.   That the Company did not calculate the exercise price of options using the method stated in the Proxy Statement;

   c.   That the Company's internal controls and accounting practices were inadequate and the Company did not "have in place a variety of policies and practices to promote good corporate governance; and

   d.   That the Compensation and Audit Committees did not adequately perform their function because top executives were allowed to manipulate the Company's stock option programs to their benefit since 1995.

189.   The misstatements and omissions alleged above were material.  Had the truth been disclosed, Mercury shareholders may well have elected different directors to Mercury's board.

190.   Mercury has been injured by the material misstatements and omissions from the Proxy Statement.  Mercury has no adequate remedy at law and is therefore entitled to equitable relief including, without limitation, an order setting aside the election of the Director Defendants, all of whom were reelected to the Mercury's Board pursuant to the Proxy Statement.  Further, Mercury is entitled to recover damages to compensate the Company for all damages resulting from the Defendants acts and omissions in violation of Rule 14a-9.

191.   This action was timely commenced within three years of the date of the Proxy Statement and within one year from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based.

## COUNT VIII

### Derivative Claim for Abuse of Control
### (Against All Defendants)

192.   Plaintiffs incorporate by reference all paragraphs above as if set forth herein.

CONSOLIDATED AMENDED DERIVATIVE COMPLAINT - CASE NO. 3:05-cv-04642 JF (PVT)

193.   Defendants, by engaging in the wrongdoing alleged herein, abused their control as executives and/or directors of Mercury, for which they are liable.

194.   As a direct and proximate result of Defendants' wrongful conduct, the Company has suffered damages in an amount to be proven at trial.

**COUNT IX**

**Derivative Claim for Gross Mismanagement**
**(Against All Defendants)**

195.   Plaintiffs incorporate by reference all paragraphs above as if set forth herein.

196.   Defendants, by engaging in the wrongdoing alleged herein, were grossly negligent and grossly mismanaged the Company to which they owed fiduciary duties, and for which they are liable.

197.   As a direct and proximate result of Defendants' wrongful conduct, Mercury has suffered damages in an amount to be proven at trial.

**COUNT X**

**Derivative Claim for Waste of Corporate Assets**
**(Against All Defendants)**

198.   Plaintiffs incorporate by reference all paragraphs above as if set forth herein.

199.   Defendants, by engaging in the wrongdoing alleged herein, wasted corporate assets by, among other things, improperly granting stock option grants, improperly manipulating stock option grants, failing to recover improperly secured profits, damaging the goodwill and reputation of the Company, and exposing the company to civil and criminal liability, for which they are liable.

200.   As a direct and proximate result of Defendants' wrongful conduct, Mercury has suffered damages in an amount to be proven at trial.

**COUNT XI**

**Derivative Claim for Violations of §16(b) of the Exchange Act**
**(Against All Defendants)**

201.   Plaintiffs incorporate by reference all paragraphs above as if set forth herein.

CONSOLIDATED AMENDED DERIVATIVE COMPLAINT - CASE NO. 3:05-cv-04642 JF (PVT)

202.   Section 16(b) of the Exchange Act provides that if a person, who is an officer or director of an issuer of a class of registered equity securities, purchases, and sells or sells and purchases shares of any equity security of such issuer within a period of less than six months, any profits arising from those transactions are recoverable by the issuer or by a shareholder suing derivatively on its behalf.

203.   SEC Rule 16b-3(d) provides an exemption for "transactions between an issuer and its officers or directors" if the transaction satisfies certain conditions.  The Rule requires, *inter alia*, that the Board or a committee of non-employee directors of the Board approve the transaction in advance and in good faith, as a gate-keeper, with an eye towards preventing speculative abuse by its officers and directors.  The SEC noted in the Release proposing the Rule that it sought to craft a rule that, consistent with the statutory purpose of Section 16(b), erected meaningful safeguards against the abuse of inside information by officers and directors without impeding their participation in legitimate compensatory transactions.   Ownership Reports and Trading by Officers, Directors and Principal Stockholders, Exchange Act Release No. 36356, 60 Fed. Reg. 53832, 53835, 60 SEC Docket 1393, 1396, 1995 WL 597472 at *3, *7 (Oct. 11, 1995).

204.   The stock option grants received by Skaer, Landan, and Smith were not properly approved by the Company's Compensation Committee, these stock option grants are not exempt under SEC Rule 16b-3(d) and constitute non-exempt purchases under Section 16(b).

205.   At all relevant times, Skaer, Landan, and Smith were officers or directors of the Company.

206.   Under Section 16(b), the stock option grants received by Skaer, Landan, and Smith were purchases and are matchable with the purchases and sales made the individual defendants within the six-month statutory period.  Skaer, Landan, and Smith would often exercise the options, buy and sale all at once.  For example, on October 27, 2003 and January 1, 2004, Smith exercised an option to purchase 100,000 and 20,000 shares respectively at $24.29 (Smith has since admitted the correct strike price was $28.05).  On the same day that he purchased the shares, he sold 100,000 and 20,000 shares respectively, for $45.757 and $51.02 per share.  He had made proceeds

of over $2.6 million.  Plaintiffs believe that upon further discovery and investigation, the evidence will also demonstrate that both Landan and Skaer bought and sold Mercury common stock within six months based on back-dated options.

207.    As a result, Skaer, Landan, and Smith garnered an indeterminate sum of short-swing profits which is subject to disgorgement, which is believed to be substantially in excess of $50,000,000.

## COUNT XII

### Negligent Accounting
### (Against PWC)

208.    Plaintiffs incorporate by reference all paragraphs above, as if set forth herein.

209.    PWC was retained by Mercury and the individual defendants to act as the Company's independent auditor.  PWC issued unqualified audit opinions from 1996 through 2004.  As part of the unqualified opinions as required by Generally Accepted Auditing Standards ("GAAS"), PWC stated that Mercury's financial statements were presented in accordance with GAAP. As was later admitted by Mercury, the financial reports of the Company were not GAAP compliant because of the manipulation of stock options given to Landan, Smith, and Skaer.

210.    PWC knew or should have known but for its own negligence that Mercury's financial reports were materially incorrect by failing to accurately reflect compensation and in particular the treatment of stock options held by Landan, Smith, and Skaer.

211.    Under GAAS, the independent auditor is responsible for compliance with GAAS in an audit engagement.  The 10 general standards are as follows:

**General Standards**

      a.    The audit is to be performed by a person or persons having adequate technical training and proficiency as an auditor.

      b.    In all matters relating to the assignment, independence in mental attitude is to be maintained by the auditor or auditors.

      c.    Due professional care is to be exercised in the performance of the audit of the preparation of the report.

CONSOLIDATED AMENDED DERIVATIVE COMPLAINT - CASE NO. 3:05-cv-04642 JF (PVT)

**Standards of Fieldwork**

a. The work is to be adequately planned and assistants, if any, are to be properly supervised.

b. A sufficient understanding of the internal control structure is to be obtained to plan the audit and to determine the nature, timing and extent of tests to be performed

c. Sufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit.

**Standards of Reporting**

a. The report shall state whether the financial statements are presented in accordance with GAAP.

b. The report shall identify those circumstances in which such principles have not been consistently observed in the current period in relation to the preceding period.

c. Informative disclosures in the financial statements are to be regarded as reasonably adequate unless otherwise stated in the report.

d. The report shall either contain an expression of opinion regarding the financial statements, taken as a whole, or an assertion to the effect that an opinion cannot be expressed. When an overall opinion cannot be expressed, the reasons therefore should be stated. In all cases when an auditor=s name is associated with financial statements, the report should contain a clear-cut indication of the character of the auditor=s work, if any, and the degree of responsibility the auditor is taking.

212. PWC was negligent in performing its audit work and as a result violated each of the GAAS standards set forth above.

213. PWC was also negligent by failing to require Mercury to disclose material adverse facts and allowed the Company to make material misrepresentations to their shareholders and to the investing public.

214. In providing auditing services to Mercury, PWC owed a duty to Mercury and its shareholders to use such skill, care and diligence as other members of its profession commonly exercised. The accountants, however, breached such duty by committing the wrongful acts and conduct alleged herein.

215.   As a proximate result of PWC's negligent performance of its duties, Mercury and its shareholders have been damaged.

## COUNT XIII

### Aiding and Abetting of Claims
### (Against PWC)

216.   Plaintiffs incorporate by reference all paragraphs above as if set forth herein.

217.   PWC, as the independent auditor of Mercury, was given unfettered access to the internal financial information about Mercury. As a result, PWC was or should have been aware of the materially incorrect financial accounting and reporting at the Company.

218.   With knowledge of the wrongdoing, PWC also knew that the investing public would rely to its detriment upon the false and misleading financial reports issued by Mercury.

219.   Nevertheless by taking no action to correct the wrongful reporting and, indeed issuing audit opinions without reservation, PWC aided and abetted the individual defendants in breaching their fiduciary obligations, violating securities laws, and breach other common law obligations.

220.   As a proximate result of the aiding and abetting by PWC, Mercury and its shareholders have been damaged thereby

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on their own behalf, and derivatively on behalf of Mercury, pray for judgment as follows:

A.   As to Count I, Breach of Fiduciary Duty, against all the Defendants:

(1)   an award of monetary damages to Plaintiffs, on behalf of Mercury, against all of the Defendants, for all losses and/or damages suffered by Mercury as a result of the wrongdoings complained of herein, together with prejudgment and post-judgment interest thereon, in an amount to be proved at trial;

B.   As to Count II, Negligent Breach of Fiduciary duty , against all Defendants:

(1)   an award of monetary damages to Plaintiffs, on behalf of Mercury, against all of the Defendants, for all losses and/or damages suffered by Mercury as a result of the wrongdoings complained of herein, together with prejudgment and post-judgment interest

CONSOLIDATED AMENDED DERIVATIVE COMPLAINT - CASE NO. 3:05-cv-04642 JF (PVT)

thereon, in an amount to be proved at trial;

C.      As to Count III, Unjust Enrichment, against Defendants Landan, Smith and Skaer, individually:

(1)     an award of monetary damages to Plaintiffs, on behalf of Mercury, against Defendants Landan, Smith, and Skaer, for all losses and/or damages suffered by Mercury as a result of the wrongdoings complained of herein, together with prejudgment and post-judgment interest thereon, in an amount to be proved at trial;

(2)     an order directing the Defendants to account to Mercury for all damages sustained or to be sustained by the Company, and all profits obtained by Landan, Smith, and Skaer by reason of the wrongs alleged herein;

(3)     an order requiring Landan, Smith, and Skaer to return to Mercury all incentive-based or equity-based compensation paid to them by the Company during the time they were in breach of their fiduciary duties that they owed to Mercury;

(4)     an order requiring Landan, Smith, and Skaer to return to Mercury all unexercised stock option grants granted to them by the Company during the period of wrongdoing;

(5)     an order imposing a constructive trust on all profits obtained by Landan, Smith, and Skaer by reason of the wrongs alleged herein; all incentive-based compensation and equity-based compensation paid to them by the Company during the period of time they were in breach of their fiduciary duties that they owed to Mercury; and all unexercised stock option grants granted to them by the Company during the period of wrongdoing; and

(6)     an order directing Landan, Smith, and Skaer to pay interest at the highest rate allowable by law, on the amount of damages sustained by Mercury and the unlawful profits of these individuals, as a result of misconduct described herein;

D.      As to Count IV, Contribution and Indemnification, against all the Defendants:

(1)     contribution and indemnification from each of the Defendants in connection with all such claims that have been, are or may in the future be asserted against Mercury by virtue of Defendants' misconduct and wrongdoing alleged herein;

E.      As to Count V, Disgorgement under Sarbanes-Oxley Act of 2002, against Defendants Landan and Smith, individually:

(1)     disgorgement by Defendants Landan and Smith for all bonuses or other incentive-based or equity-based compensation received by

CONSOLIDATED AMENDED DERIVATIVE COMPLAINT - CASE NO. 3:05-cv-04642 JF (PVT)

them from Mercury during the restatement period; and

(2)   an order imposing a constructive trust on all unexercised stock option grants granted to them by the Company during the period of wrongdoing;

F.   As to Count VI, Derivative Claim for Violation of  Section 10(b) of the Securities and Exchange Act of 1934, against Defendants Landan, Smith, and Skaer, individually:

(1)   an award of monetary damages to Plaintiffs, on behalf of Mercury, against Defendants Landan, Smith, and Skaer, for all losses and/or damages suffered by Mercury as a result of the wrongdoings complained of herein, together with prejudgment and post-judgment interest thereon, in an amount to be proved at trial;

G.   As to Count VII, Derivative Claim for Violation of Section 14(a) of the Exchange Act, against all Defendants:

(1)   an award of monetary damages to Plaintiffs, on behalf of Mercury, against Defendants, for all losses and/or damages suffered by Mercury as a result of the wrongdoings complained of herein, together with prejudgment and post-judgment interest thereon, in an amount to be proved at trial;

H.   As to Count VIII, Derivative Claim for Abuse of Control, against all Defendants:

(1)   an award of monetary damages to Plaintiffs, on behalf of Mercury, against all Defendants for all losses and/or damages suffered by Mercury as a result of the wrongdoings complained of herein, together with prejudgment and post-judgment interest thereon, in an amount to be proved at trial;

I.   As to Count IX, Derivative Claim for Gross Mismanagement, against all Defendants:

(1)   an award of monetary damages to Plaintiffs, on behalf of Mercury, against all Defendants for all losses and/or damages suffered by Mercury as a result of the wrongdoings complained of herein, together with prejudgment and post-judgment interest thereon, in an amount to be proved at trial;

J.   As to Count X, Derivative Claim for Waste of Corporate Assets, against all Defendants:

(1)   an award of monetary damages to Plaintiffs, on behalf of Mercury, against all Defendants for all losses and/or damages suffered by Mercury as a result of the wrongdoings complained of herein, together with prejudgment and post-judgment interest thereon, in an amount to be proved at trial;

CONSOLIDATED AMENDED DERIVATIVE COMPLAINT - CASE NO. 3:05-cv-04642 JF (PVT)

K.    As to Count XI, Derivative Claim for Violation of §16(b) of the Exchange Act, against defendants all Defendants:

    (1)    disgorgement by defendants of all proceeds from short swing profits;

    (2)    an award of monetary damages to Plaintiffs, on behalf of Mercury, against all Defendants for all losses and/or damages suffered by Mercury as a result of the wrongdoings complained of herein, together with prejudgment and post-judgment interest thereon, in an amount to be proved at trial;

L.    As to Count XII, Negligent Accounting Against PWC:

    (1)    an award of monetary damages to Plaintiffs, on behalf of Mercury, against PWC for all losses and/or damages suffered by Mercury as a result of the wrongdoings complained of herein, together with prejudgment and post-judgment interest thereon, in an amount to be proved at trial;

M.    As to Count XIII, Aiding and Abetting Of Claims Brought Against PWC:

    (1)    an award of monetary damages to Plaintiffs, on behalf of Mercury, against PWC for all losses and/or damages suffered by Mercury as a result of the wrongdoings complained of herein, together with prejudgment and post-judgment interest thereon, in an amount to be proved at trial;

N.    Awarding Plaintiffs, on behalf of Mercury, all equitable and injunctive relief permitted by law and equity, including the imposition of a constructive trust and attachment of assets, as may be necessary to grant to Mercury all relief to redress all of the harm suffered by Mercury as a result of Defendants' wrongdoing;

O.    Ordering Defendants to take all actions necessary to improve its corporate governance, including full compliance with the Sarbanes Oxley Act of 2002;

P.    Awarding Plaintiffs the fees and expenses incurred in this action, including reasonable allowance of fees for Plaintiffs' attorneys and experts; and

Q.    Granting Plaintiffs such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury of all issues so triable.

CONSOLIDATED AMENDED DERIVATIVE COMPLAINT - CASE NO. 3:05-cv-04642 JF (PVT)

1

## CERTIFICATION OF INTERESTED ENTITIES OR PERSONS

2        Pursuant to Civil L.R. 3-16, the undersigned certifies that as of this date, other than the

3   named parties, there is no such interest to report.

4   DATED:  May 22, 2006              WOLF HALDENSTEIN ADLER
                                        FREEMAN & HERZ LLP
5                                     FRANCIS M. GREGOREK
                                      BETSY C. MANIFOLD
6                                     FRANCIS A. BOTTINI, JR.
                                      RACHELE R. RICKERT
7

8

9                                     *Betsy C Manifold*
10                                        BETSY C. MANIFOLD

11                                    750 B Street, Suite 2770
                                      San Diego, CA 92101
12                                    Telephone:  619/239-4599
                                      Facsimile:   619/234-4599
13
                                      WOLF HALDENSTEIN ADLER
14                                      FREEMAN & HERZ LLP
                                      MARK C. RIFKIN
15                                    270 Madison Avenue
                                      New York, NY 10016
16                                    Telephone:  212/545-4600
                                      Facsimile:   212/545-4677
17
                                      Chair of Plaintiffs' Executive Committee
18
                                      WECHSLER HARWOOD LLP
19                                    ROBERT HARWOOD
                                      488 Madison Avenue, 8th Floor
20                                    New York, NY 10022
                                      Telephone:  212/935-7400
21                                    Facsimile:   212/753-3630

22                                    MILBERG WEISS BERSHAD
                                        & SHULMAN LLP
23                                    JEFFREY S. WESTERMAN
                                      355 S. Grand Avenue, Suite 4170
24                                    Los Angeles, CA 90071
                                      Telephone: 213/617-1200
25                                    Facsimile:  213/617-1975
26

27

28
     CONSOLIDATED AMENDED DERIVATIVE COMPLAINT - CASE NO. 3:05-cv-04642 JF (PVT)

1

SCHIFFRIN & BARROWAY LLP
ERIC ZAGAR

2

280 King of Prussia Road
Radnor, PA 19807

3

Telephone: 610/667-7706
Facsimile: 610/667-7056

4

5

Plaintiffs' Executive Committee

6

DANZIGER SHAPIRO & LEAVITT PC
DOUGLAS M. LEAVITT

7

2101 Pine Street, Third Floor

8

Philadelphia, PA 19103
Telephone: 215/545-4830

9

Facsimile: 215/5455-6710

10

BORNSTEIN & BORNSTEIN

11

JONATHAN HERSCHEL BORNSTEIN
2590 Geary Boulevard

12

San Francisco, CA 94115
Telephone: 415/409-7611

13

Facsimile: 415/409-9345

14

15

BULL & LIFSHITZ
JOSHUA M. LIFSHITZ

16

18 East 41st Street
New York, NY 10017

17

Telephone: 212/213-6222
Facsimile: 212/205-6823

18

19

JOHNSON LAW FIRM APC
FRANK J. JOHNSON

20

402 West Broadway, Suite 2700

21

San Diego, CA 92101
Telephone: 619/230-0063

22

Facsimile: 619/230-1839

23

PROVOST & UMPHREY LAW FIRM, LLP

24

JOE KENDALL
WILLIE C. BRISCOE

25

3232 McKinney Avenue, Suite 700
Dallas, TX 75204

26

Telephone: 214/744-3000

27

Facsimile: 214/744-3015

28

CONSOLIDATED AMENDED DERIVATIVE COMPLAINT - CASE NO. 3:05-cv-04642 JF (PVT)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICE OF ALFRED G. YATES, JR., P.C.
ALFRED G. YATES, JR.
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA 15219
Telephone: 412/391-5164
Facsimile:  412/471-1033

MERCURY:  13295.CPT

CONSOLIDATED AMENDED DERIVATIVE COMPLAINT - CASE NO. 3:05-cv-04642 JF (PVT)

1

**DECLARATION OF SERVICE**

2

I, BORANY T. REINBOLD, the undersigned, declare:

3

    1.    That declarant is and was, at all times herein mentioned, a citizen of the United

4

States and a resident of the County of San Diego, over the age of 18 years, and not a party to or

5

interested in the within action; that declarant's business address is 750 B Street, Suite 2770, San

6

Diego, California 92101.

7

    2.    That on May 22, 2006, declarant served **CONSOLIDATED AMENDED**

8

**DERIVATIVE COMPLAINT** via the CM/ECF System to the parties so indicated on the

9

attached service list, who are registered participants of the CM/EMF System.

10

    3.    That on May 22, 2006, declarant served the parties so indicated on the attached

11

service list, who are not registered participants of the CM/ECF System, via U.S. Mail.

12

    4.    That there is regular communication by mail, facsimile, and electronic mail within

13

this office.

14

I declare under penalty of perjury that the foregoing is true and correct.  Executed this

15

22nd day of May 2006, at San Diego, California.

16

17

18

19

               BORANY T. REINBOLD

20

21

22

23

24

25

26

27

28

CONSOLIDATED AMENDED DERIVATIVE COMPLAINT - CASE NO. 3:05-cv-04642 JF (PVT)

MERCURY INTERACTIVE
Service List — May 22, 2006
Page 1

<u>COUNSEL FOR PLAINTIFFS</u>

Francis M. Gregorek
Betsy C. Manifold
Francis A. Bottini, Jr.
Rachele R. Rickert
WOLF HALDENSTEIN ADLER
 FREEMAN & HERZ LLP
750 B Street, Suite 2770
San Diego, CA 92101
    619/239-4599
    619/234-4599 (fax)
manifold@whafh.com
rickert@whafh.com

** Mark C. Rifkin
   Demet Basar
   WOLF HALDENSTEIN ADLER
    FREEMAN & HERZ LLP
   270 Madison Avenue
   New York, NY 10016
       212/545-4600
       212/545-4653 (fax)
   rifkin@whafh.com
   basar@whafh.com

** Robert I. Harwood
   Matthew M. Houston
   WECHSLER HARWOOD LLP
   488 Madison Avenue, 8th Floor
   New York, NY 10022
       212/935-7400
       212/753-3630 (fax)
   rharwood@whesq.com
   mhouston@whesq.com

** Jeff S. Westerman
   MILBERG WEISS BERSHAD
    & SCHULMAN LLP
   355 South Grand Avenue, Suite 4170
   Los Angeles, CA 90071
       213/617-1200
       213/617-1975 (fax)
   jwesterman@milbergweiss.com

** Peter E. Seidman
   Andrei V. Rado
   MILBERG WEISS BERSHAD
    & SCHULMAN LLP
   One Pennsylvania Plaza
   New York, NY 10119
       212/594-5300
       212/868-1229 (fax)
   sschulman@milbergweiss.com
   pseidman@milbergweiss.com
   arado@milbergweiss.com

*  Jonathan Herschel Bornstein
   Kathryn Quetel
   BORNSTEIN & BORNSTEIN
   2590 Geary Boulevard
   San Francisco, CA 94115-3318
       415/409-7611
       415/409-9345 (fax)
   jonathan@bornsteinandbornstein.com

** Douglas M. Leavitt
   DANZIGER SHAPIRO & LEAVITT PC
   2101 Pine Street, Third Floor
   Philadelphia, PA 19103
       215/545-4830
       215/545-6710 (fax)
   leavitt@ds-l.com

*  Frank J. Johnson
   JOHNSON LAW FIRM APC
   402 West Broadway, Suite 2700
   San Diego, CA 92101
       619/230-0063
       619/230-1839 (fax)
   frank@johnsonlawfirmapc.com

** Alfred Glenn Yates, Jr.
   LAW OFFICE OF ALFRED G. YATES JR., P.C.
   519 Allegheny Building
   429 Forbes Avenue
   Pittsburgh, PA 15219
       412/391-5164
       412/471-1033 (fax)
   yateslaw@aol.com

*       Indicates those parties served electronically via the CM/ECF System
**      Indicates those parties served via U.S. Mail

MERCURY INTERACTIVE
Service List — May 22, 2006
Page 2

<u>COUNSEL FOR PLAINTIFFS</u>

** Joe Kendall
Willie C. Briscoe
PROVOST & UMPHREY LAW FIRM, LLP
3232 McKinney Avenue, Suite 700
Dallas, TX 75204
        214/744-3000
        214/744-3015 (fax)

*  Mark A. Topaz
Eric L. Zagar
SCHIFFRIN & BARROWAY, LLP
280 King of Prussia Road
Radnor, PA 19087
        610/667-7706
        610/667-7056 (fax)
ezagar@sbclasslaw.com
mtopaz@sbclasslaw.com

** Joshua M. Lifshitz
BULL & LIFSHITZ
18 East 41st Street, 11th Floor
New York, NY 10017
        212/213-6222
        516/205-6823 (fax)
jml@nyclasslaw.com

*  Stephen Lyle Porter
WHITEHEAD PORTER & GORDON LLP
200 Montgomery Street, Suite 1850
San Francisco, CA 94104
        415/781-6070
        415/788-6521 (fax)
slp@wpglaw.com

**Glenn F. Ostranger
OSTRANGER CHONG & FLAHERTY LLP
825 Third Avenue
New York, NY 10022
        212/826-6565
        212/826-5909 (fax)

**Paul D. Wexler
BRAGAR WEXLER EAGEL
   & MORGENSTEIN LLP
885 Third Avenue
New York, NY 10022
        212/308-5858
        212/486-0462 (fax)

<u>COUNSEL FOR DEFENDANTS</u>

** Melinda Haag
James Kramer
Todd Scott
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, California 94105
        415/773-5610
        415/773-5759 (fax)
tscott@orrick.com
jkramer@orrick.com

*Attorneys for Defendant Susan Skaer*

** Eric S. Goldstein
Mark F. Pomerantz
PAUL WEISS
1285 Avenue of the Americas
New York, NY 10019-6064
        212-373-3000
        212-757-3990 (fax)
egoldstein@paulweiss.com
mpomerzntz@paulweiss.com

**Jan Nielsen Little
Asim Bhansali
KEKER & VAN NEST LLP
710 Sansome Street
San Francisco, California 94111
        415/391-5400
        415/397-7188 (Fax)
jlittle@kvn.com
abhansali@kvn.com

*Attorneys for Defendants Igal Kohavi, Giora Yaron
and Yair Shamir*

**William Goodman
Andrea DeShazo
TOPEL & GOODMAN
832 Sansome Street, 4th Floor
San Francisco, CA  94111
        415/421-6140
        415/398-5030 (fax)
wmg@topelgoodman.com
apd@topelgoodman.com

*Attorneys for Defendant Bryan LeBlanc*

*        Indicates those parties served electronically via the CM/ECF System
**      Indicates those parties served via U.S. Mail

MERCURY INTERACTIVE
Service List — May 22, 2006
Page 3

## COUNSEL FOR DEFENDANTS

\* Sara Brody
  Nicole Acton Jones
  HELLER EHRMAN LLP
  333 Bush Street
  San Francisco, CA 94104
      415/772-6032
      415/772-6268 (fax)
  sara.brody@hellerehrman.com
  nicole.jones@hellerehrman.com

\* Norman J. Blears
  HELLER EHRMAN LLP
  275 Middlefield Road
  Menlo Park, CA 94025-3506
      650/324-7000
      650/324-0638 (fax)
  norman.blears@hellerehrman.com

*Attorneys for Defendants Mercury Interactive, Clyde Ostler, Brad Boston, and Anthony Zingale*

\* Jeffrey S. Facter
  Patrick D. Robbins
  SHEARMAN & STERLING LLP
  525 Market Street
  San Francisco, CA 94105
      415/616-1000
      415/616-1199 (fax)
  jfacter@shearman.com
  probbins@shearman.com

*Attorneys for Defendant Douglas P. Smith*

\* Kirk A. Dublin
  John D. Cline
  Elise N. Milstein
  JONES DAY
  555 California Street, 26th Floor
  San Francisco, CA 94104
      415/875-5812
      415/875-5700 (fax)
  kdublin@jonesday.com
  jcline@jonesday.com
  emilstein@jonesday.com

\*\* Jonathan Cohen
  Robyn Callahan
  KIRKPATRICK LOCKHART NICHOLSON
    & GRAHAM LLP
  Four Embarcadero Center, 10th Floor
  San Francisco CA 94111
      415/249-1000
      415/249-1001 (fax)
  jcohen@klng.com
  rcallahan@klng.com

\*\*Franklin Velie
  Andrew Solomon
  SULLIVAN & WORCESTER LLP
  1290 Avenue of the Americas
  New York, NY 10104
      212/660-3037
      212/660-3001 (fax)
  fvelie@sandw.com
  asolomon@sandw.com

*Attorneys for Defendant Amnon Landan*

\*\*Jared L. Kopel
  WILSON, SONSINI, GOODRICH & ROSATI
  650 Page Mill Road
  Palo Alto, CA 94304-1050
      650/493-9300
      650/493-6811 (fax)
  jkopel@wsgr.com

*Attorneys for Defendant Kenneth Klein*

\*     Indicates those parties served electronically via the CM/ECF System
\*\*   Indicates those parties served via U.S. Mail